UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHLEEN MAKINEN, JAMIE NARDINI,
and ANGEL TORRES,

                                    Plaintiffs,

        - against –

CITY OF NEW YORK; RAYMOND W. KELLY,
as Police Commissioner of the City of New York;
NEW YORK CITY POLICE DEPARTMENT;
and SERGEANT DANIEL J. SWEENEY, individually
and in his official capacity,

                                    Defendants.

**AMENDED
COMPLAINT AND
DEMAND FOR
JURY TRIAL**

11 Civ. 7535 (ALC/GWG)

        Plaintiffs Kathleen Makinen, Jamie Nardini and Angel Torres, by and through their

attorneys, Gleason, Dunn, Walsh & O'Shea, as and for their Amended Complaint against the

defendants, allege as follows:

## INTRODUCTION

        1.        This is a civil action to remedy defendants' unlawful actions, omissions and

practices against the plaintiffs, who are current and former police officers employed by the

New York City Police Department.

        2.        Defendants' acts, practices and omissions detailed herein constitute violations

of: the New York State Human Rights Law (New York Executive Law §§290 *et seq.*); the New

York City Human Rights Law (Administrative Code of the City of New York §8-107); the

Americans with Disabilities Act (42 U.S.C. §§ 12101 *et seq.*); the Fair Labor Standards Act (29

U.S.C. §§ 201 *et. seq.*); New York Labor Law §§190 *et seq.*; New York Public Health Law

§18; and common law, in the form of breach of duty of confidentiality, negligence, defamation and defamation *per se*.

3.    Plaintiffs seek attorneys' fees pursuant to: 29 U.S.C. §216; 42 U.S.C. §12205; and the Administrative Code of the City of New York §8-502(f).

## JURISDICTION AND VENUE

4.    The New York State Supreme Court is a court of general and original jurisdiction pursuant to the New York State Constitution, Article 6, §7, and New York Judiciary Law §140-b.    This Court has jurisdiction to determine plaintiffs' claims herein described.

5.    Certain of defendants' acts and practices described herein were committed in the State of New York, County of New York, where defendants City of New York and New York City Police Department are located.    Accordingly, venue lies in New York County Supreme Court.

6.    Plaintiffs demand a jury trial in this action.

## PARTIES

7.    Plaintiff Jamie Nardini ("Nardini"), at all times herein relevant, was a resident of the County of Putnam, State of New York.    Plaintiff Nardini was, at all times herein relevant, an employee of defendant New York City Police Department.

8.    Plaintiff Nardini was an "employee" as that term is defined by 42 U.S.C. §12111(4), New York Executive Law §292(6), New York Labor Law §190(2), and 29 U.S.C. §203(e).

9.    Plaintiff Nardini was perceived to have a "disability" as that term is defined by 42 U.S.C. §12101(2), New York Executive Law §292(21), and Administrative Code of the City of New York §8-102(16).

10.    Plaintiff Angel Torres ("Torres"), at all times herein relevant, was a resident of the County of Queens, State of New York. Plaintiff Torres was, at all times herein relevant, an employee of defendant New York City Police Department.

11.    Plaintiff Torres was an "employee" as that term is defined by 42 U.S.C. §12111(4), New York Executive Law §292(6), New York Labor Law §190(2), and 29 U.S.C. §203(e).

12.    Plaintiff Torres was perceived to have a "disability" as that term is defined by 42 U.S.C. §12101(2), New York Executive Law §292(21), and Administrative Code of the City of New York §8-102(16).

13.    Plaintiff Kathleen Makinen ("Makinen"), at all times herein relevant, was a resident of the County of Suffolk, State of New York. Plaintiff Makinen was, at all times herein relevant, an employee of defendant New York City Police Department.

14.    Plaintiff Makinen was an "employee" as that term is defined by 42 U.S.C. §12111(4), New York Executive Law §292(6), New York Labor Law §190(2), and 29 U.S.C. §203(e).

15.    Plaintiff Makinen was perceived to have a "disability" as that term is defined by 42 U.S.C. §12101(2), New York Executive Law §292(21), and Administrative Code of the City of New York §8-102(16).

16.    Upon information and belief, defendant City of New York ("City") is a municipal corporation duly organized and existing by and under the laws of the State of New

York, and employs more than fifteen (15) employees. The City maintains central offices in the County of New York.

17.    Defendant City is a "covered entity" as that term is defined under 42 U.S.C. §12111(2), and is an "employer" as that term is defined under: 42 U.S.C. §12111(5); New York Executive Law §292(5); New York Labor Law §190(3), Administrative Code of the City of New York §8-102(5); and 29 U.S.C. §203(d).

18.    Upon information and belief, defendant New York City Police Department ("NYPD") is a department of defendant City, duly organized and existing pursuant to the laws of the State of New York. Defendant NYPD employs more than fifteen (15) employees, and maintains a principal place of business at One Police Plaza, New York, New York, 10038.

19.    Defendant NYPD is a "covered entity" as that term is defined under 42 U.S.C. §12111(2), and is an "employer" as that term is defined under: 42 U.S.C. §12111(5); New York Executive Law §292(5); New York Labor Law §190(3), Administrative Code of the City of New York §8-102(5); and 29 U.S.C. §203(d).

20.    Upon information and belief, defendant Raymond W. Kelly ("Commissioner"), at all times herein relevant, was the duly appointed Commissioner of defendant City, with responsibility for operation and supervision of the NYPD.

21.    Upon information and belief, defendant Sergeant Daniel J. Sweeney ("Sweeney"), at all times herein relevant, was employed by defendant NYPD as the Unit Sergeant for the department's Alcohol Counseling Services Unit ("CSU").

22.    Upon information and belief, defendant Sweeney is a Licensed Master Social Worker under Article 154 of the New York State Education Law, and is a "health care practitioner" as defined by New York Public Health Law §18(1)(d).

4

## PROCEDURAL HISTORY

### Notices of Claim

23.      Pursuant to New York General Municipal Law §50-e, on or about January 26, 2011, plaintiff Nardini properly and timely served defendants with a Notice of Claim, advising defendants of Nardini's complaints concerning the acts and practices herein described. A copy of Nardini's Notice of Claim is attached hereto as **Exhibit "A."**

24.      On or about February 25, 2011, defendants served upon Nardini a "Notice of 50-H Hearing," pursuant to New York General Municipal Law §50-h.

25.      On May 19, 2011, defendants conducted a Section 50-h examination of Nardini.

26.      Pursuant to New York General Municipal Law §50-e, on or about May 13, 2011, plaintiff Torres properly and timely served defendants with a Notice of Claim, advising defendants of Torres' complaints concerning the acts and practices herein described. A copy of Torres' Notice of Claim is attached hereto as **Exhibit "B."**

27.      On or about June 15, 2011, defendants served upon Torres a "Notice of 50-H Hearing," pursuant to New York General Municipal Law §50-h.

28.      On July 7, 2011, defendants conducted a Section 50-h examination of Torres.

29.      Pursuant to New York General Municipal Law §50-e, on or about June 3, 2011, plaintiff Makinen properly and timely served defendants with a Notice of Claim, advising defendants of Makinen's complaints concerning the acts and practices herein described. A copy of Makinen's Notice of Claim is attached hereto as **Exhibit "C."**

30.      On or about June 24, 2011, defendants served upon Makinen a "Notice of 50-H Hearing," pursuant to New York General Municipal Law §50-h.

31.    On August 18, 2011, defendants conducted a Section 50-h examination of Makinen.

### Equal Employment Opportunity Commission

32.    On or about May 9, 2011, Nardini filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), against defendants City and NYPD, alleging discrimination on the basis of a perceived disability, in violation of the Americans with Disabilities Act of 1990, as amended.    A copy of Nardini's Charge of Discrimination is attached hereto as **Exhibit "D"**.

33.    On or about May 23, 2011, Torres filed a Charge of Discrimination with the EEOC, against defendants City and NYPD, alleging discrimination on the basis of a perceived disability, in violation of the Americans with Disabilities Act of 1990, as amended.  A copy of Torres' Charge of Discrimination is attached hereto as **Exhibit "E"**.

34.    On or about June 2, 2011, Makinen filed a Charge of Discrimination with the EEOC, against defendants City and NYPD, alleging discrimination on the basis of a perceived disability, in violation of the Americans with Disabilities Act of 1990, as amended.  A copy of Makinen's Charge of Discrimination is attached hereto as **Exhibit "F"**.

35.    Upon information and belief, the EEOC thereafter referred plaintiffs' Charges of Discrimination to the U.S. Department of Justice, Civil Rights Division ("DOJ"), for review and consideration.

36.    On or about February 8, 2012, the DOJ issued plaintiff Nardini a Notice of Right to Sue, a copy of which notice is attached hereto as **Exhibit "G"**.

37.    On or about February 8, 2012, the DOJ issued plaintiff Torres a Notice of Right to Sue, a copy of which notice is attached hereto as **Exhibit "H"**.

38.    On or about February 17, 2012, the DOJ issued plaintiff Makinen a Notice of Right to Sue, a copy of which notice is attached hereto as **Exhibit "I"**.

39.    Plaintiffs' filing of this Amended Complaint has occurred within ninety (90) days of receipt of their Notices of Right to Sue.

## FACTUAL ALLEGATIONS

### JAMIE NARDINI

40.    Plaintiff Nardini commenced employment with the NYPD as a Police Officer in July 2006.

41.    In the course of her employment with the NYPD, defendants have regarded Nardini as suffering from alcoholism, and have engaged in a pattern of disparate treatment motivated by such perception.

42.    Nardini has at no time suffered from alcoholism, and has at all times been qualified to perform the essential functions of her job as a police officer for the NYPD.

43.    On or about October 28, 2010, when Nardini reported for work at the NYPD, she was directed to report to the department's CSU.

44.    At the CSU, Nardini met with a staff counselor, Vicky Tobin, who advised her that her former boyfriend (a former Sergeant of the Department) and his sister had called the CSU and suggested that Nardini had a problem with alcohol consumption. At the time, Nardini and her former boyfriend were engaged in a contentious custody dispute concerning their young daughter.

45.    Nardini explained to Ms. Tobin that the allegations were entirely false, that she rarely consumed alcohol, and that the allegations were motivated solely by an intent to harm Nardini in the custody dispute.

46.    Nardini advised Ms. Tobin that, just two (2) days prior, during an October 26, 2010 court appearance, her former boyfriend had lost overnight visitation with their daughter, and was ordered to see her only during supervised visits.  Nardini further explained to Ms. Tobin that these false allegations were designed solely to punish her for the ruling, and to improperly utilize the NYPD's procedures to damage Nardini personally and professionally.

47.    Despite these explanations, Ms. Tobin treated Nardini with extreme hostility, and refused to acknowledge the context in which these allegations were brought.  After a short conversation, Ms. Tobin made it clear to Nardini that there was nothing that she could say or do to dissuade Ms. Tobin from her conclusion that Nardini suffered from alcoholism.

48.    Despite Nardini's explanations, Ms. Tobin advised her that she was required to undergo treatment for alcohol abuse.  Ms. Tobin suggested that Nardini attend out-patient counseling sessions during work hours, Alcoholics Anonymous ("AA") meetings three to four times per week during her personal time, and out-patient therapy during her personal time.

49.    Nardini advised Ms. Tobin that, because she did not abuse alcohol and did not require the treatment that Ms. Tobin suggested, she would not agree to participate in it.

50.    Ms. Tobin then stated to Nardini that if she refused to participate in the recommended treatment, her employment with the NYPD would be suspended.

51.    Ms. Tobin and Nardini then spoke with defendant Sweeney, the Unit Sergeant, via telephone, as he was out of the office at the time.  Nardini reiterated to defendant Sweeney that she did not abuse alcohol, and that these allegations were made solely to punish her for the custody ruling in her favor, and to damage her personally and professionally.  Defendant Sweeney told Nardini that he would be in the office the next day, and that they could speak then.

8

52.    Nardini returned to the Unit the following day, October 29, 2010, but did not meet with Sweeney. Instead, Nardini met again with Ms. Tobin. Ms. Tobin "offered" Nardini a slightly modified treatment package, involving one less AA meeting per week, and provided that the outpatient counseling would be during work time.

53.    Nardini again refused the treatment, explaining that she did not have a problem with alcohol, and that the allegations were baseless. Ms. Tobin responded again that, if Nardini refused the treatment, her employment would be suspended.

54.    Several more times, Ms. Tobin modified the suggested course of treatment, and Nardini continued to refuse participation. After each refusal, Ms. Tobin reiterated that Nardini risked suspension if she refused alcohol-related treatment.

55.    During the period October 28 through 29, 2010, Nardini was threatened with suspension approximately 10 times. Ms. Tobin's repeated threats of suspension caused Nardini to suffer extreme stress and anxiety. Nardini became visibly upset and emotional, and started crying as a result of the threats. As a single mother, suspension from work would be devastating to her ability to make ends meet and pay her mortgage, as well as being able to provide health coverage for her family.

56.    Eventually, on October 29, 2010, Ms. Tobin advised Nardini that if she agreed to watch a series of six (6) "educational videos" during her regular working hours, the CSU would not require her to undergo any additional treatment. After a grueling two-day period, Nardini agreed to this offer, to avoid suspension of her employment. Other police officers of the NYPD are not mandated to watch any such educational videos.

57.    The following week, Nardini returned to the Unit to view the first in the series of six videos, and was finally able to meet defendant Sweeney.

58.    Nardini tried again to explain to Sweeney that she did not have an alcohol-related problem, and that the false allegations were brought against her solely to impact the ongoing custody dispute.

59.    Rather than discuss this issue with Nardini, as previously promised, defendant Sweeney rudely and abruptly cut her off.  In a belittling manner, Sweeney told her that her experiences with her former boyfriend, including the acrimonious custody dispute, were like "PMS."

60.    Defendant Sweeney continued to make inappropriate and degrading remarks, and refused to acknowledge the true context in which Nardini was "referred" to the CSU for treatment.

61.    As directed, Nardini returned to the unit on five (5) more occasions to complete her "treatment" program.

62.    At no point was Nardini subjected to any diagnostic tests by CSU.

63.    During the period October through December 2010, defendants disclosed to other employees and agents of defendants, as well as third parties, directly or indirectly, that Nardini suffered from alcoholism and/or had a problem with alcohol consumption, and that Nardini was compelled to undergo alcohol-related treatment and care as a result.

64.    Defendants disclosed this information without Nardini's authorization.

65.    Learning of these communications, and their potential to damage Nardini's professional reputation, caused Nardini to suffer further distress.

## ANGEL TORRES

66.    Plaintiff Torres commenced employment with the NYPD as a Police Officer on August 30, 1993.

67.    In the course of Torres' employment with the NYPD, defendants have regarded Torres as suffering from alcoholism, and have engaged in a pattern of disparate treatment motivated by such perception.

68.    Torres has at no time suffered from alcoholism, and at all times has been qualified to perform the essential functions of his job as a police officer at the NYPD.

69.    On or about March 1, 2009, a complaint was filed against Torres with the 107th Precinct, Sector A, by an acquaintance, Matthew Doran, which falsely accused Torres of assaulting Mr. Doran at a party.

70.    Torres was not arrested as a result of the complaint by Mr. Doran, nor did the Assistant District Attorney assigned to the complaint pursue any charges against Torres.

71.    Regardless, Torres was placed on "modified duty," and was directed to report to Police Plaza and obtain a new NYPD Identification indicating the same.  Torres also was directed to meet with a counselor and psychologist for "early intervention."

72.    On or about March 4, 2009, Torres met with a counselor and psychologist, as directed.  After meeting for approximately 20-30 minutes, the psychologist directed Torres to report to the department's CSU.

73.    Later in the day, on or about March 4, 2009, Torres reported to the CSU located at 189 Montague Street, in Brooklyn, New York, and met with Officer Karl Schaefer, LMSW ("Schaefer").

74.    Schaefer appeared in plainclothes and identified himself as a "counselor." Schaefer and Torres discussed the circumstances of the party, Mr. Doran's false complaint against Torres, and his consumption of alcoholic beverages.

75.    In response to Schaefer's questions, Torres advised, among other things, that: he consumed alcohol for the very first time during New Year's Eve 2000; that he keeps no liquor in his house; and that he would describe himself only as a "social drinker."

76.    Torres was ordered to sign a release identifying approximately five (5) individuals whom the CSU was authorized to contact regarding these events.  Torres complied with this demand.

77.    Schaefer then directed Torres to execute an authorization permitting the CSU to speak with his ex-wife, which Torres refused to sign, as they had long since been divorced.

78.    Upon Torres' refusal to execute the additional authorization, Schaefer threatened to send him to an inpatient treatment program.  Under this threat, Torres agreed to sign an authorization permitting them to speak to his ex-wife.

79.    Shortly thereafter, Schaefer advised Torres that he believed that Torres had an alcohol-related problem, and that he required treatment for the purported problem.  Schaefer then presented Torres with documentation pertaining to an in-patient treatment program, and directed Torres to "volunteer" to participate in the program.

80.    Torres told Schaefer that he would not participate in any such program, because he did not require alcohol-related treatment.  Upon his refusal to volunteer for the program, Schaefer brought defendant Sweeney into the meeting.

81.    Defendant Sweeney demanded to know the reason Torres refused to voluntarily undergo alcohol-related treatment.  When Torres attempted to explain that he did not require

12

such treatment, Sweeney stated abruptly that, unless Torres agreed to treatment, he would be suspended without pay or fired.

82.     At the conclusion of the meeting, Sweeney directed Torres, in form or substance, to go home and think about what he was doing.  Sweeney then directed Torres to return to CSU at 8:00 a.m. the following morning.  Sweeney stated, in words or substance, that he should "pack a bag" and be prepared "to go to rehab."

83.     On or about March 5, 2009, Torres was accompanied to CSU by PBA delegate William Kearney.  Sweeney advised Torres that if he did not voluntarily participate in a rehabilitation program, Sweeney would send him to the NYPD Medical Division at Lefrak City Plaza in Corona, New York ("Lefrak"), and Lefrak personnel would order Torres to participate.

84.     Defendant Sweeney then threatened that Torres would have to come back to CSU, and that Sweeney would make sure that Torres never left CSU.

85.     Delegate Kearney and Torres then went to Lefrak, where Torres met with a superior officer whom Torres understood to be a Captain or Deputy Inspector.  The superior officer appeared to already know the details of Torres' interactions with CSU, and CSU's recommendation of in-patient treatment.  Torres does not recall signing any authorization permitting CSU to disclose confidential information to Lefrak personnel.

86.     The Lefrak superior officer advised Torres that if CSU made a recommendation for him to go to treatment, then he would order it.  The superior officer stated to Torres that he was not in a position to second-guess CSU's recommendations, but rather only to order Torres to obey such recommendations.

87.     The superior officer then advised Torres that if he disobeyed the order, he would be suspended for thirty (30) days; and if he disobeyed a second order to undergo treatment, he

13

would be suspended for an additional thirty (30) days. Torres was further advised that, if he disobeyed a third order for treatment, termination proceedings would be commenced.

88.    At no point was Torres subjected to any diagnostic tests by CSU.

89.    Under threat of suspension and termination, Torres agreed to undergo treatment as ordered by the defendants.

90.    Torres was placed on "modified duty" for a period of approximately seven (7) months, and defendants compelled him to: (a) participate in a thirty (30)-day inpatient rehabilitation program at the Mirmont Treatment Center in Media, Pennsylvania; (b) attend Alcoholics Anonymous ("AA") meetings five (5) times per week for an additional three-month period thereafter; and (c) attend weekly, monthly and bi-annual counseling sessions at CSU.

91.    Only the CSU meetings occurred during work time.

92.    The AA meetings were required during Torres' personal time, and he was not compensated for the time he spent there.

93.    During his mandated participation in the inpatient rehabilitation program, Torres lost opportunities for overtime, night shift differential, and other benefits and compensation.

94.    Torres' compelled "treatment" is on-going, with his most recent counseling session occurring in February 2011.

95.    Additionally, it has come to Torres' attention that defendants disclosed to other employees and agents of the defendants, as well as third parties, directly or indirectly, that: Torres purportedly suffers from alcoholism and/or has a problem with alcohol consumption; and that Torres was compelled to undergo alcohol-related treatment as a result.

96.    Defendants disclosed this information without Torres' authorization.

97.    Learning of these communications, and their potential to damage his professional reputation, caused Torres to suffer further distress.

## KATHLEEN MAKINEN

98.    Plaintiff Makinen commenced employment with the NYPD as a Police Officer in April 1991.

99.    In the course of her employment with the NYPD, defendants have regarded Makinen as suffering from alcoholism, and have engaged in a pattern of disparate treatment motivated by such perception.

100.    Makinen has at no time suffered from alcoholism, and at all times have been qualified to perform the essential functions of her job as a police officer at the NYPD

101.    On August 16, 2010, Makinen was ordered by CSU to report immediately to the unit in response to information received by the NYPD Medical Division from retired NYPD Detective Joseph Cornetta ("Cornetta"), her ex-husband.

102.    Apparently, Cornetta – with whom Makinen had recently ended contentious divorce proceedings – had contacted the CSU, and alleged in sum or substance that: she was an "alcoholic in relapse on a daily basis;" operating a motor vehicle under the influence of alcohol with her children in the vehicle; violent; and "abusing" her children.

103.    Cornetta's accusations were entirely false, and occurred just four days after Makinen received a home visit from Child Protective Services concerning an acrimonious custody battle between Makinen and Cornetta.  The results of the home visit were favorable to Makinen, which upset Cornetta.

104.    As instructed, on August 16, 2010, Makinen immediately reported to CSU.

15

105.    Upon Makinen's arrival at CSU, she met with John Mazzella, who asked her if she had been "drinking."  Makinen responded that she had not been "drinking," except for the occasional glass of wine with dinner.

106.    Mazzella then stated to Makinen that, after a prior interaction she had with CSU in 2007, she had signed documentation purportedly prohibiting her from consuming any alcohol whatsoever.

107.    Makinen objected to this statement, and stated that she was unaware that CSU had ordered her to refrain entirely from consuming alcohol.

108.    It is notable that during her 2007 interactions with CSU, it was determined by an independent counselor at an out-patient facility that there were no indications that she was an "alcoholic" or "abused alcohol."

109.    During the meeting with Mazzella, Makinen was asked to identify five (5) people whom the CSU could contact regarding her consumption of alcohol, and was told to sign a release authorizing such contact.

110.    In response to this request, Makinen identified the following individuals:  (1) her personal therapist, Margie Sugarman; (2) the Child Protective Services representative assigned to her custody proceedings with her ex-husband; (3) her brother; (4) her sister-in-law; and (4) her father.

111.    Mazzella telephoned each of these individuals to seek information regarding Makinen's consumption of alcohol, and each one assured Mazzella that she did <u>not</u> have a drinking problem.

112.    Makinen's father stated to Mazzella that she consumed alcohol only "once in a blue moon."

16

113.   Makinen herself advised Mazzella repeatedly that she did not have a problem with alcohol consumption.

114.   Mazzella then contacted Cornetta himself, and Makinen was able to overhear the phone conversation between the two.   During their conversation, Cornetta conceded to Mazzella that he had not personally observed Makinen drinking alcohol, nor did he have any other proof of her alcohol consumption.  He stated only that he "just knew" that she "drank."

115.   At no point was Makinen subjected to any diagnostic tests by CSU.

116.   However, Mazzella advised Makinen that based on her ex-husband's allegations and her father's statement that she "drank once in a blue moon," she would be compelled to attend inpatient rehabilitation for alcohol abuse.

117.   Makinen was shocked, and became visibly distressed.  She attempted repeatedly to explain to Mazzella that Cornetta and she were engaged in very contentious custody proceedings, and that any allegations or statements made by him were motivated solely by an attempt to gain advantages in these proceedings.

118.   Makinen pleaded with Mazzella to consider the context in which the allegations were made, and the fact that all other individuals contacted by CSU had corroborated her position.  Makinen's efforts were in vain, as Mazzella disregarded her statements entirely, and indicated that the decision had been made.

119.   Despite having no factual support for the allegations made by Makinen's ex-husband, Mazzella had summarily determined that Makinen suffered from alcoholism and/or a problem with alcohol consumption, and ordered her to undergo treatment as a result.

120.   Makinen stated that she would not comply with this directive, because she did not require it.

121.    Shortly thereafter, defendant Sweeney and CSU employee Mike Barenberg joined the meeting with Mazzella and Makinen.

122.    Upon hearing Makinen's objections to the recommended "treatment," the three men told Makinen that her only options were to either: (1) report to CSU at 9:00 a.m. the following day, with her bags packed for in-patient rehabilitation; or (2) to report to the NYPD Medical Division at Lefrak City Plaza in Corona, New York ("Lefrak"), at 10:00 a.m. the following day.

123.    Makinen was kept at the CSU until approximately 5:00 pm on August 16, 2010, and then had to meet Mazella back at her command post, where Makinen's guns, ID and shield were taken from her.

124.    Chief Michael Marino and Lt. Stephen O'Hare, with whom Makinen worked, were both present when she returned to her command, and both spoke with Mazzella in an effort to convince him that she did not require inpatient rehabilitation for alcoholism. Mazzella ignored Marino and O'Hare.

125.    The following day, on August 17, 2010, Makinen reported to Lefrak to meet with Captain Donnelly of the NYPD Medical Division. Makinen advised Donnelly that she did not abuse alcohol and did not require treatment. Makinen attempted to explain the circumstances surrounding her ex-husband's unsubstantiated allegations, and his manipulation of the system to gain leverage in our ongoing custody proceedings.

126.    Captain Donnelly told Makinen that there was nothing that he could do, and advised her that: (1) if she refused the CSU's recommendation of inpatient treatment, she would be suspended for thirty (30) days, during which period, she would not be paid, and neither she nor her children would be covered by health insurance; (2) once the suspension

18

ended, Makinen would again be faced with the decision to either comply with recommended treatment, or be suspended for a second thirty (30) day period; and (3) after three suspensions, termination proceedings would begin against her.

127.    As a single mother, responsible for supporting two children, Makinen had no choice but to accept the CSU's recommendation of inpatient treatment.

128.    On August 17, 2010, Makinen signed a CSU Treatment Agreement & Client Confidentiality Agreement ("Treatment Agreement").

129.    The terms of the Treatment Agreement included, among other things: abstaining from alcohol; inpatient rehabilitation, including detoxification, for approximately 28 days; placement on Limited Capacity or Restricted Duty for approximately 90 days, "or until such time as the Supervising Chief Surgeon or his representative authorizes restoration to Full Duty;" attendance at 12-15 weekly group counseling sessions at CSU; and attendance at three (3) AA meetings per week on separate days, one individual therapy session per week, and two group sessions per week at an out-patient rehabilitation center.

130.    In addition, the Treatment Agreement required that Makinen would be monitored for a period of two (2) years after successful completion of the CSU Program, and assignment to the Confidential Medical District ("CMD") for a period of one (1) year.

131.    The Treatment Agreement further mandated that Makinen would be picked up at her Suffolk County residence by the treatment facility on August 20, 2010.

132.    Makinen was sent to in-patient treatment at Marworth Treatment Center in Waverly, Pennsylvania, for the period August 20 to September 17, 2010.

133.    During this time, Makinen's contact with her children and family was severely restricted, as the program provides for only limited visitation and telephone communications.

Makinen made arrangements for her parents to care for her children during this period, but she suffered distress by the lack of contact with her children.

134.    Makinen learned that there were treatment facilities closer to her home on Long Island, New York, and requested that CSU assign her to one of those facilities, so that she could be closer to her children. CSU refused her request.

135.    To make matters worse, Makinen's health insurance policy did not cover her inpatient rehabilitation treatment. As a result, she was required to take out a $2,800 pension loan to pay for the treatment compelled by CSU.

136.    While at the Marworth treatment center, Makinen was specifically told by the counselors that she did not have a problem with alcohol, and did not belong at the facility.

137.    Upon returning home from inpatient rehabilitation, Makinen was required to: attend one (1)-hour outpatient rehabilitation sessions twice per week (with a $5.00 co-pay each visit); attend counseling sessions with a private counselor once per week (with a $25.00 co-pay each session); attend AA meetings three (3) days per week; and attend a counseling session at CSU once per week.

138.    Only the weekly CSU meeting occurred during work time.

139.    The outpatient rehabilitation sessions, private counseling sessions, and the AA meetings were required during Makinen's personal time, and she was not compensated for the time she spent there.

140.    During her mandated participation in the inpatient rehabilitation program, Makinen lost opportunities for overtime, night shift differential, and other benefits and compensation.

141.    Makinen was required to adhere to this course of "treatment" for 19 weeks. During this period, Makinen was prohibited from working overtime hours, which resulted in a loss of her income.

142.    Makinen was required to attend a CSU meeting once per month for three months following her completion of the program, and then once every three months for a period of time. Thereafter, Makinen was required to attend a CSU meeting once every six months.

143.    As anticipated, Makinen's ex-husband, Detective Cornetta, attempted to use her forced inpatient treatment to gain leverage in their custody proceedings. During Makinen's stay in the Marworth facility, Cornetta removed their children from the care of her parents, and obtained a temporary order of protection against Makinen, which prevented her from driving a vehicle with their children in it. While Makinen regained physical custody of the children upon her return from Marworth, the order of protection had a devastating effect on their lives. Once again, she was required to seek assistance from her parents in order to care for her children.

144.    Cornetta also filed for full custody of the children, citing Makinen's inpatient treatment as a basis for his motion. While Cornetta's motion was denied, he continues to attempt to use Makinen's inpatient treatment as a means to cause difficulties for her.

145.    Additionally, Makinen learned that defendants disclosed to other employees and agents of defendants, as well as third parties, directly or indirectly, that Makinen purportedly suffers from alcoholism and/or has a problem with alcohol consumption, and that she was compelled to undergo alcohol-related treatment and care as a result.

146.    Defendants disclosed this information without Makinen's authorization.

147.    Learning of these communications, and their potential to damage Makinen's professional reputation, caused her to suffer extreme distress.

148.    Defendants' unlawful acts and practices detailed herein caused Makinen to suffer stress and anxiety, and physical manifestations of the same.

149.    As a result of defendants' unlawful acts and practices, Makinen retired from her employment with the NYPD, effective May 30, 2011.

150.    Makinen's "treatment" with CSU described above continued through the date of her retirement.

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINST DEFENDANTS CITY AND NYPD

### Americans with Disabilities Act

151.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "150" above, as if set forth in full herein.

152.    By their conduct described herein, defendants City and NYPD discriminated against plaintiffs in the terms and conditions of their employment, and deprived plaintiffs of their rights, on the basis of perceived disability, in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*.

153.    Plaintiffs were injured as a direct and proximate result of defendants' discriminatory conduct.

154.    By reason of the foregoing, plaintiffs are entitled to compensatory damages.

### AS AND FOR A SECOND CAUSE OF ACTION
### AGAINST DEFENDANTS CITY AND NYPD

### New York State Human Rights Law

155.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "154" above, as if set forth in full herein.

156.    By their conduct described herein, defendants City and NYPD discriminated against plaintiffs in the terms and conditions of their employment, and deprived plaintiffs of their rights, on the basis of perceived disability, in violation of the New York State Human Rights Law, New York Executive Law §§290 *et seq.*

157.    Plaintiffs were injured as a direct and proximate result of defendants' discriminatory conduct.

158.    By reason of the foregoing, plaintiffs are entitled to compensatory damages.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS KELLY AND SWEENEY

### New York State Human Rights Law

159.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "158" above, as if set forth in full herein.

160.    By their conduct described herein, defendants Kelly and Sweeny discriminated against plaintiffs in the terms and conditions of their employment, and deprived plaintiffs of their rights, on the basis of perceived disability, in violation of the New York State Human Rights Law, New York Executive Law §§290 *et seq.*

161.    Plaintiffs were injured as a direct and proximate result of defendants' discriminatory conduct.

162.    By reason of the foregoing, plaintiffs are entitled to compensatory damages.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS CITY AND NYPD

### New York City Human Rights Law

163.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "162" above, as if set forth in full herein.

164.    By their conduct described herein, defendants City and NYPD discriminated against plaintiffs in the terms and conditions of their employment, and deprived plaintiffs of their rights, on the basis of perceived disability, in violation of the New York City Human Rights Law, Administrative Code of the City of New York §8-107.

165.    Plaintiffs were injured as a direct and proximate result of defendants' discriminatory conduct.

166.    By reason of the foregoing, plaintiffs are entitled to compensatory damages.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST DEFENDANTS KELLY AND SWEENEY

### New York City Human Rights Law

167.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "166" above, as if set forth in full herein.

168.    By their conduct described herein, defendants Kelly and Sweeney discriminated against plaintiffs in the terms and conditions of their employment, and deprived plaintiffs of their rights, on the basis of perceived disability, in violation of the New York City Human Rights Law, Administrative Code of the City of New York §8-107.

169.    Plaintiffs were injured as a direct and proximate result of defendants' discriminatory conduct.

170.    Because defendant Sweeney's actions directed at the plaintiffs were malicious, oppressive, wanton and/or done with reckless disregard for plaintiffs' federally-protected rights, plaintiffs are entitled to punitive damages from defendant Sweeney.

171.    By reason of the foregoing, plaintiffs are entitled to compensatory and punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST DEFENDANT SWEENEY

### New York Public Health Law

172.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "171" above, as if set forth in full herein.

173.     Defendant Sweeney disclosed, and/or authorized others to disclose, to other employees and agents of defendants, as well as third parties, directly or indirectly, that plaintiffs purportedly suffer from alcoholism and/or have a problem with alcohol consumption, and that they were compelled to undergo alcohol-related treatment and care as a result.

174.     Defendant Sweeney disclosed and/or authorized disclosure of this information without plaintiffs' authorization, in violation of New York Public Health Law §18.

175.     Plaintiffs were injured as a direct and proximate result of defendant Sweeney's unlawful conduct.

176.     By reason of the foregoing, plaintiffs are entitled to compensatory damages against defendant Sweeney.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## AGAINST DEFENDANTS CITY AND NYPD

### Fair Labor Standards Act

177.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "176" above, as if set forth in full herein.

178.     Plaintiffs Torres and Makinen were unlawfully required to attend outpatient rehabilitation sessions, private counseling sessions, and AA meetings during their personal time, and were not compensated for the time spent there.

179.    Plaintiffs Torres and Makinen also were required to participate in inpatient rehabilitation programs, during which time they lost opportunities for overtime, night shift differential, and other benefits and compensation.

180.    The Fair Labor Standards Act (29 USC §207) and related regulations (29 CFR 785.27) require that employees be paid for such mandated activity, and at the overtime rate for overtime that is worked.

181.    By withholding plaintiffs' overtime pay for their time spent in inpatient rehabilitation programs, outpatient rehabilitation sessions, and AA meetings, defendants have failed and refused to pay overtime wages as required by the provisions of the Fair Labor Standards Act.

182.    At no time did either Torres or Makinen consent to the withholding of their pay, or not being paid at the overtime rate or otherwise for their work.

183.    Plaintiffs were injured as a direct and proximate result of defendants' unlawful withholding of their wages.

184.    By reason of the foregoing, plaintiffs Torres and Makinen are entitled to compensatory damages against defendants.

### AS AND FOR A EIGHTH CAUSE OF ACTION
### AGAINST DEFENDANTS CITY AND NYPD

### New York State Labor Law

185.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "184" above, as if set forth in full herein

186.    Plaintiffs Torres and Makinen were unlawfully required to attend outpatient rehabilitation sessions, private counseling sessions, and AA meetings during their personal time, and were not compensated for the time spent there.

187. Plaintiffs Torres and Makinen also were required to participate in inpatient rehabilitation programs, during which time they lost opportunities for overtime, night shift differential, and other benefits and compensation.

188. As a result, defendants City and NYPD have failed to pay Torres and Makinen their earned wages and benefits as required under New York Labor Law §§190 *et seq*.

189. Plaintiffs were injured as a direct and proximate result of defendants' unlawful withholding of their wages.

190. By reason of the foregoing, plaintiffs Torres and Makinen are entitled to compensatory damages against defendants.

## AS AND FOR AN NINTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

### Duty of Confidentiality

191. Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "190" above, as if set forth in full herein.

192. At all times herein relevant, plaintiffs and defendants engaged in a relationship of trust and confidence.

193. Additionally, defendants were prohibited from disclosing confidential information to others without authorization, to the extent that information provided or shared by or concerning plaintiffs is subject to HIPAA.

194. Additionally, the CSU is subject to the confidentiality obligations as set forth in Title 42 of the Code of Federal Regulations, Part 2, governing alcoholism programs, and as such, cannot disclose without authorization the records of the identity, diagnosis, prognosis or treatment of any patient as further detailed in 42 U.S.C. §290dd-2(a).

195.   Moreover, state laws and regulations (including N.Y. Mental Hygiene Law §22.05(b) and 14 NYCRR §§815.4(e), 822(a)(17), 822.5(b), 853.28(4)) impose upon OASAS-certified providers, counselors and/or chemical dependence programs, treatment facilities and services, including alcoholism and/or substance abuse programs, treatment facilities and services, to maintain patient confidentiality.

196.   As a result, defendants owed plaintiffs a duty not to disclose confidential medical and employment information to third parties and to other employees and agents of the defendants.

197.   By their conduct herein alleged, defendants breached their duty of confidentiality owed to the plaintiffs.

198.   Defendants' breach of their duty was a direct and proximate cause of harm suffered by the plaintiffs.

199.   Because defendant Sweeney's actions directed at the plaintiffs were malicious, oppressive, wanton and/or done with reckless disregard for plaintiffs' rights, plaintiffs are entitled to punitive damages from defendant Sweeney.

200.   By reason of the foregoing, plaintiffs are entitled to compensatory and punitive damages.

## AS AND FOR A TENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS

### Defamation and Defamation *Per Se*

201.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "200" above, as if set forth in full herein.

202.   Defendants NYPD and Sweeney knowingly, intentionally, maliciously and/or with gross negligence or reckless disregard for the truth, misrepresented orally and/or in writing

28

to personnel at the Lefrak Medical Division, and others, that plaintiffs suffered from alcoholism and/or had a problem with alcohol consumption or dependence, and that plaintiffs were compelled to undergo alcohol-related treatment and care as a result.

203.    Defendants NYPD and Sweeney knew or should have known that these representations about plaintiffs were false.

204.    At no time have plaintiffs suffered from alcoholism or had a problem with alcohol consumption.

205.    At all relevant times, plaintiffs have been fit and qualified to perform the essential functions of their jobs as police officers with the NYPD.

206.    Defendants NYPD and Sweeney knowingly, intentionally, maliciously and/or with gross negligence and reckless disregard for the truth, made the above misrepresentations with the intent to defame and malign plaintiffs' credibility and reputation, and/or illegally suspend and/or remove plaintiffs from their positions with the NYPD.

207.    As a result of the actions and practices of defendants NYPD and Sweeney, plaintiffs have suffered and will continue to suffer financial and economic loss, pain and suffering, humiliation, degradation, shame, mental anguish, and injury to their personal and professional reputations.

208.    These acts and practices of defendants NYPD and Sweeney constitute defamation and defamation *per se.*

209.    Because defendant Sweeney's actions directed at the plaintiffs were malicious, oppressive, wanton and/or done with reckless disregard for plaintiffs' rights, plaintiffs are entitled to punitive damages from defendant Sweeney.

210.   By reason of the foregoing, plaintiffs are entitled to compensatory and punitive damages.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## AGAINST DEFENDANT SWEENEY

### Negligence

211.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "210" above, as if set forth in full herein.

212.   Defendant Sweeney is a Licensed Master Social Worker, and is employed as the Unit Sergeant for the CSU.

213.   As such, defendant Sweeney was charged with responsibility for supervision and oversight relative to the care and control of the plaintiffs and other officers upon their referral to the CSU for examination and/or treatment.

214.   By virtue of this relationship, and his role in the CSU, defendant Sweeney owed the plaintiffs a duty to exercise reasonable care.

215.   By his conduct herein alleged, defendant Sweeney breached this duty of care to plaintiffs by misdiagnosing them as suffering from alcoholism and/or a problem with alcohol consumption.

216.   Additionally, defendants were prohibited from disclosing confidential information to others without authorization, to the extent that information provided or shared by or concerning plaintiffs is subject to HIPAA.

217.   Additionally, the CSU is subject to the confidentiality obligations as set forth in Title 42 of the Code of Federal Regulations, Part 2, governing alcoholism programs, and as such, cannot disclose without authorization the records of the identity, diagnosis, prognosis or treatment of any patient as further detailed in 42 U.S.C. §290dd-2(a).

218.    Moreover, state laws and regulations (including N.Y. Mental Hygiene Law §22.05(b) and 14 NYCRR §§815.4(e), 822(a)(17), 822.5(b), 853.28(4)) impose upon OASAS-certified providers, counselors and/or chemical dependence programs, treatment facilities and services, including alcoholism and/or substance abuse programs, treatment facilities and services, to maintain patient confidentiality.

219.    By his conduct herein alleged, defendant Sweeney breached this duty of care to plaintiffs.

220.    Defendant Sweeney's breach of his duty of care was a direct and proximate cause of harm suffered by the plaintiffs.

221.    Defendant Sweeney's actions and inactions constitute gross negligence, recklessness and/or deliberate indifference with respect to the care and control of the plaintiffs.

222.    By reason of the foregoing, plaintiffs are entitled to compensatory and punitive damages from defendant Sweeney.

### AS AND FOR A TWELFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS

#### Attorneys' Fees

223.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "222" above, as if set forth in full herein.

224.    Based on the foregoing, plaintiffs are entitled to an award of attorneys' fees and expenses pursuant to: 29 U.S.C. §216; 42 U.S.C. §12205; and the Administrative Code of the City of New York §8-502(f).

**WHEREFORE,** plaintiffs respectfully request that the Court award plaintiffs the following relief against defendants:

31

(a)    Order, adjudge and decree that defendants' acts and practices complained of herein violate: New York Executive Law §§290 *et seq.*; Administrative Code of the City of New York §8-107; 42 U.S.C. §§ 12101 *et seq.*; 29 U.S.C. §§ 201 *et seq.*; New York Labor Law §§190 *et seq.*; New York Public Health Law §18; and common law, in the form of negligence, breach of duty of confidentiality, defamation and defamation *per se.*

(b)    Order that defendants remove from plaintiffs' personnel files, medical records files, and other employment files, any and all documents and records which refer, relate or pertain to their CSU referrals, interviews, diagnoses and treatment;

(c)    Order that defendants implement new policies, practices and procedures pertaining to CSU referrals, examinations, tests, interviews, diagnoses and treatment;

(d)    Award plaintiffs back pay, benefits and other emoluments of employment;

(e)    Award plaintiffs compensatory damages in an amount to be determined by a jury;

(f)    Award plaintiffs punitive damages in an amount to be determined by a jury;

(g)    Award plaintiffs attorneys' fees, together with the costs and disbursements of this action; and

(h)    Award plaintiffs such other and further relief as to this Court appears just and proper.

## JURY DEMAND

Plaintiffs respectfully demand trial by jury on each and every issue raised in the Complaint.

Dated:  March 6, 2012
        Albany, New York

GLEASON, DUNN, WALSH & O'SHEA

By:

Lisa F. Joslin, Esq.
Attorneys for Plaintiffs
(Bar Roll No. LF 9245)
Office and Post Office Address:
40 Beaver Street
Albany, New York 12207
(518) 432-7511

# EXHIBIT "A"

In the Matter of the Claim of

POLICE OFFICER Jamie Nardini,

     -against-

RAYMOND KELLY, as Police Commissioner of the
City of New York; Sergeant Daniel Sweeney,
individually and in his official capacity; John Doe,
individually and in his official capacity; Jane Doe,
individually and in her official capacity; and THE
CITY OF NEW YORK.

                            **NOTICE OF CLAIM**

TO:

**THE NEW YORK CITY OFFICE OF THE**　　**CORPORATION COUNSEL OF THE**
**COMPTROLLER**　　　　　　　　　　　　**CITY OF NEW YORK**
Division of Law　　　　　　　　　　　　100 Church Street
Bureau of Law & Adjustment　　　　　　New York, New York 10007
1 Centre Street
Room 1225
New York, New York 10007

      PLEASE TAKE NOTICE that the undersigned claimant hereby makes this claim

and demand against you as follows:

      1.    <u>The name and post office address of the claimant is:</u>

<u>Claimant</u>
Jamie Nardini



      2.    <u>The nature of the claim:</u>

The nature of the claim is for damages sustained by Jamie Nardini ("Nardini")
including, but not limited to, all damages allowed by statute and case law as a
result of the negligent acts of the City of New York, its agents, servants,
employees and those acting under its direction, behest, permission and control,
including, but not limited to, Sergeant Daniel J. Sweeney ("Sweeney")
(collectively, the "Defendants"). This action arises out of the actions taken by

the Defendants against Nardini, a police officer of the New York City Police Department ("NYPD"). Defendants' acts include, among other things, wrongfully and negligently suggesting, concluding, or diagnosing Nardini with a problem with alcohol, forcing Nardini to undergo a plan of care where such a plan was unnecessary, and stating to others explicitly or by ordering her participation in the Unit's (as defined below) plan of care that Nardini had a problem with alcohol. These actions may have violated common law rights including but not limited to breaches of confidentiality, negligence including negligent diagnosis, defamation, defamation per se, slander, slander per se, libel, libel per se, due process, the Americans with Disabilities Act, New York State and City Human Rights Laws, and/or other statutory rights including HIPAA, NY Public Health Law Section 18, 42 USC § 290dd-2 et seq. and related regulations at 42 CFR § 2.1 et seq. governing confidentiality.

3.   The time when, the place where and the manner in which the claim rose:

On or about October 28, 2010, Nardini reported to the NYPD's Counseling Services Unit (the "Unit") located at 189 Montague Street in Brooklyn, NY. At the Unit, Nardini met with a staff counselor named Vicky Tobin, who accused Nardini of having an alcohol problem, which Nardini does not. Vicky admitted that the sole basis for her accusations were unverified allegations by Nardini's ex-boyfriend William Eiseman, with whom Nardini is involved in a separate civil matter, and his sister, Tracey Eiseman. On this day Nardini also spoke with Sergeant Sweeney on the telephone. Nardini returned to the Unit on October 29, 2010, where she again spoke with Vicky, as well as a male Unit staff counselor whose name is unknown. On or about both October 28 and October 29, 2010, Nardini was threatened repeatedly with suspension by the Unit if she did not agree to undergo treatment because of the allegations surrounding her alcohol usage. The Unit's recommended treatment, which Nardini refused because Nardini has no problem with alcohol usage, included outpatient treatment at an outpatient treatment center, attendance at alcoholics anonymous meetings, and attending counseling sessions at the Unit. The recommended treatment by the Unit arising from allegations of Nardini's alcohol use was stated by Unit staff counselors in the presence of others, including Police Officer Thomas Sullivan and Police Officer Joe Strong, who are both police officers of the NYPD. On information and belief, Sergeant Sweeney was constantly consulted by Unit staff on or about both October 28 and 29, 2010 regarding the allegations against Nardini and the recommended treatment by the Unit, and made decisions regarding the recommended treatment for Nardini. During November and December 2010, Nardini attended six counseling sessions at the Unit arising out of the unverified allegations surrounding her alcohol use.

4.   The items of damage or injuries claimed are:

Nardini has sustained damages including psychological and emotional harm, and harm to her professional reputation. Nardini is also entitled to compensatory and special damages and all other relief that is appropriate for the damages she suffered as a result of the Defendants' unlawful acts, including attorney's fees.

The undersigned claimant therefore presents this claim for adjustment and payment. You are hereby notified that unless it is adjusted and paid within the time provided by law from date to presentation to you, the claimant may commence an action on this claim.

Dated January 26, 2011

*Jamie Nardini*
Jamie Nardini

STATE OF NEW YORK   )
                     ) SS:
COUNTY OF NEW YORK )

JAMIE NARDINI, being duly sworn, deposes and says:

I am the Claimant in the within action. I have read the foregoing Notice of Claim and know the contents thereof. The facts set forth therein are true to my knowledge and as to those matters I believe them to be true.

*Jamie Nardini*
Jamie Nardini

Sworn to before me
on January 26, 2011

Notary Public

GAURAV SHAH
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY
LIC. #02SH6200135
COMM. EXP. 1/26/2013

Page 3 of 3

EXHIBIT "B"

In the Matter of the Claim of

POLICE OFFICER Angel Torres

    -against-

THE CITY OF NEW YORK; RAYMOND KELLY,
as Police Commissioner of the City of New York;
THE NEW YORK CITY POLICE DEPARTMENT;
and SERGEANT DANIEL J. SWEENEY,

**NOTICE OF CLAIM**

TO:

**The New York City Office of the Comptroller**
Division of Law
Bureau of Law & Adjustment
1 Centre Street
Room 1225
New York, New York 10007

**Corporation Counsel of the City of New York**
100 Church Street
New York, New York 10007

    **PLEASE TAKE NOTICE** that the undersigned claimant hereby makes this claim and

demand against you as follows:

    1.    <u>Name and Post Office Addresses of the Claimant and Claimant's Attorneys</u>

Angel Torres



Lisa F. Joslin, Esq.
Gleason, Dunn, Walsh & O'Shea
40 Beaver Street
Albany, New York 12207
(518) 432-7511

2.    **Nature of the Claim**

This claim is for damages sustained by Claimant Angel Torres ("Torres"), due to the actions, omissions and practices of the City of New York ("City") and the New York City Police Department ("NYPD"), by its agents, servants, employees, and those acting under its direction, behest, permission and control, including, but not limited to, Sergeant Daniel J. Sweeney ("Sweeney") (collectively "respondents").

This action is to remedy respondents' unlawful actions, omissions and practices against Torres, a police officer employed by the NYPD. Respondents' unlawful acts, omissions and practices include, among other things: (1) intentionally, inaccurately, inappropriately, wrongfully, recklessly and/or negligently suggesting, implying, concluding, perceiving and/or diagnosing Torres as suffering from alcoholism and/or a problem with alcohol consumption and/or dependence; (2) compelling Torres to undergo an unwarranted course of alcohol-related treatment and care, based on an inaccurate, inappropriate, wrongful, reckless and/or negligent referral for such treatment and care; (3) wrongfully, intentionally, recklessly and/or negligently advising other employees and agents of the respondents, as well as third parties, that Torres suffers from alcoholism and/or a problem with alcohol consumption and/or dependence; and (4) wrongfully, intentionally, recklessly and/or negligently advising other employees and agents of the respondents, as well as third parties, that Torres was compelled to undergo alcohol-related treatment and care.

Respondents' acts, omissions and practices constitute: negligence; gross negligence; breach of fiduciary duty; defamation and defamation per se; violations of New York Public Health Law §18, the New York State Human Rights Law, the New York City Human Rights Law, the Americans with Disabilities Act, the Fair Labor Standards Act, 42 U.S.C. §1983, 42 U.S.C. §290dd-2 et seq. and related regulations at 42 C.F.R. §2.1 et seq.; and/or violations of other statutory or common law rights.

3.    **Date, Location and Manner in Which the Claim Arose**

On or about March 1, 2009, a complaint was filed against Torres with the 107th Precinct, Sector A, by an acquaintance, Matthew Doran, which falsely accused Torres of assaulting Mr. Doran at a party. Torres was not arrested as a result of the complaint by Mr. Doran, nor did the Assistant District Attorney assigned to the complaint pursue any charges against Torres. Regardless, Torres was placed on "modified duty," and was directed to report to Police Plaza and obtain a new NYPD Identification indicating the same. Torres also was directed to meet with a counselor and psychologist for "early intervention."

On or about March 4, 2009, Torres met with a counselor and psychologist, as directed. After meeting for approximately 20-30 minutes, the psychologist directed Torres to report to the Counseling Services Unit ("CSU") of the NYPD.

Later in the day, on or about March 4, 2009, Torres reported to the CSU located at 189 Montague Street, in Brooklyn, New York, and met with Officer Karl Schaefer, LMSW ("Schaefer"). Schaefer appeared in plainclothes and identified himself as a "counselor." Torres

2

and Schaefer discussed the circumstances of the party, Mr. Doran's false complaint against Torres, and Torres' consumption of alcoholic beverages. In response to Schaefer's questions, Torres advised, among other things, that: he consumed alcohol for the very first time during New Year's Eve, 2000; that he keeps no liquor in his house; and that he would describe himself only as a "social drinker."

Torres was ordered to sign a release identifying approximately five (5) individuals whom the CSU was authorized to contact regarding these events. Torres complied with this demand. Schaefer then directed Torres to execute an authorization permitting the Unit to speak with Torres' ex-wife, which he refused to sign, as they had long since been divorced. Upon Torres' refusal to execute the additional authorization, Schaefer threatened to send Torres to an inpatient treatment program. Under this threat, Torres agreed to sign an authorization permitting them to speak to his ex-wife.

Shortly thereafter, Schaefer advised Torres that he believed that Torres had an alcohol-related problem, and that Torres required treatment for the purported problem. Schaefer then presented Torres with documentation pertaining to an in-patient treatment program, and directed Torres to "volunteer" to participate in the program. Torres told Schaefer that he would not participate in any such program, because he did not require alcohol-related treatment. Upon Torres' refusal to volunteer for the program, Schaefer brought respondent Sweeney into the meeting.

Sweeney demanded to know the reason Torres refused to voluntarily undergo alcohol-related treatment. When Torres attempted to explain that he did not require such treatment, Sweeney stated abruptly that, unless he agreed to treatment, Torres would be suspended without pay or fired. At the conclusion of the meeting, Sweeney directed Torres, in form or substance, to go home and think about what he was doing. Sweeney then directed Torres to return to CSU at 8:00 a.m. the following morning. Sweeney stated, in form or substance, that Torres should "pack a bag" and be prepared "to go to rehab."

On or about March 5, 2009, Torres was accompanied to CSU by PBA delegate William Kearney. Sweeney advised Torres that if he did not voluntarily participate in a rehabilitation program, Sweeney would send him to the NYPD Medical Division at Lefrak City Plaza in Corona, New York ("Lefrak"), and they would order him to participate. Sweeney then threatened that Torres would have to come back to CSU, and that Sweeney would make sure that he never left the unit.

Torres and delegate Kearney then went to Lefrak, where Torres met with a superior officer who Torres understood to be a Captain or Deputy Inspector. The superior officer appeared to already know the details of Torre's interactions with the Unit, and the Unit's recommendation of in-patient treatment. Torres does not recall signing any authorization permitting the Unit to disclose confidential information to Lefrak.

The Lefrak superior officer advised Torres that if CSU made a recommendation for Torres to go to treatment, then he would order it. He stated to Torres that he was not in a position to second-guess the Unit's recommendations, but rather only to order Torres to obey

3

such recommendations. The superior officer then advised Torres that if he disobeyed the order, Torres would be suspended for thirty (30) days; and if he disobeyed a second order to undergo treatment, he would be suspended for an additional thirty (30) days. Torres was further advised that, if he disobeyed a third order for treatment, termination proceedings would be commenced. Under threat of suspension and termination, Torres agreed to undergo treatment as ordered by the respondents.

Torres was placed on modified duty for a period of approximately seven (7) months, and respondents compelled Torres to: (a) participate in a thirty (30)-day inpatient rehabilitation program at the Mirmont Treatment Center in Media, Pennsylvania; (b) attend Alcoholics Anonymous meetings five (5) times per week for an additional three-month period thereafter; and (c) attend weekly, monthly and bi-annual counseling sessions at CSU. Torres' compelled "treatment" is on-going, with his most recent counseling session occurring in February 2011.

### 4.    <u>Items of Damage or Injuries Claimed</u>

As a result of respondents' unlawful acts and practices, Torres has sustained psychological and emotional harm, damage to his professional reputation, and economic damages, and is entitled to compensatory and punitive damages, and attorneys' fees.

**PLEASE TAKE NOTICE**, that the undersigned claimant presents this claim and demand for adjustment and payment, and that unless it is adjusted and paid within the time provided by law from date of this presentation, it is the intent of the undersigned to commence an action against the respondents.

The claimant reserves the right to amend, and/or supplement this claim and provide additional documentation and information in support thereof.

Dated: May 10, 2011

_____
Angel Torres

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF NEW YORK   )
      Bronx

ANGEL TORRES, being duly sworn, deposes and says:

I am the Claimant in the within action. I have read the foregoing Notice of Claim and know the contents thereof. The facts set forth therein are true to my knowledge and as to those matters I believe them to be true.

_____
Angel Torres

4

Sworn to before me this
10 day of May, 2011

_____
Notary Public – State of New York

NUA NICAJ
Notary Public - State of New York
No. 01NI6212168
Qualified in Bronx County
My Commission Expires Oct 13, 2013

5

**EXHIBIT "C"**

In the Matter of the Claim of

POLICE OFFICER Kathleen Makinen                    **NOTICE OF CLAIM**

    -against-

THE CITY OF NEW YORK; RAYMOND KELLY,
as Police Commissioner of the City of New York;
THE NEW YORK CITY POLICE DEPARTMENT;
and SERGEANT DANIEL SWEENEY,

TO:

**The New York City Office of the Comptroller**
Division of Law
Bureau of Law & Adjustment
1 Centre Street
Room 1225
New York, New York 10007

**Corporation Counsel of the City of New York**
100 Church Street
New York, New York 10007

    **PLEASE TAKE NOTICE** that the undersigned claimant hereby makes this claim and

demand against you as follows:

    1.    <u>Name and Post Office Addresses of the Claimant and Claimant's Attorneys</u>

        Kathleen Makinen



        Lisa F. Joslin, Esq.
        Gleason, Dunn, Walsh & O'Shea
        40 Beaver Street
        Albany, New York 12207
        (518) 432-7511

2.    **Nature of the Claim**

This claim is for damages sustained by Claimant Kathleen Makinen ("Makinen"), due to the actions, omissions and practices of the City of New York ("City") and the New York City Police Department ("NYPD"), by its agents, servants, employees, and those acting under its direction, behest, permission and control, including, but not limited to, Sergeant Daniel J. Sweeney ("Sweeney") (collectively "respondents").

This action is to remedy respondents' unlawful actions, omissions and practices against Makinen, a police officer employed by the NYPD. Respondents' unlawful acts, omissions and practices include, among other things: (1) intentionally, inaccurately, inappropriately, wrongfully, recklessly and/or negligently suggesting, implying, concluding, perceiving and/or diagnosing Makinen as suffering from alcoholism and/or a problem with alcohol consumption and/or dependence; (2) compelling Makinen to undergo an unwarranted course of alcohol-related treatment and care, based on an inaccurate, inappropriate, wrongful, reckless and/or negligent referral for such treatment and care; (3) wrongfully, intentionally, recklessly and/or negligently advising other employees and agents of the respondents, as well as third parties, that Makinen suffers from alcoholism and/or a problem with alcohol consumption and/or dependence; and (4) wrongfully, intentionally, recklessly and/or negligently advising other employees and agents of the respondents, as well as third parties, that Makinen was compelled to undergo alcohol-related treatment and care.

Respondents' acts, omissions and practices constitute: negligence; gross negligence; breach of fiduciary duty; defamation and defamation per se; violations of New York Public Health Law §18, the New York State Human Rights Law, the New York City Human Rights Law, the Americans with Disabilities Act, the Fair Labor Standards Act, 42 U.S.C. §1983, 42 U.S.C. §290dd-2 et seq. and related regulations at 42 C.F.R. §2.1 et seq.; and/or violations of other statutory or common law rights.

3.    **Date, Location and Manner in Which the Claim Arose**

Makinen has been employed as a Police Officer with the NYPD since April 1991.

On August 16, 2010, Makinen was contacted by the Counseling Services Unit ("CSU") of the NYPD, which according to the CSU, is designed to assist NYPD members who experience difficulties with alcohol, prescription medication, gambling or finances. Makinen was ordered to report immediately to CSU in response to information received by the NYPD Medical Division from retired NYPD Detective Joseph Cornetta ("Cornetta"), Makinen's ex-husband.

Apparently, Cornetta – with whom Makinen had recently ended contentious divorce proceedings – had contacted the CSU, and alleged in sum or substance that Makinen was an "alcoholic in relapse on a daily basis," operating a motor vehicle under the influence of alcohol with her children in the vehicle, violent, and "abusing" her children. Cornetta's accusations were entirely false, and occurred just four days after Makinen received a home visit from Child Protective Services to close an acrimonious custody battle between the two. The results of the home visit were favorable to Makinen, which upset Cornetta.

2

As instructed, Makinen immediately reported to CSU, located at 189 Montague Street, in Brooklyn, New York, on August 16, 2010. Upon arrival at CSU, Makinen met with John Mazzella, who asked her if she had been "drinking." Makinen responded that she had not been drinking, except for the occasional glass of wine with dinner.

Mazzella then stated to Makinen that, after a prior interaction she had with CSU in 2007, she had signed documentation purportedly prohibiting her from consuming any alcohol. Makinen objected to this statement, and stated that she was unaware that CSU had ordered her to refrain entirely from consuming alcohol. It is notable that during her 2007 interactions with CSU, it was determined by an independent counselor at an out-patient facility that there were no indications that Makinen is an "alcoholic" or "abuses alcohol."

During the meeting with Mazzella, Makinen was asked to identify five people whom the CSU could contact regarding Makinen's consumption of alcohol, and was told to sign a release authorizing such contact. In response to this request, Makinen identified the following individuals: (1) her personal therapist, Margie Sugarman; (2) the Child Protective Services representative assigned to her custody proceedings with her ex-husband; (3) her brother; (4) her sister-in-law; and (4) her father.

Mazzella telephoned each of these individuals to seek information regarding Makinen's consumption of alcohol, and each one assured Mazzella that she did not have a drinking problem. Her father stated to Mazzella that Makinen consumed alcohol only "once in a blue moon." Makinen herself advised Mazzella repeatedly that she did not have a problem with alcohol consumption.

Mazzella then contacted Cornetta himself, and Makinen was able to overhear the phone conversation between the two. During their conversation, Cornetta conceded to Mazzella that he had not personally observed Makinen drinking alcohol, nor did he have any other proof of her alcohol consumption. He stated only that he "just knew" that Makinen "drank."

At no point was Makinen subjected to any diagnostic tests by the Unit. However, Mazzella advised Makinen that based on her ex-husband's allegations, and her father's statement that she "drank once in a blue moon," she would be compelled to attend inpatient rehabilitation for alcohol abuse.

Makinen was shocked, and became visibly distressed. She attempted repeatedly to explain to Mazzella that she and Cornetta are engaged in very contentious custody proceedings, and that any allegations or statements made by him were motivated solely by an attempt to gain advantages in these proceedings. Makinen pleaded with Mazzella to consider the context in which the allegations were made, and the fact that all other individuals contacted by CSU had corroborated her position. Makinen's efforts were in vain, as Mazzella disregarded her statements entirely, and indicated that the decision had been made.

Despite having no factual support for the allegations made by her ex-husband, Mazzella had summarily determined that Makinen suffered from alcoholism and/or a problem with alcohol

3

consumption, and ordered her to undergo treatment as a result. Makinen stated that she would not comply with this directive, because she did not require it.

Shortly thereafter, CSU personnel Sergeant Sweeney and Mike Barenberg joined the meeting with Mazzella and Makinen. Upon hearing Makinen's objections to the recommended "treatment," the three men told Makinen that her only options were to either: (1) report to CSU at 9:00 a.m. the following day, with her bags packed for in-patient rehabilitation; or (2) or report to the NYPD Medical Division at Lefrak City Plaza in Corona, New York ("Lefrak"), at 10:00 a.m. the following day.

Makinen was kept at the CSU until approximately 5pm on August 16, 2010, and then had to meet Mazella back at her command post, where her guns, ID, and shield were taken from her. Chief Michael Marino and Lt. Stephen O'Hare, with whom Makinen works, were both present when Makinen was return to her command, and both spoke with Mazzella in an effort to convince him that Makinen did not require inpatient rehabilitation for alcoholism. Mazzella ignored Marino and O'Hare.

The following day, on August 17, 2010, Makinen reported to Lefrak to meet with Captain Donnelly of the NYPD Medical Division. Makinen advised Donnelly that she did not abuse alcohol and did not require treatment. She attempted to explain the circumstances surrounding her ex-husband's unsubstantiated allegations, and his manipulation of the system to gain leverage in their ongoing custody proceedings.

Captain Donnelly told Makinen that there was nothing that he could do. He reiterated that if Makinen refused the CSU's recommendation of inpatient treatment, she would be suspended for thirty (30) days – during which period, Makinen would not be paid, and she and her children would not be covered by health insurance. Once the suspension ended, she would again be faced with the decision to either comply with recommended treatment, or be suspended for a second thirty (30) day period. Makinen was further advised that, after three suspensions, termination proceedings would begin. As a single mother, responsible for supporting two children, Makinen had no choice but to accept the CSU's recommendation of inpatient treatment.

On August 17, 2010, Makinen signed a CSU Treatment Agreement & Client Confidentiality Agreement ("Treatment Agreement"). The terms of the Treatment Agreement included, among other things: abstaining from alcohol; inpatient rehabilitation, including detoxification, for approximately 28 days; placement on Limited Capacity or Restricted Duty for approximately 90 days, "or until such time as the Supervising Chief Surgeon or his representative authorizes restoration to Full Duty;" attendance at 12-15 weekly group counseling sessions at CSU; and attendance at three (3) Alcoholics Anonymous ("AA") meetings per week on separate days, one individual therapy session per week, and two group sessions per week at an out-patient rehabilitation center.

In addition, the Treatment Agreement required that Makinen would be monitored for a period of two (2) years after successful completion of the CSU Program, and assignment to the Confidential Medical District ("CMD") for a period of one (1) year. The Treatment Agreement

4

further mandated that Makinen would be picked up at her Suffolk County residence by the treatment facility on August 20, 2010.

Makinen was sent to in-patient treatment at Marworth Treatment Center in Waverly, Pennsylvania, for the period August 20 to September 17, 2010. During this time, Makinen's contact with her children and family was severely restricted, as the program provides for only limited visitation and telephone communications. Makinen made arrangements for her parents to care for her children during this period, but she suffered distress by the lack of contact with her children.

Makinen learned that there were treatment facilities closer to her home on Long Island, New York, and requested that CSU assign her to one of those facilities, so that she could be closer to her children. CSU refused her request, however.

To make matters worse, Makinen's health insurance policy did not cover her inpatient rehabilitation treatment. As a result, Makinen was required to take out a $2,800 pension loan to pay for the treatment compelled by CSU. While at the Marworth treatment center, Makinen was specifically told by the counselors that she did not have a problem with alcohol, and did not belong at the facility.

Upon returning home from inpatient rehabilitation, Makinen was required to: attend one (1)-hour outpatient rehabilitation sessions twice per week (with a $5 co-pay each visit); attend AA meetings three (3) days per week; and attend a counseling session at CSU once per week. Only the weekly CSU meeting was during work time. The outpatient rehabilitation sessions and the AA meetings were required during Makinen's personal time, and she was not compensated for the time she spent there. Makinen was required to adhere to this course of treatment for 19 weeks. During this period, Makinen was prohibited from working overtime hours, which resulted in a loss of her income.

Makinen "treatment" with CSU continues to this date. She is required to attend a CSU meeting once per month for three months following her completion of the program, and then once every three months for a period of time. Thereafter, Makinen is required to attend a CSU meeting once every six months.

As anticipated, Makinen's ex-husband, Detective Cornetta, attempted to use Makinen's forced inpatient treatment to gain leverage in their custody proceedings. During her stay in the Marworth facility, Cornetta removed their children from the care of Makinen's parents, and obtained a temporary order of protection against her, which prevented Makinen from driving a vehicle with their children in it. While Makinen regained physical custody of the children upon her return from Marworth, the order of protection had a devastating effect on their lives. Once again, Makinen was required to seek assistance from her parents in order to care for their children.

Cornetta also filed for full custody of the children, citing Makinen's inpatient treatment as a basis for his motion. While Cornetta's motion was denied, he continues in his attempts to cause difficulties for Makinen.

5

4.    **Items of Damage or Injuries Claimed**

As a result of respondents' unlawful acts and practices, Makinen has sustained psychological and emotional harm, damage to her professional reputation, and economic damages. By reason of respondents' conduct, Makinen is entitled to compensatory and punitive damages, and attorneys' fees.

**PLEASE TAKE NOTICE**, that the undersigned claimant presents this claim and demand for adjustment and payment, and that unless it is adjusted and paid within the time provided by law from date of this presentation, it is the intent of the undersigned to commence an action against the respondents.

The claimant reserves the right to amend, and/or supplement this claim and provide additional documentation and information in support thereof.

Dated: May 27, 2011

Kathleen Makinen

STATE OF NEW YORK    )
                                        )    ss.:
COUNTY OF NEW YORK  )

KATHLEEN MAKINEN, being duly sworn, deposes and says:

I am the Claimant in the within action. I have read the foregoing Notice of Claim and know the contents thereof. The facts set forth therein are true to my knowledge and as to those matters I believe them to be true.

Kathleen Makinen

Sworn to before me this
29 day of May, 2011

Notary Public – State of New York

LYNDSEY M CIPOLLA
Notary Public - State of New York
NO. 01CI6222287
Qualified in Suffolk County
My Commission Expires 5/24/14

6

EXHIBIT "D"

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | __ FEPA<br>X EEOC | 520-2011- 02208 |

New York State Division of Human Rights and EEOC
*State or local Agency, if any*

| Name (*indicate Mr. Ms. Mrs.*) | Home Phone (*Incl. Area Code*) | Date of Birth |
|---|---|---|
| Ms. Jamie Nardini | ▮▮▮▮▮ | ▮▮▮▮▮ |
| Street Address | City, State and ZIP Code | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| City of New York | 100+ | (212) 788-0303 |
| Street Address | City, State and ZIP Code | |
| Law Department, 100 Church Street, New York, NY 10007 | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| New York City Police Department | 100+ | (646) 610-5060 |
| Street Address | City, State and ZIP Code | |
| Office of Labor Relations, One Police Plaza, New York, NY 10038 | | |

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

__ RACE   __ COLOR   __ SEX __ RELIGION   __ NATIONAL ORIGIN

__ RETALIATION __ AGE _X_ DISABILITY   __ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest     Latest
12/10/2011

__ CONTINUING ACTION

THE PARTICULARS ARE (*if additional paper is needed, attached extra sheet(s)*):

See Attachment.

RECEIVED
MAY 09 2011
EEOC-NYDO-CRTIU

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT<br>*[signature]*<br>State of New York County of Putnam<br>Notary *[signature]* 5th day of May 2011<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

5/5/11
Date          *[signature]* Charging Party Signature

DAVID A. COLBY
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN PUTNAM COUNTY
REG. # 01CO6232018

U.S. Equal Employment Opportunity Commission                    Jamie Nardini

### *Charge of Discrimination*

1.      I commenced employment with Respondent the New York City Police Department (the "Department") as a Police Officer in July 2006.

2.      In the course of my employment with Respondents, I have been subjected to discrimination on the basis of a perceived disability, in violation of the Americans with Disabilities Act of 1990, as amended, as well as the New York State and New York City Human Rights Laws.

3.      Respondents have regarded me as suffering from alcoholism, and have engaged in a pattern of disparate treatment motivated by such perception.

4.      In the course of my employment, Respondents have: (1) intentionally, wrongfully, and/or recklessly regarded me as suffering from alcoholism; (2) compelled me to undergo an unwarranted course of alcohol-related treatment and care, based on Respondents' perception; (3) wrongfully, intentionally and/or recklessly advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I suffer from alcoholism and/or have a problem with alcohol consumption; and (4) wrongfully, intentionally and/or recklessly advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I was compelled to undergo alcohol-related treatment and care.

5.      I have at no time suffered from alcoholism, and at all times have been qualified to perform the essential functions of my job as a police officer at the Department.

6.      On or about October 28, 2010, when I reported for work at the Department, I was directed to report to the Department's Alcohol Counseling Services Unit (the "Unit").

7.      At the Unit, I met with a staff counselor, Vicky Tobin, who advised me that my former boyfriend (a Sergeant of the Department) and his sister had called the Unit and suggested that I have a problem with alcohol consumption. At the time, my former boyfriend and I were engaged in a contentious custody dispute concerning our young daughter.

8.      I explained to Ms. Tobin that the allegations were entirely false, that I rarely consumed alcohol, and that the allegations were motivated solely by an intent to harm me in the custody dispute. I advised Mr. Tobin that, just two (2) days prior, during an October 26, 2010 court appearance, my former boyfriend had lost overnight visitation with our daughter, and was ordered to see her only during supervised visits. I further explained that these false allegations were designed solely to punish me for the ruling, and to improperly utilize the Department's procedures to damage me personally and professionally.

9.      Despite these explanations, Ms. Tobin treated me with extreme hostility, and refused to acknowledge the context in which these allegations were brought. She appeared to

have already concluded that I suffered from alcoholism. After a short conversation, Ms. Tobin made it clear to me that there was nothing that I could say or do to dissuade her from that conclusion.

10.    Despite my explanations, Ms. Tobin advised me that I was required to undergo treatment for alcohol abuse. She suggested that I attend out-patient counseling sessions during work hours, Alcoholics Anonymous ("AA") meetings three to four times per week during my personal time, and out-patient therapy during my personal time.

11.    I advised Ms. Tobin that, because I did not abuse alcohol and did not require the treatment she suggested, I would not agree to participate in it. Ms. Tobin then stated to me that if I refused to participate in the recommended treatment, my employment with the Department would be suspended.

12.    Ms. Tobin and I then spoke with the Unit Sergeant, Daniel J. Sweeney, via telephone, as he was out of the office at the time. I reiterated to Sergeant Sweeney that I did not abuse alcohol, and these allegations were made solely to punish me for the custody ruling in my favor, and to damage me personally and professionally. Sergeant Sweeney told me that he would be in the office the next day, and that we could speak then.

13.    I returned to the Unit the following day, October 29, 2010, but did not meet with Sergeant Sweeney. Instead, I met again with Ms. Tobin. Ms. Tobin "offered" me a slightly modified treatment package, which involved one less AA meeting per week, and provided that the outpatient counseling would be during work time. I again refused the treatment, explaining that I did not have a problem with alcohol, and that the allegations were baseless. Ms. Tobin responded again that, if I refused the treatment, my employment would be suspended.

14.    Several more times, Ms. Tobin modified the suggested course of treatment, and I continued to refuse participation. After each refusal, Ms. Tobin reiterated that I risked suspension if I refused alcohol-related treatment.

15.    During the period October 28 through 29, 2010, I was threatened with suspension approximately 10 times. Ms. Tobin's repeated threats of suspension caused me to suffer extreme stress and anxiety. I became visibly upset and emotional, and started crying as a result of the threats. As a single mother, suspension would be devastating to my ability to make ends meet and pay my mortgage.

16.    Eventually, on October 29, 2010, Ms. Tobin advised that if I agreed to watch a series of six (6) "educational videos" during my regular working hours, the Unit would not require me to undergo any additional treatment. After a grueling two-day period, I agreed to this offer, to avoid suspension of my employment.

17.    The following week, I returned to the Unit to view the first in the series of six videos, and I finally met Sergeant Sweeney. I tried again to explain to Sergeant Sweeney that I

did not have an alcohol-related problem, and the false allegations were brought against me solely to impact our ongoing custody dispute.

18.    Rather than discuss this issue with me, as previously promised, Sergeant Sweeney rudely and abruptly cut me off.  In a belittling manner, Sergeant Sweeney told me that my experiences with my former boyfriend, including the acrimonious custody dispute, were like "PMS."  Sergeant Sweeney continued to make inappropriate and degrading remarks, and refused to acknowledge the true context in which I was "referred" to the Unit for treatment.

19.    As directed, I returned to the unit on five more occasions to complete my "treatment" program.

20.    Throughout the period October through December 2010, it came to my attention that Respondents advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I purportedly suffer from alcoholism and/or have a problem with alcohol consumption, and that I was compelled to undergo alcohol-related treatment and care as a result.  Learning of these communications, and their potential to damage my professional reputation, caused me to suffer further distress.

21.    Respondents' actions described herein violate my rights under the Americans with Disabilities Act of 1990, as amended, as well as the New York State and New York City Human Rights Laws.

22.    By reason of Respondents' unlawful conduct, I have suffered emotional pain and suffering, for which I seek compensatory damages, attorneys' fees, costs and expenses.


Dated:        May 5, 2011
              Albany, New York            Sincerely,


                                          Jamie Nardini

**EXHIBIT "E"**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | __ FEPA<br>_X_ EEOC | 520-2011-02391 |

New York State Division of Human Rights and EEOC
*State or local Agency, if any*

| Name *(indicate Mr. Ms. Mrs.)* | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Angel Torres | ▆▆▆▆▆ | ▆▆▆▆▆ |
| Street Address | City, State and ZIP Code | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| City of New York | 100+ | (212) 788-0303 |
| Street Address | City, State and ZIP Code | |
| Law Department, 100 Church Street, New York, NY 10007 | | |
| Name | No. Employees, Members | Phone No. (Include Area Code) |
| New York City Police Department | 100+ | (646) 610-5060 |
| Street Address | City, State and ZIP Code | |
| Office of Labor Relations, One Police Plaza, New York, NY 10038 | | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE<br>Earliest          Latest |
|---|---|
| __ RACE   __ COLOR   __ SEX __ RELIGION   __ NATIONAL ORIGIN<br><br>__ RETALIATION   __ AGE   _X_ DISABILITY   __ OTHER (Specify below.) | _X_ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attached extra sheet(s)):*

See Attachment.

R E C E I V E D

MAY 2 3 2011

EEOC-NYDO-CRTiU

ZARINA YUSUPOVA

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY -- When necessary for State and Local Agency Requirements<br><br>NOTARY PUBLIC, STATE OF NEW YORK<br>No. 01YU6194997<br>Qualified in Queens County<br>My Commission Expires October 14, 2012 |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>5/19/11<br>*Date*      *Charging Party Signature* | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*<br>May 19, 2011 |

**U.S. Equal Employment Opportunity Commission**                    **Angel Torres**

### *Charge of Discrimination*

1.      I commenced employment with Respondent the New York City Police Department (the "Department") as a Police Officer on August 30, 1993.

2.      In the course of my employment with Respondents, I have been subjected to discrimination on the basis of a perceived disability, in violation of the Americans with Disabilities Act of 1990, as amended, as well as the New York State and New York City Human Rights Laws.

3.      Respondents have regarded me as suffering from alcoholism, and have engaged in a pattern of disparate treatment motivated by such perception.

4.      In the course of my employment, Respondents have: (1) intentionally, wrongfully, and/or recklessly regarded me as suffering from alcoholism; (2) compelled me to undergo an unwarranted course of alcohol-related treatment and care, based on Respondents' perception; (3) wrongfully, intentionally and/or recklessly advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I suffer from alcoholism and/or have a problem with alcohol consumption; and (4) wrongfully, intentionally and/or recklessly advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I was compelled to undergo alcohol-related treatment and care.

5.      I have at no time suffered from alcoholism, and at all times have been qualified to perform the essential functions of my job as a police officer at the Department.

6.      On or about March 1, 2009, a complaint was filed against me with the 107th Precinct, Sector A, by an acquaintance, Matthew Doran, which falsely accused me of assaulting Mr. Doran at a party.  I was not arrested as a result of the complaint by Mr. Doran, nor did the Assistant District Attorney assigned to the complaint pursue any charges against me. Regardless, I was placed on "modified duty," and was directed to report to Police Plaza and obtain a new NYPD Identification indicating the same.  I also was directed to meet with a counselor and psychologist for "early intervention."

7.      On or about March 4, 2009, I met with a counselor and psychologist, as directed. After meeting for approximately 20-30 minutes, the psychologist directed me to report to the Counseling Services Unit ("CSU") of the NYPD.

8.      Later in the day, on or about March 4, 2009, I reported to the CSU located at 189 Montague Street, in Brooklyn, New York, and met with Officer Karl Schaefer, LMSW ("Schaefer").   Schaefer appeared in plainclothes and identified himself as a "counselor." Schaefer and I discussed the circumstances of the party, Mr. Doran's false complaint against me, and my consumption of alcoholic beverages.  In response to Schaefer's questions, I advised, among other things, that: I consumed alcohol for the very first time during New Year's Eve,

U.S. Equal Employment Opportunity Commission                    **Angel Torres**
Page 3

order for treatment, termination proceedings would be commenced. Under threat of suspension and termination, I agreed to undergo treatment as ordered by the respondents.

15.     I was placed on modified duty for a period of approximately seven (7) months, and respondents compelled me to: (a) participate in a thirty (30)-day inpatient rehabilitation program at the Mirmont Treatment Center in Media, Pennsylvania; (b) attend Alcoholics Anonymous meetings five (5) times per week for an additional three-month period thereafter; and (c) attend weekly, monthly and bi-annual counseling sessions at CSU. My compelled "treatment" is on-going, with my most recent counseling session occurring in February 2011.

16.     Additionally, it has come to my attention that Respondents advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I purportedly suffer from alcoholism and/or have a problem with alcohol consumption, and that I was compelled to undergo alcohol-related treatment and care as a result. Learning of these communications, and their potential to damage my professional reputation, caused me to suffer further distress.

17.     Respondents' actions described herein violate my rights under the Americans with Disabilities Act of 1990, as amended, as well as the New York State and New York City Human Rights Laws.

18.     By reason of Respondents' unlawful conduct, I have suffered emotional pain and suffering, for which I seek compensatory damages, attorneys' fees, costs and expenses.

Dated:      May 19, 2011

                                         Sincerely,

                                         Angel Torres

**EXHIBIT "F"**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ___ FEPA<br>_X_ EEOC | 520 - 2011 - 02427 |

New York State Division of Human Rights and EEOC
*State or local Agency, if any*

| Name (*indicate Mr. Ms. Mrs.*) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Kathleen Makinen | | |

Street Address                                  City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency
That I believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| City of New York | 100+ | (212) 788-0303 |
| Street Address    City, State and ZIP Code<br>Law Department, 100 Church Street, New York, NY 10007 | | |
| Name | No. Employees, Members | Phone No. (Include Area Code) |
| New York City Police Department | 100+ | (646) 610-5060 |
| Street Address              . City, State and ZIP Code<br>Office of Labor Relations, One Police Plaza, New York, NY 10038 | | |

DISCRIMINATION BASED ON (*Check appropriate box(es).*)

__ RACE  __ COLOR __ SEX __ RELIGION __ NATIONAL ORIGIN

__ RETALIATION __ AGE _X_ DISABILITY __ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE |
|---|
| Earliest        Latest |
| _X_ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional paper is needed, attached extra sheet(s)*):

See Attachment.

RECEIVED
JUN 0 2 2011
EEOC-NYDO-CRTIU

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLANANT<br>*Kathleen Makinen* |
| 5/27/11    *Kathleen Makinen* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year)<br>NO. 01CA8220735<br>Qualified in Suffolk County |

**U.S. Equal Employment Opportunity Commission**          **Kathleen Makinen**

### *Charge of Discrimination*

1.     I commenced employment with Respondent the New York City Police Department (the "Department") as a Police Officer in April 1991.

2.     In the course of my employment with Respondents, I have been subjected to discrimination on the basis of a perceived disability, in violation of the Americans with Disabilities Act of 1990, as amended, as well as the New York State and New York City Human Rights Laws.

3.     Respondents have regarded me as suffering from alcoholism, and have engaged in a pattern of disparate treatment motivated by such perception.

4.     In the course of my employment, Respondents have: (1) intentionally, wrongfully, and/or recklessly regarded me as suffering from alcoholism; (2) compelled me to undergo an unwarranted course of alcohol-related treatment and care, based on Respondents' perception; (3) wrongfully, intentionally and/or recklessly advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I suffer from alcoholism and/or have a problem with alcohol consumption; and (4) wrongfully, intentionally and/or recklessly advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I was compelled to undergo alcohol-related treatment and care.

5.     I have at no time suffered from alcoholism, and at all times have been qualified to perform the essential functions of my job as a police officer at the Department.

6.     On August 16, 2010, I was contacted by the Counseling Services Unit ("CSU") of the NYPD, which according to the CSU, is designed to assist NYPD members who experience difficulty with alcohol, prescription medication, gambling or finances.  I was ordered to report immediately to CSU in response to information received by the NYPD Medical Division from retired NYPD Detective Joseph Cornetta ("Cornetta"), my ex-husband.

7.     Apparently, Cornetta – with whom I had recently ended contentious divorce proceedings – had contacted the CSU, and alleged in sum or substance that I was an "alcoholic in relapse on a daily basis," operating a motor vehicle under the influence of alcohol with my children in the vehicle, violent, and "abusing" my children.  Cornetta's accusations were entirely false, and occurred just four days after I received a home visit from Child Protective Services to close an acrimonious custody battle between us.  The results of the home visit were favorable to me, which upset Cornetta.

8.     As instructed, I immediately reported to CSU, located at 189 Montague Street, in Brooklyn, New York, on August 16, 2010.  Upon my arrival at CSU, I met with John Mazzella, who asked me if I had been "drinking."  I responded that I had not been drinking, except for the occasional glass of wine with dinner.

U.S. Equal Employment Opportunity Commission                Kathleen Makinen
Page 2

9.    Mazzella then stated to me that, after a prior interaction I had with CSU in 2007, I had signed documentation purportedly prohibiting me from consuming any alcohol. I objected to this statement, and stated that I was unaware that CSU had ordered me to refrain entirely from consuming alcohol. It is notable that during my 2007 interactions with CSU, it was determined by an independent counselor at an out-patient facility that there were no indications that I was an "alcoholic" or "abuse alcohol."

10.    During the meeting with Mazzella, I was asked to identify five people whom the CSU could contact regarding my consumption of alcohol, and was told to sign a release authorizing such contact. In response to this request, I identified the following individuals: (1) my personal therapist, Margie Sugarman; (2) the Child Protective Services representative assigned to my custody proceedings with my ex-husband; (3) my brother; (4) my sister-in-law; and (4) my father.

11.    Mazzella telephoned each of these individuals to seek information regarding my consumption of alcohol, and each one assured Mazzella that I did not have a drinking problem. My father stated to Mazzella that I consumed alcohol only "once in a blue moon." I myself advised Mazzella repeatedly that I did not have a problem with alcohol consumption.

12.    Mazzella then contacted Cornetta himself, and I was able to overhear the phone conversation between the two. During their conversation, Cornetta conceded to Mazzella that he had not personally observed me drinking alcohol, nor did he have any other proof of my alcohol consumption. He stated only that he "just knew" that I "drank."

13.    At no point was I subjected to any diagnostic tests by the Unit. However, Mazzella advised me that based on my ex-husband's allegations and my father's statement that I "drank once in a blue moon," I would be compelled to attend inpatient rehabilitation for alcohol abuse.

14.    I was shocked, and became visibly distressed. I attempted repeatedly to explain to Mazzella that Cornetta and I are engaged in very contentious custody proceedings, and that any allegations or statements made by him were motivated solely by an attempt to gain advantages in these proceedings. I pleaded with Mazzella to consider the context in which the allegations were made, and the fact that all other individuals contacted by CSU had corroborated my position. My efforts were in vain, as Mazzella disregarded my statements entirely, and indicated that the decision had been made.

15.    Despite having no factual support for the allegations made by my ex-husband, Mazzella had summarily determined that I suffered from alcoholism and/or a problem with alcohol consumption, and ordered me to undergo treatment as a result. I stated that I would not comply with this directive, because I did not require it.

U.S. Equal Employment Opportunity Commission                    Kathleen Makinen
Page 3

16.    Shortly thereafter, CSU personnel Sergeant Sweeney and Mike Barenberg joined the meeting with Mazzella and me.    Upon hearing my objections to the recommended "treatment," the three men told me that my only options were to either: (1) report to CSU at 9:00 a.m. the following day, with my bags packed for in-patient rehabilitation; or (2) to report to the NYPD Medical Division at Lefrak City Plaza in Corona, New York ("Lefrak"), at 10:00 a.m. the following day.

17.    I was kept at the CSU until approximately 5:00 pm on August 16, 2010, and then had to meet Mazella back at my command post, where my guns, ID and shield were taken from me. Chief Michael Marino and Lt. Stephen O'Hare, with whom I work, were both present when I returned to my command, and both spoke with Mazzella in an effort to convince him that I did not require inpatient rehabilitation for alcoholism. Mazzella ignored Marino and O'Hare.

18.    The following day, on August 17, 2010, I reported to Lefrak to meet with Captain Donnelly of the NYPD Medical Division. I advised Donnelly that I did not abuse alcohol and did not require treatment. I attempted to explain the circumstances surrounding my ex-husband's unsubstantiated allegations, and his manipulation of the system to gain leverage in our ongoing custody proceedings.

19.    Captain Donnelly told me that there was nothing that he could do.  He reiterated that if I refused the CSU's recommendation of inpatient treatment, I would be suspended for thirty (30) days – during which period, I would not be paid, and neither I nor my children would be covered by health insurance.  Once the suspension ended, I would again be faced with the decision to either comply with recommended treatment, or be suspended for a second thirty (30) day period.  I was further advised that, after three suspensions, termination proceedings would begin. As a single mother, responsible for supporting two children, I had no choice but to accept the CSU's recommendation of inpatient treatment.

20.    On August 17, 2010, I signed a CSU Treatment Agreement & Client Confidentiality Agreement ("Treatment Agreement"). The terms of the Treatment Agreement included, among other things: abstaining from alcohol; inpatient rehabilitation, including detoxification, for approximately 28 days; placement on Limited Capacity or Restricted Duty for approximately 90 days, "or until such time as the Supervising Chief Surgeon or his representative authorizes restoration to Full Duty;" attendance at 12-15 weekly group counseling sessions at CSU; and  attendance at three (3) Alcoholics Anonymous ("AA") meetings per week on separate days, one individual therapy session per week, and two group sessions per week at an out-patient rehabilitation center.

21.    In addition, the Treatment Agreement required that I would be monitored for a period of two (2) years after successful completion of the CSU Program, and assignment to the Confidential Medical District ("CMD") for a period of one (1) year. The Treatment Agreement further mandated that I would be picked up at my Suffolk County residence by the treatment facility on August 20, 2010.

U.S. Equal Employment Opportunity Commission                    Kathleen Makinen
Page 4

22.    I was sent to in-patient treatment at Marworth Treatment Center in Waverly, Pennsylvania, for the period August 20 to September 17, 2010. During this time, my contact with my children and family was severely restricted, as the program provides for only limited visitation and telephone communications. I made arrangements for my parents to care for my children during this period, but I suffered distress by the lack of contact with my children.

23.    I learned that there were treatment facilities closer to my home on Long Island, New York, and requested that CSU assign me to one of those facilities, so that I could be closer to my children. CSU refused my request, however.

24.    To make matters worse, my health insurance policy did not cover my inpatient rehabilitation treatment. As a result, I was required to take out a $2,800 pension loan to pay for the treatment compelled by CSU. While at the Marworth treatment center, I was specifically told by the counselors that I did not have a problem with alcohol, and did not belong at the facility.

25.    Upon returning home from inpatient rehabilitation, I was required to: attend one (1)-hour outpatient rehabilitation sessions twice per week (with a $5 co-pay each visit); attend AA meetings three (3) days per week; and attend a counseling session at CSU once per week. Only the weekly CSU meeting was during work time. The outpatient rehabilitation sessions and the AA meetings were required during my personal time, and I was not compensated for the time I spent there. I was required to adhere to this course of treatment for 19 weeks. During this period, I was prohibited from working overtime hours, which resulted in a loss of my income.

26.    My "treatment" with CSU continues to this date. I am required to attend a CSU meeting once per month for three months following my completion of the program, and then once every three months for a period of time. Thereafter, I am required to attend a CSU meeting once every six months.

27.    As anticipated, my ex-husband, Detective Cornetta, attempted to use my forced inpatient treatment to gain leverage in our custody proceedings. During my stay in the Marworth facility, Cornetta removed my children from the care of my parents, and obtained a temporary order of protection against me, which prevented me from driving a vehicle with our children in it. While I regained physical custody of the children upon my return from Marworth, the order of protection had a devastating effect on our lives. Once again, I was required to seek assistance from my parents in order to care for my children.

28.    Cornetta also filed for full custody of the children, citing my inpatient treatment as a basis for his motion. While Cornetta's motion was denied, he continues in his attempts to cause difficulties for me.

29.    Additionally, it has come to my attention that Respondents advised other employees and agents of the Respondents, as well as third parties, directly, indirectly, or by association, that I purportedly suffer from alcoholism and/or have a problem with alcohol

U.S. Equal Employment Opportunity Commission                    Kathleen Makinen
Page 5

consumption, and that I was compelled to undergo alcohol-related treatment and care as a result. Learning of these communications, and their potential to damage my professional reputation, caused me to suffer further distress.

30.    Respondents' actions described herein violate my rights under the Americans with Disabilities Act of 1990, as amended, as well as the New York State and New York City Human Rights Laws.

31.    By reason of Respondents' unlawful conduct, I have suffered emotional pain and suffering, for which I seek compensatory damages, attorneys' fees, costs and expenses.

Dated:        May 27 2011                              Sincerely,

                                                              *[signature]*
                                                              Kathleen Makinen

*Subscribed & Sworn to me*
*This 27th day of May 2011*

*[signature]*

ANGELA LASASSO
Notary Public - State of New York
NO. 01LA6220735
Qualified In Suffolk County
My Commission Expires  4/19/14

**EXHIBIT "G"**



**U.S. Department of Justice**

Civil Rights Division

NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
2011 5569

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

February 8, 2012

Ms. Jamie J. Nardini
c/o Lisa F. Joslin, Esquire
Law Office of Gleason, Dunn, et al.
40 Beaver Street
Albany, NY  12207

Re:  EEOC Charge Against City of New York, New York City Police Dept.
     No. 520201102208

Dear Ms. Nardini:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Thomas E. Perez
Assistant Attorney General
Civil Rights Division

by *Karen L. Ferguson*

Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: New York District Office, EEOC
    City of New York, New York City Police Dept.

EXHIBIT "H"



**U.S. Department of Justice**

Civil Rights Division

NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
2011 5576

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

February 8, 2012

Mr. Angel D. Torres
c/o Lisa F. Joslin, Esquire
Law Offices of Gleason, Dunn, et al.
Attorney at Law
40 Beaver Street
Albany, NY  12207

Re:  EEOC Charge Against New York City Police Department
     No. 520201102391

Dear Mr. Torres:

   Because you filed the above charge with the Equal Employment
Opportunity Commission, and more than 180 days have elapsed since the date
the Commission assumed jurisdiction over the charge, and no suit based
thereon has been filed by this Department, and because you through your
attorney have specifically requested this Notice, you are hereby notified
that you have the right to institute a civil action under Title I of the
Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq., against
the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in
the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC
New York District Office, New York, NY.

   This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is meritorious.

                                      Sincerely,

                              Thomas E. Perez
                         Assistant Attorney General
                            Civil Rights Division

              by

                            Karen L. Ferguson
                        Supervisory Civil Rights Analyst
                          Employment Litigation Section

cc: New York District Office, EEOC
    New York City Police Department

EXHIBIT "I"



**U.S. Department of Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
2012 5056

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

February 17, 2012

Ms. Kathleen Makinen
c/o Lisa F. Joslin, Esquire
Law Offices of Gleason, Dunn, et al.
Attorneys at Law
40 Beaver Street
Albany, NY  12207

Re:  EEOC Charge Against City of New York, New York City Police Department
     No. 520201102427

Dear Ms. Makinen:

     Because you filed the above charge with the Equal Employment
Opportunity Commission, and more than 180 days have elapsed since the date
the Commission assumed jurisdiction over the charge, and no suit based
thereon has been filed by this Department, and because you through your
attorney have specifically requested this Notice, you are hereby notified
that you have the right to institute a civil action under Title I of the
Americans with Disabilities Act of 1990, 42 U.S.C. 12111, et seq., against
the above-named respondent.

     If you choose to commence a civil action, such suit must be filed in
the appropriate Court within 90 days of your receipt of this Notice.

     The investigative file pertaining to your case is located in the EEOC
New York District Office, New York; NY.

     This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is meritorious.

                              Sincerely,

                         Thomas E. Perez
                    Assistant Attorney General
                       Civil Rights Division

                    by

                         Karen L. Ferguson
                    Supervisory Civil Rights Analyst
                    Employment Litigation Section

cc: New York District Office, EEOC
    City of New York, New York City Police Department