**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

KATHLEEN MAKINEN, et al.,                    :
                                             :
                              Plaintiffs,    :
                                             :        1:11-cv-07535 (ALC) (GWG)
            -against-                        :
                                             :
CITY OF NEW YORK, et al.,                    :        <u>OPINION & ORDER</u>
                                             :
                              Defendants.    :
------------------------------------------------------------x

ANDREW L. CARTER, JR., United States District Judge:

## I.      INTRODUCTION

Plaintiffs Kathleen Makinen, Jamie Naridini and Angel Torres (collectively referred to

herein as "Plaintiffs") brought this action against the City of New York, former Police

Commissioner Raymond W. Kelly, the New York City Police Department ("NYPD"), and

NYPD Sergeant Daniel Sweeney, individually and in his official capacity, (collectively referred

to as "Defendants"), asserting state and federal claims of disability discrimination and unpaid

wages and overtime, as well as a myriad of state law tort claims in connection with the NYPD's

alleged misdiagnoses of them as suffering from alcohol dependence or abuse.  On May 6, 2013,

Defendants moved for summary judgment, (ECF No. 32), and on June 26, 2013 Plaintiffs cross-

moved for partial summary judgment.  (ECF Nos. 33 & 50.)  For the reasons stated below,

Defendants' motion is granted and denied in part and Plaintiffs' motion is denied.

## II.     BACKGROUND

### A.      Factual Background

The following facts are drawn from Plaintiffs' "Statement of Material Facts pursuant to

Local Rule 56.1 Statement" (ECF No. 54 ("Pls.' Stmt."), submitted as a counterstatement to

Defendants' 56.1 Statement in support of their motion, Defendants' "Local Rule 56.1 Statement

in Opposition to Plaintiffs' Statement of Undisputed Material Facts" (ECF No. 59 ("Defs.'

Counter-Stmt.")), submitted as a counterstatement to Plaintiffs' 56.1 Statement, as well the

underlying evidence cited therein.  Where the facts are subject to legitimate dispute, they are

construed in favor of the non-moving party.  *Heublein, Inc. v. United States*, 996 F.2d 1455,

1461 (2d Cir. 1993).

>    *1.*    *NYPD CSU*

The NYPD's Counseling Services Unit ("CSU") is a certified New York State Office of

Alcoholism and Substance Abuse Services ("OASAS") outpatient treatment center.  (Pls.' Stmt.

¶ 6.)  Its stated objective is to assist police officers who are experiencing difficulty with alcohol,

prescription medication, gambling or finances in their rehabilitation and return to productive

service.  (Pls.' Stmt. ¶¶ 5, 7.)  CSU is comprised of a Commanding Officer, currently and at all

relevant times here Sergeant Daniel Sweeney, a Clinical Case Manager, currently Michael

Bahrenburg, as well as several counselors.  (Defs.' Counter-Stmt. ¶ 222.)  CSU does not have

psychologists or medical doctors on staff, but it does have access to and consults with the

NYPD's staff of medical doctors, psychologists and psychiatrists.  (Defs.' Counter-Stmt. ¶¶ 223-

24.)

An officer can be referred to CSU by NYPD supervisors, medical officials, or self-refer

themselves.  (Pls.' Stmt. ¶ 8.)  When an officer is referred to CSU, he or she first meets with a

CSU counselor for an intake interview.  (Pls.' Stmt. ¶ 9.)  CSU staff then conducts an assessment

process that includes a review of the reasons for referral and consultations with collateral

contacts familiar with the patient and for whom the patient executes a release authorizing CSU to

make disclosures.  (Pls.' Stmt. ¶ 10.)  CSU does not utilize diagnostic testing, such as the

Michigan Alcohol Screening Test, or blood, urine, liver or kidney function tests.  (Defs.'

Counter-Stmt. ¶ 229.)  With respect to alcohol dependence or abuse, CSU's stated objective is to gather information to ascertain whether the officer is suffering from alcohol dependence and abuse within the meaning of Diagnostic and Statistical Manual IV ("DSM IV") guidelines.  (Pls.' Stmt. ¶ 9.)

Approximately 98% of patients referred to CSU receive an alcohol-related diagnosis, and approximately 97% undergo some form of treatment, with 72% being sent to inpatient treatment and 18% referred to outpatient treatment.  (Defs.' Counter-Stmt. ¶¶ 237, 240.)  Employees who refuse CSU's recommended treatment are referred to the NYPD Medical Division, where they are ordered to comply and advised that refusal could result in suspension, and eventually termination.  (Pls.' Stmt. ¶ 13; Defs.' Counter-Stmt. ¶ 248.)  Upon discharge from their CSU prescribed treatment, patients are generally placed in a monitoring program for two years. (Defs.' Counter-Stmt. ¶ 249.)  All prior diagnoses remain in CSU's files and are considered in future assessments, along with other factors.  (Defs.' Counter-Stmt. ¶¶ 382-83.)

### 2.   *Plaintiff Makinen*

#### a.   March 4, 2007 Incident

Plaintiff Kathleen Makinen ("Makinen") was a police officer with the NYPD from April 1991 until May 2011.  Her ex-husband, Joseph Cornetta, is a retired NYPD Detective.  The two married in 1999, separated in 2006 and divorced in 2010, and have two children together.  (Pls.' Stmt. ¶¶ 25-28.)

On March 4, 2007, Plaintiff was living in her home with her two children, her husband's cousin, Elizabeth Schule, and Schule's child.  (Pls.' Stmt. ¶ 36.)  The minor children were all under the age of six at the time.  (Pls.' Stmt. ¶ 36.)  Makinen and Schule engaged in an argument about Schule's failure to pay rent.  (Pls.' Stmt. ¶ 37.)  Schule eventually departed the home for

what was supposed to be fifteen minutes, but was gone for about two hours. (Pls.' Stmt. ¶¶ 37, 42.) After Schule departed, Makinen left the three children at home and walked across the street to drop off a bottle of homemade wine to a neighbor. (Pls.' Stmt. ¶ 38.) Schule returned to the home while Makinen was at the neighbor's home and called Makinen, at which point they began to argue. (Pls.' Stmt. ¶¶ 39-40.) Schule accused Makinen of leaving the children unsupervised, while Makinen explained that she was only across the street in the doorway and could see Schule during their argument. (Pls.' Stmt. ¶ 41; Defs.' Counter-Stmt. ¶ 396.) Makinen, upset about the argument and Schule's unexpected two-plus hour departure, hung up on Schule. (Defs.' Counter-Stmt. ¶ 396.)

Makinen remained at the neighbor's home where she drank two glasses of the homemade wine. (Pls.' Stmt. ¶ 43.) Afterwards, Makinen departed for the home of another neighbor and friend to have some tea and calm down, and stayed for approximately two to three hours. (Pls.' Stmt. ¶¶ 44-45.) At this point, the neighbor to whom Makinen brought the wine arrived at the home and reported that there were no cars in the driveway of Makinen's home. (Pls.' Stmt. ¶ 46.) Makinen hastily returned home to find that her children were not there, at which point she called Cornetta and Schule, neither of whom answered, and then the Suffolk County Police. (Pls.' Stmt. ¶ 47; Defs.' Counter-Stmt. ¶ 400.)

The police responded to Makinen's home at 9:15 p.m., and found Makinen hysterical and crying. (Pls.' Stmt. ¶¶ 49-50.) The responding Suffolk County Police sergeant advised Makinen that they had also received a call from Schule alleging that Makinen had left the children unattended for two hours. (Pls.' Stmt. ¶ 50; Defs.' Counter-Stmt. ¶ 401.) The sergeant observed Makinen as intoxicated and "acting irrational[ly]" and "belligerent[ly] toward the responding officers." (Pls.' Stmt. ¶ 51.) Makinen attempted to explain her version of the events to the

4

officers but, after an investigation, was placed under arrest and charged with three counts of Endangering the Welfare of a Child and transported to the 6th Precinct of the Suffolk County Police Department.  (Pls.' Stmt. ¶¶ 52-53; Defs.' Counter-Stmt. ¶ 403.)[1]

At around midnight on March 5, 2007, hours after Makinen had been placed under arrest, NYPD Sergeant Shirley Pinkey, Lieutenant George Howley and Captain Theodor Papadapolos arrived at the Suffolk County Police station where Makinen was being held.  (Pls.' 56.1 Stmt. ¶ 54.)  The three all observed that Makinen had a strong odor of alcohol on her breath, bloodshot eyes, and appeared disheveled. (Pls.' Stmt. ¶¶ 55-60.)  Sgt. Pinkey and Lt. Howley found Makinen to be cooperative; Capt. Papadapolos noted Plaintiff was acting excitedly and irrationally.  (Pls.' Stmt. ¶¶ 55, 57, 60.)  The three unanimously found Makinen unfit for duty and informed her that she was suspended.  (Pls.' Stmt. ¶ 61.)  Makinen was suspended for thirty days, placed on modified duty status, under which she was unable to work overtime, and had her gun and shield removed.  (Pls.' Stmt. ¶¶ 62-64.)  Makinen was also referred by the NYPD's Medical Division to CSU.  (Pls.' Stmt. ¶ 65.)

b.     2007 CSU Diagnosis & Treatment

On May 18, 2007, Makinen reported to CSU and was interviewed by CSU counselor Christine Carlozzi.  (Pls.' Stmt. ¶¶ 65-67.)  Makinen reported that she only had two glasses to drink on the evening of March 4, 2007 and was not intoxicated, and that she only drank once in a while.  (Pls.' Stmt. ¶¶ 68-69, 71.)  Makinen signed releases permitting CSU to consult with her mother and father, supervisor, counselors, psychiatrist, ex-husband and the friend to whom she brought the bottle of wine on March 4, 2007.  (Pls.' Stmt. ¶¶ 74-75.)

---

[1]     In January 2010, Makinen was found not guilty of the child endangerment charge.  (Defs.' Counter-Stmt. ¶ 405.)

After CSU conducted its independent review of the circumstances surrounding the March 4, 2007 incident and the determination that she was unfit for duty, and consulted with Makinen and her references, CSU determined that Makinen was suffering from alcohol dependence. (Pls.' Stmt. ¶ 75.) Among other things, CSU considered the reports of Makinen's actions on the evening of March 4, 2007, and Makinen's denial of being intoxicated that evening or of having any alcohol-related issues. (Pls.' Stmt. ¶¶ 76-79.) Incidentally, however, about one month after her arrest, one of Makinen's counselors, Licensed Clinical Social Worker Joseph Stassi, had noted that while "there has been a question as to whether Makinen [was] an alcoholic or abuses alcohol," there was "nothing in [his] evaluation which leads [him] to have that impression." (Defs.' Counter-Stmt. ¶¶ 406-07.)

Nonetheless, CSU recommended a course of outpatient treatment for Makinen, which she initially refused, but ultimately accepted after being advised she would be ordered to and suspended if she refused. (Pls.' Stmt. ¶¶ 80-81; Defs.' Counter-Stmt. ¶¶ 412-13.) Makinen was discharged from outpatient treatment on November 1, 2007 and prescribed follow-up treatment that included alcohol abstinence, attendance at Alcoholic Anonymous ("AA") meetings and maintenance of a sober support network. (Pls.' Stmt. ¶ 82.)

### c.    2008 CSU Referral

In September 2008, Makinen was again referred to CSU in connection with an internal affairs complaint lodged by Cornetta alleging, among other things, that Makinen had a drinking problem and should be treated. (Pls.' Stmt. ¶¶ 83-84; Defs.' Counter-Stmt. ¶ 415.) As a result, Makinen met with CSU counselor Karl Schaeffer. (Pls.' Stmt. ¶ 85.) Schaeffer interviewed Makinen, contacted individuals for whom Makinen provided releases, and ultimately concluded that Cornetta's allegation was unreliable and unfounded, and that there was no evidence that

Makinen was in relapse.  (*See* Pls.' Stmt. ¶¶ 86-91.)

d.    2010 CSU Referral & Treatment

On July 31, 2010, Makinen was again referred to CSU after Cornetta made allegations

that Makinen had disclosed to the psychologist of one of their children that she was drinking

again, and that Makinen had also driven while intoxicated and abused their children.  (Pls.' Stmt.

¶¶ 92-93; Defs.' Counter-Stmt. ¶¶ 418-19.)  On August 16, 2010, Makinen was interviewed by

CSU counselor John Mazzella and denied that she had resumed drinking.  (Pls.' Stmt. ¶¶ 94-95,

98.)   Makinen executed releases for her parents, her ex-husband, her brother and his wife, her

counselor, Patrolmen's Benevolent Association ("PBA") attorney, Child Protective Services

("CPS") case worker and her child's psychologist.  (Pls.' Stmt. ¶ 97.)

Mazzella's notes indicate the following with respect to his conferrals with Makinen's

collateral contacts: Makinen's CPS worker reported that Makinen had advised her that she drank

"sporadically," sometimes while watching TV, going to bed or reading a book on the porch;

Makinen's counselor reported that Makinen advised that she consumed one to two glasses of

wine a week; Makinen's child's psychologist reported that Makinen told her that she would drink

one glass of wine after work due to job-related stress, and that the child had told her that

Makinen drank while in bed with her.  (*See* Pls.' Stmt. ¶¶ 100-101; June 25, 2013 Declaration of

Lisa Joslin ("Joslin Decl.") Ex. V, ECF No. 51.)  Mazzella subsequently confronted Makinen

with this information, at which point she admitted to drinking.  (Pls.' Stmt. ¶ 102.)

After CSU completed its review, it determined that Makinen was in relapse, and

recommended Makinen attend an inpatient rehabilitation treatment facility in Waverly,

Pennsylvania.  (Pls.' Stmt. ¶ 103.)  Makinen refused initially, and was ordered to go by the

NYPD Medical Division.  (Pls.' Stmt. ¶ 107.)  Makinen reported the next day with her PBA

7

attorney and was advised that she would be suspended without pay for 30 days if she refused to

comply with CSU's recommended inpatient treatment. (Pls.' Stmt. ¶¶ 107-09.) Makinen

decided to comply and was transported to Waverly two days later, where she remained from

August 20, 2010 through September 17, 2010. (Pls.' Stmt. ¶ 110.) The facility's records

indicate that Makinen had "a fair treatment experience and began the process of being educated

into the disease of alcoholism," while Makinen subsequently stated that she learned coping skills

for dealing with her ex-husband during treatment. (Pls.' Stmt. ¶¶ 112, 113.)

After Makinen was discharged, CSU prescribed a treatment regimen which included

three AA meetings per week, two group outpatient counseling sessions per week, private therapy

sessions with her personal therapist and weekly group sessions at CSU. (Pls.' Stmt. ¶ 114.)

Makinen was discharged from CSU's outpatient treatment program on January 26, 2011. (Pls.'

Stmt. ¶ 116.) On May 30, 2011, Makinen retired from the NYPD with her full pension and

benefits. (Pls.' Stmt. ¶ 118.) Makinen testified that she retired because of CSU's involvement

with Cornetta and Schule's complaints. (Pls.' Stmt. ¶ 118).

### 3.    *Plaintiff Nardini*

Plaintiff Jamie Nardini was appointed an NYPD police officer on July 10, 2006. (Pls.'

Stmt. ¶ 182.) She has a daughter with her ex-boyfriend, former NYPD Sergeant William

Eiseman, from whom she separated in March 2010. (Pls.' Stmt. ¶¶ 183, 184.) At some point

after the separation, Nardini applied for and was granted full custody of their daughter, over

Eiseman's objection. (Pls.' Stmt. ¶¶ 184-85; Defs.' Counter-Stmt. ¶¶ 361-62.)

On October 27, 2010, Nardini was referred to CSU as a result of allegations of alcohol

abuse and/or dependence emanating either from Eiseman or his sister, Tracy Sinatra. (Pls.' Stmt.

¶ 188; Defs. Counter-Stmt. ¶¶ 362-63.) On October 28, 2010, Nardini reported to CSU with her

PBA delegate and was interviewed by CSU counselor Victoria Tobin.  (Pls.' Stmt. ¶¶ 193-94.)

Nardini reported that the last time she drank alcohol was at an NYPD boxing match and asserted

that Eiseman/Sinatra's allegations were in retaliation for her successful custody application.

(Pls.' Stmt. ¶ 195; Defs.' Counter-Stmt. ¶ 365.)  Nardini executed a release authorizing CSU to

speak with her NYPD partner, mother, brother, the law guardian of her child, a friend and

Sinatra.  (Pls.' Stmt. ¶¶ 197-98.)

　　　　When contacted by CSU, Nardini's family members reported that Nardini did not have a

drinking problem.  (Pls.' Stmt. ¶ 202.)  Sinatra, however, reported that she had witnessed Nardini

intoxicated on two occasions and that Nardini became "nasty" and "unsteady on her feet" when

she drank.  (Pls.' Stmt. ¶ 203).  After CSU completed its review, it concluded that Nardini was

suffering from alcohol abuse, but was not in need of chemical dependence services.  (Pls.' Stmt.

¶ 204.)  Specifically, CSU discredited Nardini's denial in light of the fact that Eiseman, whom

Tobin did not confer with directly, corroborated Sinatra's "specific recollection of two public

outings."  (Defs.' Counter-Stmt. ¶¶ 366-67, 69.)  However, the NYPD had previously

determined, on October 22, 2010, in connection with an allegation by Eiseman that Nardini had

sent him harassing messages, that Eiseman had "taken several steps to manipulate the judicial

system and use the internal regulations of this Department to cause undue harm to Officer

Nardini, both personally and professionally."  (Pls.' Stmt. ¶ 384.)

　　　　CSU initially recommended that Nardini attend two weekly AA meetings, and weekly

individual counseling sessions at CSU.  (Pls.' Stmt. ¶ 204; Defs.' Counter-Stmt. ¶ 379.)  Nardini

refused and returned to CSU the following day.  After additional discussion, CSU and Nardini

agreed that she would watch six educational videos over the course of six weeks and have

weekly meetings with a CSU counselor.  (Pls.' Stmt. ¶¶ 208-09.)  Nardini was paid for the time

she spent watching the educational videos at CSU, and she remained on full duty status throughout this period, with her pay and duties unchanged. (Pls.' Stmt. ¶ 211.)

4.   *Plaintiff Torres*

a.   March 1, 2009 Incident

Plaintiff Angel Torres has been an NYPD police officer since August 20, 1993. (Pls.' Stmt. ¶ 119.) During the early morning hours of March 1, 2009, Torres was attending a party at a neighbor's apartment in his building with his then girlfriend, now wife (referred to hereinafter as his wife) and his brother. (Pls.' Stmt. ¶ 125.) Torres had "two, possibly three" Bacardi Limon with Sprite cocktails earlier that evening. (Pls.' Stmt. ¶ 126.) At the party, Torres was approached by Matthew Doran, a friend at the time, who was intoxicated. (Pls.' Stmt. ¶ 127.) An argument ensued between the two after Torres refused to give Doran a PBA card. (Pls.' Stmt. ¶ 127.) Torres eventually walked away, hoping to diffuse the situation after Doran had become belligerent. (Defs.' Counter-Stmt. ¶ 300.)

Approximately fifteen minutes later, Torres was advised by a friend that Doran had assaulted his wife and that she had sustained a bloody nose. (Pls.' Stmt. ¶¶ 128-29.) Torres's wife had also shoved Doran in retaliation, causing him to fall into a door jam and sustain a laceration above his right eye. (Pls.' Stmt. ¶ 130.) Upon learning of the altercation, Torres left the party with his wife. (Pls.' Stmt. ¶ 131.)

At approximately 6:10 a.m., NYPD Duty Captain Scott Stelmok was notified of the incident and of Plaintiff's involvement, although the precise details provided to him are unclear. (Pls.' Stmt. ¶¶ 132-33.) An NYPD Lieutenant then reported to Torres's apartment and directed Torres to get dressed and report to the 107th Precinct. (Pls.' Stmt. ¶ 134.) Once there, Torres met with Capt. Stelmok who queried Torres about his failure to report the incident, to which

Torres responded that his wife refused to make a complaint. (Pls.' Stmt. ¶¶ 135-36.) Torres admitted that he had a duty to report the assault on his wife and had failed to do so. (Pls.' Stmt. ¶ 137.) At some point between 8:30 a.m. and 8:50 a.m., Torres was assessed and found fit for duty. (Pls.' Stmt. ¶ 138.) However, based on the fact that it appeared Torres had been involved in a physical altercation with Doran and that he failed to remain at the scene after the incident, Captain Stelmok placed Torres on modified duty. (Pls.' Stmt. ¶ 139.) Doran had also filed a complaint, apparently at 4:00 p.m. that day, alleging that Torres's wife assaulted him and caused him to sustain a laceration above his eye. (Defs.' Counter-Stmt. ¶¶ 304, 321; Joslin Decl. Ex. FF.)

b.    CSU Diagnosis & Treatment

After the modified duty designation, Torres was ordered to be evaluated by an NYPD psychologist. (Defs.' Counter-Stmt. ¶ 141.) After the evaluation, he was referred to CSU for further evaluation, where he reported on March 5, 2009. (Pls.' Stmt. ¶ 143.) Schaeffer interviewed Torres. (Pls.' Stmt. ¶¶ 144-45.) Torres reported that he usually had approximately two Bacardi Limon drinks when socializing, which occurred approximately twice a month, and that he only drank when he left home. (Pls.' Stmt. ¶ 148.) Torres also reported that he did not like the taste of alcohol, and that he was unaware that alcohol consumption was contraindicated for a medication he was taking. (Defs.' Counter-Stmt. ¶¶ 338-39.) Torres executed releases authorizing CSU to speak with his current and former NYPD supervisor, wife, sister, brother and ex-wife. (Pls.' Stmt. ¶¶ 150-53.)

Torres's wife, brother and sister reported that Torres drank minimally and never to the point of intoxication. (*See* to September 6, 2013 Declaration of Eric Eichenholz ("Eichenholz Decl.") Ex. 36, ECF No. 60.) Torres's supervisor at the time also said that he had never

11

observed any alcohol-related issues at work.  (Defs.' Counter-Stmt. ¶ 324.)  Torres's former

supervisor, however, reported that he socialized with Torres "several times a month, half of

which would include alcohol," and that he had seen Torres intoxicated once at a New Year's Eve

party.  (Defs.' Counter-Stmt. ¶ 326.)  Upon completing its review, CSU determined that Torres

was suffering from alcohol dependence.  (Pls.' Stmt. ¶ 154.)  This determination was based in

part on CSU's findings that Torres: had exhibited poor judgment while drinking on March 1,

2009 which interfered with his job; had been designated as chronic sick in the past (although

Torres maintains the absences were unrelated to alcohol); was unaware that alcohol was

contraindicated with a medication he was taking; had reported alcohol consumption that was

inconsistent with the report of his former supervisor and friend; and admitted to drinking despite

not liking the taste.  (Pls.' Stmt. ¶¶ 155-56; Defs.' Counter-Stmt. ¶¶ 325-32, 335-44.)

     After Sweeney learned of the diagnosis, he directed Schaefer to refer Torres to inpatient

treatment at the facility in Waverly, Pennsylvania.  (Defs.' Counter-Stmt. ¶ 349.)  When

Schaeffer advised Torres of CSU's recommendation, Torres refused.  (Pls.' Stmt. ¶ 160.)

Schaeffer left momentarily and then returned with Sweeney, and both gentlemen attempted to

convince Torres to attend inpatient treatment, with Sweeney in particular stating to Torres that he

should return the next day prepared to attend rehabilitation.  (Pls.' Stmt. ¶¶ 161-62.)  Torres

reported to CSU again the next day with his PBA delegate and, after again refusing

rehabilitation, was sent to the NYPD Medical Division where he was ordered to report for

inpatient treatment and advised that noncompliance would result in a suspension.  (Pls.' Stmt. ¶¶

165-67.)  After conferring with his PBA delegate, Torres complied with the order and was

thereafter transferred to the facility.  (Pls.' Stmt. ¶¶ 169-70.)  Treatment records note that Torres,

upon admission, was "commit[ed] to the recovery process" and that upon discharge Torres had

developed an "understanding of his own addictive behaviors and how they could lead to relapse if not addressed." (Pls.' Stmt. ¶¶ 171-72.)

Torres was discharged on April 3, 2009 and was ordered to attend weekly group AA sessions, where he developed a "close friend" in one of his sponsors. (Pls.' Stmt. ¶¶ 173-74.) Torres did not work any overtime shifts during the initial twelve weeks of his outpatient treatment, although there is a dispute about whether he was eligible to do so. (Pls.' Stmt. ¶ 175.) Torres was discharged from CSU's outpatient treatment program on June 29, 2009. (Pls.' Stmt. ¶ 177.) Torres remained on modified assignment duty until September 2009, after Doran's complaint had been deemed unsupported, at which point he was restored to full duty status. (Pls.' Stmt. ¶¶ 178-79.)

### 5.   OASAS Review

In 2011, OASAS performed an impromptu on-site recertification review of CSU. (Defs.' Counter-Stmt. ¶ 283.) The review included analyses of CSU's files with respect to Plaintiffs Makinen and Torres.   With respect to Torres, OASAS observed that, based on the documentation submitted, there was not a required "level of care determination" and that his diagnosis appeared to have been based on "police department interviews, investigations and reports," rather than "a comprehensive evaluation, including clinical interviews with the patient [as required by OASAS regulations]." (Defs.' Counter-Stmt. ¶ 287.) With respect to Makinen, it found that "documentation submitted with respect to [Makinen] included a level care of determination and compliance with [OASAS] regulations." (Pls.' Stmt. ¶ 20.) OASAS did not find any evidence of breaches of confidentiality during its review. (Pls.' Stmt. ¶ 21.)

### 6.   Dr. Richard Frances' Expert Report

Plaintiffs have submitted a report from Dr. Richard Frances, currently a Clinical

13

Professor of Psychiatry at New York University School of Medicine and an Adjunct Clinical

Professor at New Jersey Medical School, as an expert in addiction psychiatry. (Defs.' Counter-

Stmt. ¶¶ 441-43.) Dr. Frances states that, after conducting standardized diagnostic tests on

Plaintiffs and interviewing Plaintiffs and sources provided by them, it is his professional opinion

that neither Makinen, Nardini nor Torres ever qualified for a diagnosis of alcohol abuse or

dependence or suffered from any problem related to the consumption of alcohol. (Defs.'

Counter-Stmt. ¶¶ 455-57.) Dr. Frances further concludes that CSU had "an egregious problem"

in terms of its diagnoses and treatment of the Plaintiffs including "inadequate gathering of

sources," and failures to employ "laboratory testing, or careful screening" when applying the

DSM-IV criteria. (Eichenholz Decl. Ex. 61, at 34-35.)

### B.    Procedural Background

Plaintiffs filed their Verified Complaint in New York State Supreme Court on October 7,

2011. Defendants removed this action into this Court on October 21, 2011. (ECF No. 1.) On

March 9, 2012, Plaintiffs submitted their Amended Complaint, (ECF No. 7), alleging—against

the City and the NYPD unless otherwise noted—claims of: disability discrimination under the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* (Count I), the New York

State Human Rights Law ("NYSHRL"), New York Executive Law §§ 290 *et seq.* (Counts II and

III; against all Defendants), New York City Human Rights Law ("NYCHRL"), Administrative

Code of the City of New York § 8-107 (Counts IV and V; against all Defendants); unpaid wages

and overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* (Count

VII; asserted by Makinen and Torres only), as well as under Section 190 of the New York Labor

Law (Count VIII; asserted by Makinen and Torres only); violations of Section 18 of the New

York Public Health Law (Count VI; against Sgt. Sweeney only); breaches of the duty of

confidentiality (Count IX; against all Defendants), negligence (Count XI; against Sgt. Sweeney only), defamation (Count X; against all Defendants).   On March 22, 2012, Defendants answered the Amended Complaint.  (ECF No. 17.)  Defendants' moved for summary judgment on May 6, 2013, (ECF No. 32), and Plaintiffs' cross-moved for partial summary judgment, on their disability discrimination, FLSA and negligence claims, on June 26, 2013.  (ECF No. 33.)

## III.   DISCUSSION

### A.   Summary Judgment Standard

A district court's grant of a motion for summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party can satisfy their burden by showing that the non-moving party has failed "'to come forth with evidence to permit a reasonable juror to return a verdict in his or her favor' on an essential element of a claim." *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (quoting *New Orleans Empls. Ret. Sys. v. Omnicom Grp., Inc.*, 597 F.3d 501, 509 (2d Cir. 2010)).

To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The party "must set forth specific facts showing that there is a

genuine issue for trial," through affidavits or other evidence, as opposed to allegations or denials in the pleadings. *Anderson*, 477 U.S. at 248, 250. Speculation, conclusory allegations and conjecture are not enough to raise genuine issues of fact. *Knight v. U.S. Fire Ins. Co*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). Finally, "[o]n cross-motions for summary judgment, the court must consider each motion independently of the other and when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Sciascia v. Rochdale Vill., Inc.*, 851 F. Supp. 2d 460, 468 (E.D.N.Y. 2012) (citing *Heublein*, 996 F.2d at 1461); *see also Lopez v. SB. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir. 1987) ("The burden rests on the moving the party to demonstrate the lack of a genuine issue of fact, and the record 'must be viewed in the light most favorable to the party opposing the motion.'" (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### B.  Claims against the NYPD

Plaintiffs have sued the NYPD and the City of New York.  However, it is well-settled that the NYPD "is a non-suable agency of the City [of New York]," *Jenkins v. City of New York*, 478 F.3d 76, 93 n. 19 (2d Cir. 2007), and that where, as here, they are sued, the City of New York is the real party of interest. *See* N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in the that of any agency, except where otherwise provided by law."). Plaintiffs' claims against the NYPD are therefore dismissed.

### C.  Disability Discrimination Claims

The Amended Complaint asserts disability discrimination under the ADA, the NYSHRL and the NYCHRL.  The ADA provides that "[n]o covered entity shall discriminate against a

qualified individual on the basis of disability in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer . . . . because of an individual's . . . disability . . . to discriminate against such individual . . . in [the] terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). The NYCHRL states that "[i]t shall be unlawful discriminatory practice . . . for an employer[,] . . . because of the actual or perceived . . . disability . . . of any person[,] . . . to discriminate against such person . . . in [the] terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). Courts generally apply the same standard to ADA, NYSHRL and NYCHRL claims on a motion for summary judgment, in view of the largely coextensive scope of the ADA and NYSHRL, and the fact that both are considered to be "a floor below which the [NYCHRL] cannot fall." *See, e.g.*, *Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 292 (E.D.N.Y. 2013) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)). The Court adheres to that approach here, and will only independently evaluate Plaintiffs' NYCHRL claims in the event that their claims based on its state and federal counterparts fail.

Under the ADA, a plaintiff establishes a *prima facie* case of discrimination by showing, by a preponderance of the evidence, that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job . . . and (4) he suffered adverse employment action because of his [actual or perceived] disability." *McMillan v. City of N.Y.*, 711 F.3d 120, 125-26 (2d Cir. 2013) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). In this case, Plaintiffs allege that Defendants discriminated against them by subjecting them to adverse employment actions based on the illegitimately perceived disability of alcohol dependence and/or abuse. Articulated

as such, it is clear that, in contrast to many antidiscrimination cases, Plaintiffs do not allege that

Defendants' adverse employment actions were motivated by any animus toward their perceived

disability.  Plaintiffs' gripe, rather, is with the legitimacy of Defendants' perception of them as

disabled.  As a result, a threshold issue for this Court to decide is whether Plaintiffs' claims of

discrimination absent discriminatory animus are cognizable under the ADA, NYSHRL and

NYCHRL.[2]

In *Deane v. Pocono Medical Center*, the Third Circuit answered this question in the

affirmative with respect to the ADA, holding that "even an innocent misperception based on

nothing more than a simple mistake of fact as to the severity, or even the very existence, of an

individual's impairment can be sufficient to satisfy the statutory definition of a perceived

disability."  142 F.3d 138, 144 (3d Cir. 1998).  Although the Second Circuit has not yet

addressed the issue, the issue was presented in one recent case in this District.  In *Nelson v. City*

*of New York*, a former NYPD officer asserted a similar disability discrimination *sans* animus

claim, alleging that the NYPD violated the ADA, NYSHRL and NYCHRL by failing to rehire

her based on a misperceived psychological impairment.  No. 11 Cv 2732 (JPO), 2013 WL

4437224, at *7-*8 (S.D.N.Y Aug. 19, 2013).  After observing that the "weight of the case law"

and the EEOC's interpretive guidance were in accord with the Third Circuit's holding in *Deane*,

Judge Oetken concluded that liability did extend to discrimination based on misperceived

disabilities.  *See id.* at *8; *see also* 29 C.F.R. pt. 1630, app. § 1630.2(l) (noting that the ADA

protects employees from prohibited action because of actual or perceived impairment "whether

---

[2]      A separate, settled consequence of the nature of Plaintiffs' claims is that, because they concede
that Defendants' alleged adverse employment action is related to and a direct result of their perception of
Plaintiffs as disabled, the burden-shifting framework promulgated by the Supreme Court in *McDonnell
Douglas v. Green*, 411 U.S. 792 (1973) does not apply here. *See McMillan*, 711 F.3d at 129.

or not myths, fears, or stereotypes about disability motivated the employer's decision"); *see also* Section III-C-1, *infra*. This Court agrees with *Nelson*'s analysis and holds that Plaintiffs' claims are cognizable under the ADA, NYSHRL and NYCHRL.

### 1.   Whether Plaintiffs are "Disabled"

The ADA proscribes discrimination based on perceived disability via its definition of "disability" as including "being *regarded as* having" a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(C) (emphasis added). An individual is eligible for coverage under the "regarded as" prong if he or she "establishes that he or she has *been subjected to an action prohibited* under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added).[3] Accordingly, where "regarded as" liability is asserted, the court must determine whether a plaintiff was "disabled" by determining whether they were subjected to an adverse employment action based on a perceived disability. *See Nelson*, 2013 WL 4437224, at *7-*8; *see also* 29 C.F.R. pt. 1630, app. § ↑630.2(l) ("[E]vidence that a covered entity took a prohibited action because of an [actual or perceived] impairment will establish coverage and will be relevant in establishing liability, although liability may ultimately turn on whether the covered entity can establish a defense.").[4]

---

[3]      This definition came into existence with Congress's passage of the ADA Amendments Act of 2008, Pub. L. No. 110-325 (2008).  Before then, demonstrating that one was "regarded as" disabled required a showing that the perceived disability "was one that 'substantially limited a major life activity.'" *See Widomski v. State Univ. of N.Y. at Orange*, 748 F.3d 471, 475 (2d Cir. 2014).

[4]      Although "disability" itself is defined differently under the ADA and NYSHRL, courts have observed that the regarded as/perceived disability inquiry is the same under the both statutes. *See Wagner v. Cnty. of Nassau*, No. 11–CV–1613(JS)(ARL), 2014 WL 3489747, at *5 n.3 (E.D.N.Y. July 11, 2014)

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of [his or her] employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F. 3d 636, 640 (2d. Cir. 2000). "A materially adverse change is one that 'has an attendant negative result, a deprivation of a position or an opportunity.'" *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 506 (S.D.N.Y. 2010) (quoting *Davis v. City Univ. of N.Y.*, No. 94 Civ. 7277(SHS), 1996 WL 243256, at *8 (S.D.N.Y. May 9, 1996)). It is "more disruptive than a mere inconvenience or an alteration of job responsibilities," and includes actions like "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities." *Williams v. R.H. Donnelley, Corp.* 368 F.3d 123, 128 (2d Cir. 2004) (citing *Galabya*, 202 F.3d at 640). Applying these standards here indicates that Makinen and Torres were subjected to an adverse employment action, while Nardini was not.

First, Makinen and Torres's treatment regimens are adverse employment actions because they constituted substantial, material and undesirable changes in the terms and conditions of their employment. *See Payne v. N.Y.C. Police Dep't*, 863 F. Supp. 2d 169, 181 (E.D.N.Y. 2012) (plaintiff's adverse employment action prong satisfied where Plaintiff was reassigned to undesirable precinct; stripped of his gun and shield, placed on modified duty, and moved from patrol to answering phones); *see also Henderson v. City of N.Y.*, 818 F. Supp. 2d 573, 582 (E.D.N.Y. 2011) (finding order that police officer to "attend alcohol rehabilitation camp" constituted adverse employment action in retaliation context). Among other things, Makinen and Torres were at least temporarily deprived of the opportunity to earn overtime benefits as a consequence of the inpatient component of their treatments. *See Montgomery v. Chertoff*, 03 CV

---

(collecting cases).

5387(ENV)(JMA), 2007 WL 1233551, at *12 (E.D.N.Y. Apr. 25, 2007) ("Not being assigned overtime can result in a material loss of pay and may be considered an adverse act.") (citing *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006)); *cf. Freeman v. Dep't of Env'tl Prot.*, No. 10 CV 1555(NGG)(LB), 2013 WL 817221, at *5 (E.D.N.Y. Feb. 5, 2013) (holding temporary transfer was not adverse employment action because no evidence suggested that transfer "was materially less prestigious, less suited to her skills, or materially less conducive to career advancement" and did not "result in a demotion or a reduction in her salary or benefits"), *reported and recommendation adopted*, 2013 WL 801684 (E.D.N.Y. Mar 05, 2013).  Moreover, Defendants' argument that the action is not adverse because Makinen and Torres "opted" for the treatment is unpersuasive, as the record establishes that they did so under the threat of suspension and possible termination. *See Madera v. Metro. Life Ins. Co.*, No. 99 CIV. 4005(MBM), 2002 WL 1453827, at *6 (S.D.N.Y. July 3, 2002) (noting that employee's "voluntary" resignation could still constitute adverse employment action given that Plaintiff alleged that it was understood that he would be terminated absent such an agreement).

However, the Court finds that, contrary to Makinen's argument, she does not have a viable claim for the adverse action of constructive discharge.  To demonstrate constructive discharge, Makinen must "prove that *her employer* deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in [her] position would have felt compelled to resign.'" *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2010) (emphasis added) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)).  Here, the undisputed evidence in the record indicates that, to the extent Makinen was subjected to intolerable working conditions that prompted her retirement, they were created by her husband and Schule, not the Defendants.  (Pls.' Stmt. ¶ 118).

21

Finally, well-settled precedent forecloses Nardini's proffered adverse action. Specifically, her educational video and CSU counseling treatments resulted in only a schedule alteration once a week for six weeks, and she remained on full-duty status throughout this period. (*See* Pls.' Stmt. ¶¶ 209-11.) As such, Nardini's treatment was tantamount to a temporary shift change, which does not constitute an adverse employment action. *See, e.g.*, *DiBrino v. Dept. of Veteran's Affairs*, 118 F. App'x. 533, 535 (2d Cir. 2004) (summary order) (shift change is not adverse action absent "extraordinary circumstances"); *see also Leget v. Henderson*, Nos. 99 Civ. 3636 DLC and 99 Civ. 4610 DLC, 2001 WL 43615, at *6 (S.D.N.Y. Jan. 18, 2001) (no adverse action where employee's "temporary transfer" for three weeks did not impact her salary, benefits, or title). Furthermore, Nardini's argument that her diagnosis triggered mandatory alcohol abstinence for the duration of her NYPD tenure, which if true could qualify as akin to a form of probation, *see Smith v. Da Ros*, 777 F. Supp. 2d 340, 355 n.7 (D. Conn. 2011) (collecting cases), lacks any support in the record. Rather, the record indicates that any re-referred officer will be reassessed based on the available facts and circumstances at that time. (Defs.' Counter-Stmt. ¶¶ 382-83.) Nardini's ADA and NYSHRL claims therefore must be dismissed.

As previously indicated, however, this conclusion with respect to Nardini's ADA and NYSHRL claims does not *per se* determine the fate of her claims under the more-protective NYCHRL. Indeed, the Second Circuit has noted that, "[t]o state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment" as opposed to the "materially adverse employment actions" required under the ADA and NYSHRL. *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order). But, as neither side has

addressed whether Nardini's treatment qualifies under this more lenient standard, the Court will not attempt to resolve Nardini's NYCHRL claim at this stage.[5]

### 2. *Essential Functions Element and Direct Threat Defense*

In order to prevail on a claim of disability discrimination, an actually or regarded as disabled Plaintiff must demonstrate that they were otherwise capable of performing the job. A "[p]laintiff is not otherwise qualified unless he [or she] is able, with or without reasonable accommodation, to perform the essential functions of the job in question." *Stamey v. NYP Holdings, Inc.*, 358 F. Supp. 2d 317, 323 (S.D.N.Y. 2005); *see also* 42 U.S.C. § 12111(8). "'Essential functions' are duties that are 'fundamental' to the job in question." *Vandenbroek v. PSEG Power, CT LLC*, 356 F. App'x 457, 459 (2d Cir. 2009) (summary order) (citing *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)). "In determining which duties are fundamental, [courts] accord 'considerable deference to an employer's judgment.'" *Id.* (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 151 (2d Cir. 1998)). Generally speaking, however, a plaintiff can discharge their burden by demonstrating that they possess the "basic skills necessary for the performance of [the] job." *Mattera v. JP Morgan Chase Corp.*, 740 F. Supp. 2d 561, 572 (S.D.N.Y. 2010) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2011)).

---

[5] Defendants argue alternatively that all of Plaintiffs' NYCHRL claims should be dismissed because the statute only applies to recovering or rehabilitating alcoholics. The NYCHRL does in fact provide that "[i]n the case of alcoholism, drug addiction or other substance abuse, the term 'disability' shall only apply to a person who (1) is recovering or has recovered and (2) currently is free of such abuse." N.Y.C. Admin. Code § 8-102(16)(c). However, the Court is not persuaded that this provision applies in this case because, if it did, the NYCHRL's protective reach would be narrower than that of its state and federal counterparts, which would be contrary to the express purpose of the New York City Council in enacting the Local Civil Rights Restoration Act of 2005. *See* N.Y.C. Local Law No. 85, § 1 (2005) (federal and state civil rights laws are a "floor below which the City Human Rights law cannot fall"); *Loeffler*, 582 F.3d at 278 (noting that City Council promulgated a "one-way ratchet" under which the NYCHRL is interpreted more liberally than its federal and state counterparts).

Inextricably intertwined with a plaintiff's burden on this element is an employer's potential defense that, because of the employee's actual or perceived disability, he or she constitutes a "direct threat to themselves or others" and is thereby unqualified for the position. 42 U.S.C. § 12113(b); N.Y. Comp. Codes R. & Regs. tit. 9, § 466.11(g)(2). A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). In order to be a significant risk, "the probability of significant harm must be substantial, constituting more than a remote or slightly increased risk." *Hatzakos v. Acme Am. Refrigeration, Inc.*, No. 03–CV–5428 (DLI) (VVP), 2007 WL 2020182, at *9; *see also* 29 C.F.R. pt. 1630, app. § 1630.2(r) ("An employer . . . is not permitted to deny an employment opportunity to an individual with a disability merely because of a slightly increased risk. The risk can only be considered when it poses a significant risk, i.e. high probability, of substantial harm; a speculative or remote risk is insufficient."). An employer can avail itself of this defense if it conducts "an individualized assessment of the employee's present ability to safely perform the essential functions of the job based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 170 (2d Cir. 2006); 29 C.F.R. § 1630.2(r)); *see also* N.Y. Comp. Codes R. & Regs. tit 9, § 466.11(g)(2)(ii). An individualized assessment involves a consideration of: "(1) [t]he duration of the risk; (2) [t]he nature and severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he imminence of the potential harm." *Id.* (alterations in original) (quoting 29 C.F.R. § 1630.2(r)).

In light of the nexus between the essential functions element and the direct threat defense, many courts singularly analyze the issue. *See Nelson*, 2013 WL 4437224, at *9 (collecting cases). This Court will follow that approach here.[6]

*    *    *

In this case, it is uncontested that police officers occupy safety-sensitive positions which require the carriage and usage of deadly weapons, "undeviating concentration," "split-second good judgment," and "self-control," *Seelig v. Koehler*, 76 N.Y.2d 87, 93-94 (1990), as well as the ability to tolerate "a high degree of danger, [and] periods of enormous physical and emotional stress." *Sauer v. Connelie*, 71 A.D.2d 770, 771 (3d Dep't 1979). It is also apparently undisputed that, given these essential functions, police officers who are suffering from alcohol dependence or abuse are, as a matter of law, not qualified to perform the essential functions of the job and/or constitute a direct threat to themselves or others. *See Brennan v. N.Y.C. Police Dep't*, No. 93 CIV. 8461(BSJ), 1997 WL 811543, at *4-*7 (S.D.N.Y. May 27, 1997), *aff'd*, 141 F.3d 1151 (2d Cir. 1998). Accordingly, for Defendants to prevail on their motion for summary judgment, they must demonstrate that there is no genuine issue of material fact as to whether: (1) the Plaintiffs were not qualified to perform the essential functions of police work at the time of their diagnosis because they suffered from alcohol dependence or abuse; *or* (2) CSU's determinations that Plaintiffs constituted direct threats (i.e., that they suffered from alcohol

---

[6]     The Court is mindful that it is an open question in this Circuit whether the plaintiff or defendant bears the burden of proof on the direct threat issue. *Sista*, 445 F.3d at 170 n.3 ("Although the parties disagree as to which party bears the burden of proving or disproving that an employee poses a direct threat and disagree as to whether this Court [previously] held that the 'poses a direct threat defense' is an affirmative defense to be proven by the defendant, we need not address this issue, given our resolution of this case.") (citation omitted). However, the issue need not be resolved at this stage because the Court concludes that summary judgment cannot be granted at this time regardless of who bears the burden.

25

dependence or abuse) were individualized, reasonable assessments based upon current medical knowledge and/or the best available evidence.  For Plaintiffs to prevail on their cross-motion, on the other hand, they must demonstrate that there is no genuine issue of material fact as to *both* the aforementioned issues so at to warrant judgment in their favor.  After a careful of review of the record, the Court concludes that there are genuine issues of material fact as to both issues, and that both summary judgment motions on these claims should be denied.[7]

a.   Defendants' Motion

Defendants' motion for summary judgment is largely premised on their view that Dr. Frances's report and testimony are inadmissible under the Federal Rules of Evidence.  Indeed, on a motion for summary judgment, this court must ignore any inadmissible evidence, even if it to do so would be outcome determinative.  *See, e.g., Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 666 (E.D.N.Y. 2013).  In this case, it appears that holding Dr. Frances's testimony inadmissible could in fact be outcome determinative, as the only relevant evidence in the record on the issues of the reasonableness and individualized nature of CSU's determinations would essentially be the determinations themselves, which, as a preliminary matter, are entitled to some

---

[7]      In many employment discrimination cases, a plaintiff can be satisfy their burden on the qualification element by offering evidence of previous employment in their position for multiple years. *See, e.g., Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) (holding employee who he had been performing job for seven years qualified); *see also Mattera v. JP Morgan Chase Corp.*, 740 F. Supp. 2d 561, 572 (S.D.N.Y. 2010) (employee qualified for job he had performed for two years, although he had received poor performance reviews).  However, the law is not settled on whether and under what circumstances this line of case law applies in the disability discrimination context where, as discussed, the actual or perceived disability may implicate a plaintiff's qualifications. *See, e.g., Mobley v. Madison Square Garden LP*, No. 11 Civ. 8290(DAB), 2012 WL 2339270, at *3 (S.D.N.Y. June 14, 2012) (holding former professional basketball player diagnosed with heart ailment could not satisfy the qualification element through evidence of past performance).  The Court finds that it not need decide this issue at this stage, however, because, while Plaintiffs certainly have evidence of satisfactory past performance for several years, (*see, e.g.*, Pls.' Stmt. ¶¶ 25, 119, 182; Defs.' Counter-Stmt. ¶¶ 212-21), their CSU diagnoses raise genuine issues of material fact as to their qualifications at the time of their diagnoses so as to foreclose summary judgment.

degree of deference. *See, e.g.*, *Nelson*, 2013 WL 4437224, at *11 ("courts quite properly accord

a significant measure of deference to a police department's determination that an officer poses

too great a risk to herself and the public"). As discussed below, however, the Court finds that

Dr. Frances's testimony is admissible and sufficient to create a genuine issue of material fact on

both the qualification and direct threat issues.

District courts have broad discretion when determining whether or not to admit expert

testimony. *United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir. 2000). The proponent of

expert testimony bears the burden of establishing by a preponderance of the evidence that the

requirements of reliability and relevance under Rules 702 and 401 of the Federal Rules of

Evidence, respectively, have been met, although this Court serves as the "ultimate gatekeeper."

*United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). In that role, the court is charged

with the responsibility of determining whether the testimony possesses sufficient indicia of

reliability based on a number of factors, including "(1) whether the theory or technique can be

(and has been) tested, (2) whether the theory or technique has been subjected to peer review and

publication; (3) a technique's known or potential rate of error and the existence and maintenance

of standards controlling the technique's operation; and (4) whether a particular technique or

theory has gained general acceptance in the relevant scientific community." *Amorgianos v. Nat'l

R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (internal quotations marks and citations

omitted). Defendants argue that Dr. Frances's testimony and report violate these canons

because they are (1) irrelevant, since he failed to interview many of the individuals whose

statements were critical to CSU's diagnosis and also considered facts that could not have been

known to CSU at the time of their diagnosis, and (2) unreliable, because Dr. Frances

misunderstands many of the critical facts that CSU relied upon.

27

With respect to the essential functions element, Dr. Frances's conclusions on the issue of whether Plaintiffs are now or have ever suffered from alcohol dependence or abuse are unquestionably probative of whether Plaintiffs could perform the essential functions of police work at the time of CSU's diagnoses. While Dr. Frances naturally did not examine the Plaintiffs under the same circumstances as CSU did, this does render his testimony inadmissible. *See Nelson*, 2013 WL 4437224, at *11 (doctor's assessment of plaintiff created genuine issue of material of fact although it was conducted under different conditions than defendant's assessment). Defendants' reliability concerns, moreover, including their argument that Dr. Frances misapplied certain diagnostic tests on Plaintiffs, go to the weight of Dr. Frances's testimony and not its admissibility, and should be explored through cross-examination. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); *POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188, 200 (S.D.N.Y. 2011) ("The methodological flaws alleged in [the expert's report] go to the weight . . . , not their admissibility." (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987)).

As indicated, the foregoing determination as to the essential functions element is not dispositive of Defendants' motion. Even assuming *arguendo* that Plaintiffs are able to establish that they were in fact qualified through Dr. Frances's testimony, Defendants could still prevail on this motion if Dr. Frances's testimony were inadmissible or insufficient on the issue of the direct threat defense. Indeed, on this issue, Defendants' objection that Dr. Frances failed to interview several sources on whom CSU relied upon in their determinations is much more compelling as,

28

at least on the surface, this seemingly would impair his ability to reliably opine on the *reasonableness* of CSU's medical judgment in light of the objective evidence *available* to CSU *at the time*.

Despite this concern, the Court finds that Dr. Frances's testimony is admissible and sufficient to create a genuine issue of material fact on the direct threat issue. Specifically, Dr. Frances's report and deposition testimony make clear that it is his professional opinion that CSU was not only wrong in the conclusions they drew, but also unreasonable in the methodology they applied. (*See* Eichenholz Decl. Ex. 61, at 34-35) (concluding that CSU had "an egregious problem" in terms of diagnoses and treatment of the Plaintiffs including "inadequate gathering of sources," "no laboratory testing, or careful screening" using the DSM-IV criteria). In light of this conclusion, his failure to replicate what he finds to be a flawed technique does not make his testimony so unreliable as to be inadmissible, especially given that Defendants can cross-examine Dr. Frances on this point. *See Amorgianos*, 303 F.3d at 267 ("A minor flaw in an expert's reasoning or slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."). In sum, while it may be a close call, the rules of evidence favor admissibility and deferring consideration of these genuine factual issues until trial. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) ("[T]he Federal Rules of Evidence favor the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system." (internal quotation marks and citations omitted)).

### b.  Plaintiffs' Cross-Motion

Plaintiffs argue in their cross-motion that there is no genuine issue of material fact on the qualification and direct threat issues because, *inter alia*: (1) CSU concedes that its diagnosis of

Torres might have been different if he had not in fact been involved/reported to be involved in the incident with Doran, who's complaint was unsubstantiated; and (2) Makinen was ultimately found not guilty of child endangerment while her ex-husband was found to have attempted to exploit CSU's processes to gain an upper hand in their custody battle. Plaintiffs also press that a finding of unreasonableness and non-individualized, "cookie-cutter" assessments is supported by what they insist are abnormally high rates of positive diagnoses of alcohol dependence and abuse by CSU, as well by OASAS's criticisms of CSU with respect to its diagnosis and treatment of an unnamed officer not a party here.[8] These arguments simply misapprehend the elements of the direct threat defense.

In evaluating a defense of direct threat, the factfinder's responsibility is not to independently assess whether a plaintiff *actually* posed a direct threat to himself or others, but to determine whether the *defendant's determination* that plaintiff was a direct threat was a reasonable medical judgment based upon: (1) an individualized assessment and (2) (a) current medical knowledge, and/or (b) the best *available* objective evidence. *See Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 346 (S.D.N.Y. 2010). The focal point, in other words, is the *ex ante* reasonableness of a defendant's determination, not an *ex post* determination of its accuracy by the factfinder. *See Brennan*, 1997 WL 811543, at *6 (granting summary judgment on direct threat claim because "[t]o the extent that the defendants considered plaintiff's alcoholism or potential relapse in their termination decision, they did so reasonably"). An

---

[8]     With respect to OASAS's conclusion that, as to Torres, CSU failed to comply with OASAS regulations which require a "comprehensive evaluation, including clinical interviews with the patient," (Defs.' Counter-Stmt. ¶ 287), Defendants argue without any real objection from Torres, that this determination was based only on CSU's inadequate documentation of the assessment, and that CSU did in fact comply with OASAS regulations in assessing Torres. (*See* Sept. 5, 2013 Declaration of Sergeant Daniel J. Sweeney, ("Sweeney Decl.") ¶¶ 18-19, ECF No. 62.)

erroneous diagnosis, or one based on what is later learned to be an erroneous view of the facts, is not necessarily an unreasonable one.

As such, the fact that Makinen may have eventually been found not guilty of child endangerment or that Doran's complaint against Torres was ultimately unsubstantiated is not germane to the issue of the reasonableness of Defendant's medical judgment because this information was unavailable at the time CSU's diagnoses. OASAS's findings with respect to CSU's diagnosis and treatment of another patient, meanwhile, are similarly not probative of whether CSU conducted the requisite individualized assessment of each of the Plaintiffs in this case. Plaintiffs' cross-motion for summary judgment on their disability discrimination claims is likewise denied.

### C.  FLSA and NYLL Claims

Plaintiffs Makinen and Torres assert claims under the FLSA and NYLL for unpaid wages for "work" they performed during time spent in "vigorously objected to and unwarranted" outpatient rehabilitation sessions, private counseling sessions and AA meetings during their personal time, as well as for hours spent in excess of their normal working hours in mandated meetings and programs during their inpatient treatment. Both sides have moved for summary judgment on their claims for compensation for this under the FLSA. Makinen and Torres, however, have failed to answer or otherwise respond to Defendants' motion for summary judgment on their NYLL claim, which argues that the claim must be dismissed because the NYPD is not subject to NYLL § 190(3). Accordingly, Makinen and Torres' NYLL claims (Count VIII) are hereby dismissed for failure to prosecute. Furthermore, as described below, the Court grants Defendants' motion for summary judgment on the FLSA claims on the grounds that Plaintiffs' treatment is not compensable "work."

The Second Circuit has held that, under the FLSA, a "trial judge [is] responsible for determining as a matter of law whether plaintiff's activities could potentially constitute 'work.'" *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir. 1998). An activity is not considered work under the FLSA unless it constitutes "exertion or loss of an employee's time that is (1) controlled or required by an employer, (2) pursued necessarily and primarily for the employer's benefit, and (3) if performed outside the scheduled work time, an integral and indispensable part of the employee's principal activities." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008) (citing *Holzapfel*, 145 F.3d at 522)).

This Court's independent research has uncovered one federal court decision, not cited by either of the parties, which directly addresses whether employer-mandated alcohol rehabilitation treatment constitutes compensable work. In *Todd v. Lexington Fayette Urban County Government*, a police officer sought compensation under the FLSA for time he spent in alcohol treatment including AA meetings and psychiatric sessions that the police department had required after it learned of an episode where he had consumed alcohol and sleeping pills and blacked out. No. 5:08-295-KKC, 2009 WL 4800052, at *1-*2 (E.D. Ky. Dec. 10, 2009). The court granted summary judgment for the defendant, holding that while the treatment was certainly required by the police department—given that Plaintiff's employment would have been adversely affected if he declined to participate—the other two elements of "compensable work" were not satisfied. *Id.* at *4-*7. Specifically, the court found that the treatment was not "necessarily and primarily" pursued for the benefit of the police department, given that the employee was "not crucial to the operations of the police department," and had himself benefitted from the treatment. *Id.* at *6. It also found that the treatment was not an indispensable part of the police officer's primary activities of "patrol assignments, apprehending

32

criminals, performing investigations and responding to the various happenings of daily life affecting the public safety," as he performed none of these duties while at his AA meetings or psychiatric evaluations. *Id.* at *7.

This Court is persuaded by *Todd*'s compensable work analysis. While Makinen and Torres vehemently object to the conclusion that their treatment was anything other than unwarranted and detrimental, what matters in the compensable work analysis is that the NYPD certainly did not benefit, as Makinen and Torres were not crucial to their operations, and that Makinen and Torres were in any event the *intended* beneficiaries of the treatment. Similarly, as in *Todd*, there is no legitimate dispute here that their treatment was not an indispensable part of their duties as police officers.

In support of their argument to the contrary, however, Makinen and Torres rely heavily on a Department of Labor ("DOL") Opinion Letter which opined that "medical or psychiatric examinations" that are "conducted outside of working hours" and "which the City's police officers [were] required to have" constitutes compensable work under the FLSA. *See Police/Hours Worked*, Wages & Hours Manual (BNA) (Dep't of Labor, Aug. 2, 1989), 1989 WL 1595239. The letter's rationale is that such activity is "regarded as indispensable to the performance of the principal activity the employee is hired to perform" and is "time during which the employee is subject to [the] employer's direction and control." *Id.* The Court finds Makinen and Torres' reliance on the Opinion Letter to be misplaced.

As an initial matter, the Opinion Letter's conclusion could reasonably be interpreted as limited to those "medical and psychiatric examinations" that are required of *all* a department's police officers, and inapplicable here by its very terms. In any event, even if it were construed to extend to the instant case, the Second Circuit has cautioned that "DOL opinion letters . . . are not

33

binding authority . . . and do not command [deference under *Chevron U.S.A. Inc. v. National Resource Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984)] . . . but 'may be properly resort[ed] [to] for guidance.'" *Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 149 (2d Cir. 2008) (citing *Gualandi v. Adams*, 385 F.3d 236, 243 (2d Cir. 2004)). Resort to the letter for guidance is not necessary here given that a straightforward application of case law establishes that Makinen and Torres' treatment is not compensable work under the FLSA.

### D. State Tort Law Claims Against All Defendants

Plaintiffs allege that Defendants are liable for breaches of duties of confidentiality owed to Plaintiffs through their disclosure of information related to their diagnoses to the NYPD Medical Division and other third-parties (Count IX), and that Defendants have defamed them by misrepresenting orally and in writing to the NYPD Medical Division and others that the Plaintiffs were suffering from alcohol abuse or dependence (Count X). For the reasons described below, the Court grants Defendants' motion for summary judgment against Plaintiffs on these claims, on the grounds that they are barred by the releases Plaintiffs executed to CSU or, with respect to CSU's disclosures to the NYPD Medical Division, barred by the doctrines of qualified interest privilege and justified or excused disclosures.

#### 1. Disclosures to Those For Whom Plaintiffs' Executed Releases

To establish a claim for defamation under New York law, a plaintiff is required to demonstrate four elements: "(1) a false statement about the plaintiff; (2) *published to a third party without authorization or privilege*; (3) through the fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation *per se* or caused 'special damages.'" *Boehner v. Heise*, 734 F. Supp. 2d 389, 397-98 (S.D.N.Y. 2010) (alteration in original) (emphases added) (quoting *Gargiulo v. Forster & Garbus, Esqs.*, 651 F. Supp. 2d 188,

192 (S.D.N.Y. 2009)).  Execution of a release authorizing the publicized statement negates the

third element and thus constitutes a complete defense to a defamation claim.  *See, e.g.*, *Johnson*

*v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 271 (W.D.N.Y. 2010); *Hirschfield v.*

*Institutional Investor*, 260 A.D.2d 171, 172 (1st Dep't 1999).  With respect to a patient's

common law claim for breach of confidentiality, meanwhile, it is well established that the cause

of action is grounded in an "*unauthorized* disclosure of the patient's medicals records."  *See*

*Burton v. Matteliano*, 81 A.D.3d 1272, 1274 (4th Dep't 2011) (emphasis added).

      In this case, each of the Plaintiffs executed written releases permitting CSU to disclose

their patient information to their provided references in order to "aid in [CSU's assessment]."

(*See* Eichenholz Decl.  Exs. 16, 23, 26, 35, 45.)  These authorizations negate an essential

element of Plaintiffs' claims of breach of confidentiality and defamation as to disclosure or

publication to these parties.  Plaintiffs do not dispute this, and argue instead that the releases are

invalid because they were "forced to sign the documents by CSU under threat of self-

incrimination," that Defendants forfeited this defense of waiver by failing to raise it in their

answer and that Defendants in any event exceeded the scope of the authorizations by disclosing

the information to other third parties.  Each of these contentions is unavailing.

      First, because the unauthorized nature of a disclosure is an essential element of Plaintiffs'

claims for defamation and breach of confidentiality, Defendants' authorization argument strikes

at the very merits of Plaintiffs' claims.  This is distinct from the affirmative defense of waiver,

which applies when a party knowingly and intentionally relinquishes their right to proceed on a

claim that has already accrued.  *See, e.g.*, *Tom Rice Buick-Pontiac v. Gen. Motors Corp.*, 551

F.3d 149, 157 (2d Cir. 2008) ("Waiver requires the voluntary and intentional abandonment of *a*

*known right* which, but for the waiver, would have been enforceable." (emphasis added) (quoting

*Gen. Motors Acceptance Corp. v. Clifton–Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236 (1995))).

In any event, even if the Defendants were required to plead authorization as an affirmative

defense in their answer, this Court will excuse their failure to do so, because Plaintiffs have been

afforded notice and an opportunity to respond and have not otherwise been prejudiced. *Rose v.*

*AmSouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004).

As for Plaintiffs' argument that their execution of the releases was "forced," the Court

construes this as asserting the defense of duress and, given the evidence cited in support of this

contention, to be made only with respect to Plaintiff Torres. (*See* Pls. Opp'n & Cross-Mot. at 48,

ECF No. 55.)  Under New York law, duress exists where a person, by the unlawful act of

another, is induced to take an action which he had a legal right to abstain from performing. *See,*

*e.g.*, *Chase Manhattan Bank v. State*, 13 A.D.3d 873, 874 (3d Dep't 2004).  Here, Torres argues

that the releases are void because CSU informed him that it could draw an adverse inference in

its diagnosis if he refused to provide them.  While a threat can give rise to duress, however, it is

beyond cavil that, especially in the employment context, threatening to do what one has a legal

right to do does not give rise to a claim of duress. *See Faillace v. Port Auth. of N.Y. and N.J.*,

130 A.D.2d 34, 42 (1st Dep't 1987) (threat of termination did not give rise to duress where

employer had statutory right to terminate employee); *see also Lyons v. Lyons*, 289 A.D.2d 902,

904 (3d Dep't 2001).  Torres's duress claim fails, then, because there is no denying that CSU had

the right to draw any inferences in their diagnosis from a refusal to provide a release.

Finally, Plaintiffs' arguments that Defendants exceeded the scope of their authorizations

is utterly lacking support in the record.  Specifically, Nardini's claim that CSU exceeded her

authorization by disclosing her diagnosis to Sinatra because her authorization to CSU was

limited only to CSU consulting with Sinatra about her allegations, is inconsistent with the plain

language of the authorization and in any event supported only by mere self-serving statements and inadmissible hearsay. *See, e.g.*, *Chansamone v. IBEW Local 97*, 523 F. App'x 820, 823 n.4 (2d Cir. 2013) (summary order) ("[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment." (alteration in original) (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985))).[9] Meanwhile, Torres's conjecture that CSU must have exceeded the scope of his authorization because several of his colleagues were aware of his treatment upon his discharge is similarly insufficient evidence of unauthorized disclosure to survive summary judgment. *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir. 2006) ("speculation alone is insufficient to defeat a motion for summary judgment").

### 2.  *Disclosures to the NYPD Medical Division*

Plaintiffs also assert their breach of confidentiality and defamation claims against Defendants based on CSU's admitted disclosures of information related to their diagnosis to the NYPD Medical Division, for whom Plaintiffs did not execute releases. The Court, however, grants summary judgment for Defendants on these claims as well, on the grounds that they are barred by the doctrine of qualified privilege, as to defamation, and legal justification and excuse, as to breach of confidentiality.

### a.  Qualified Privilege

New York law recognizes a qualified privilege against defamation claims that "encompasses communications 'made by one person to another upon a subject in which both

---

[9]      Moreover, while Nardini testified that either Sinatra and/or Eiseman published the information Tobin disclosed to Sinatra in court proceedings, (Pls.' Stmt. ¶¶ 199-200), Nardini also admitted that she spoke with her mother, brother, partner, two friends and NYPD supervisors about her interactions with CSU. (Pls.' Stmt. ¶ 201.)

have an interest.'" *Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 894-95 (2d Cir. 2012)

(summary order) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992)).  This includes

"[c]ommunications by supervisors or co-workers made in connection with the evaluation of an

employee's performance, including allegations of employee misconduct and communications

regarding the reasons for an employee's discharge." *Albert v. Loksen*, 239 F.3d 256, 272 (2d Cir.

2001); *Huntemann v. City of Yonkers*, No. 95 Civ. 1276(LAP), 1997 WL 527880, at *8

(S.D.N.Y. Aug. 25, 1997) (noting that "statements made in the employment context concerning

the qualifications and actions of employees" clearly "f[e]ll within the qualified privilege").  Such

statements are protected unless they were made with common-law malice, which is defined as

"spite or ill will," or constitutional malice, which requires "knowledge that [the statement] was

false or . . . reckless disregard of whether it was false or not." *Albert*, 239 F.3d at 272 (citation

omitted).

    In this case, CSU's disclosures to the NYPD Medical Division in connection with

Plaintiffs' diagnoses and prescribed treatment is protected by the qualified privilege, given their

joint interest in the treatment, misconduct and/or qualifications of the officers.  Plaintiffs tacitly

acknowledge this common interest, but argue that Defendants acted with knowledge or reckless

disregard of the falsity of their statements.  However, they fail to point to any evidence in the

record which supports this contention and their claims must therefore be dismissed.

### b.  Justification or Excuse

    The Court similarly finds that Defendants' disclosure to the NYPD Medical Division

does not give rise to a claim for breach of confidentiality.  In particular, New York courts have

recognized that a patient's right to confidentiality is "less than absolute and that, in order to be

considered wrongful, and thus actionable, the disclosure must be without legal justification or

38

excuse." *Rea v. Pardo*, 132 A.D.2d 442, 445 (4th Dep't 1987) (citations omitted). Disclosures

considered to be protected by legal justifications or excuses include disclosures necessary to

"protect the safety of the patient or others," and those based on statutory or regulatory

obligations. *See id.* (collecting authorities). In evaluating whether a disclosure in any given case

was with or without legal justification or excuse, a court is required to "balance the competing

interests at stake." *Id.*

Under this rubric, the Court finds that CSU's disclosures to the NYPD Medical Division

were made with legal justification or excuse. The record illustrates that the Medical Division

and CSU work in tandem on referrals and diagnoses, as the Medical Division is ultimately

charged with the fitness for duty determinations and the issuance of lawful orders for compliance

with CSU's recommended treatments. *See, e.g., Roberts v. Bratton*, 233 A.D.2d 102, 103 (1st

Dep't 1996). Prohibiting disclosure under these circumstances would eviscerate CSU's *raison*

*d'etre* and needlessly create grave safety risks by preventing the Medical Division from taking

legitimate action against a police officer who poses a danger to other officers and the general

public. *See id.* The compelling public safety interest served by CSU's limited disclosure,

moreover, certainly outweighs Plaintiffs' interests in privacy in light of the fact that, as other

courts have already observed, Plaintiffs consented to occasional, employment-related intrusions

into their privacy when they joined the NYPD. *See, e.g., MacShane v. City of N.Y.*, No. 05 CV

6021 (RML), 2007 WL 1062936, at *9 (E.D.N.Y. Mar. 30, 2007).

### E.  State Law Claims Against Sergeant Sweeney

Against Sergeant Sweeney, in his individual and official capacities, Plaintiffs assert

claims for violations of New York Public Health Section 18 ("Section 18"), through his

disclosure (or authorization of the disclosure) of Plaintiffs' diagnoses and treatment plans, and

for breach of his duty of care, by misdiagnosing them as suffering from alcohol dependence or

abuse, failing to maintain their confidentiality, failing to adequately supervise CSU, and for his

negligence *per se* in breaching his statutorily imposed duties of confidentiality.  Defendants

move for summary judgment on the grounds that Section 18 claim give rise to a private right of

action and that Sergeant Sweeney is otherwise protected by the cloak of governmental immunity.

### 1.  Section 18 of New York Public Health Law

Count VI of Plaintiffs' Amended Complaint alleges that, in violation of Section 18,

Sweeney "disclosed, and/or authorized [CSU] to disclose to [third parties], directly or indirectly,

that plaintiffs purportedly suffer from alcoholism and/or have a problem with alcohol

consumption and that they were compelled to undergo alcohol-related treatment and care as

result." (Am. Compl. ¶ 173.)  Plaintiffs have not identified which particular paragraph(s) of

Section 18 they seek to proceed under but, in opposition to Defendant's motion for summary

judgment, cite two cases, *Rockland County Patrolmen's Benevolent Ass'n v. Collins*, 225 A.D.2d

534 (2d Dep't 1996) and *Caraveo v. Nielsen Media Research*, No. 01Civ.9609 LBSRLE, 2003

WL 169767 (S.D.N.Y. Jan. 22, 2013), *report and recommendation adopted in part, rejected in

part* 2003 WL 1745064 (S.D.N.Y. Mar 31, 2003), which involved claims under Section 18(6).

Section 18(6) provides:

> *Disclosure to third persons.* Whenever a health care provider, *as
> otherwise authorized by law*, discloses patient information to a
> person or entity other than the subject of such information or to
> other qualified persons, *either a copy of the subject's written
> authorization shall be added to the patient information or the name
> and address of such third party and a notation of the purpose for
> the disclosure* shall be indicated in the file or record of such
> subject's patient information maintained by the provider . . . . Any
> disclosure made pursuant to this section shall be limited to that
> information necessary in light of the reason for disclosure.
> *Information so disclosed should be kept confidential by the party*

> *receiving such information and the limitations on such disclosure*
> *in this section shall apply to such party.*

In their papers, the parties strenuously debate whether Section 18 gives rise to a private right of action under New York law. The Court has determined that this issue is academic in this case, however, as, even if it does, Plaintiffs' claims still must fail in light of the plain language of Section 18(6).

Specifically, the above-quoted plain language of Section 18(6) only imposes a duty of confidentiality on *third parties* to whom health care providers make otherwise *authorized* disclosures of patient information. This appears to be the duty breached by the Respondent and Defendant in *Rockland County* and *Caraveo*, respectively. *See Rockland Cnty.*, 225 A.D.2d at 535; *Caraveo*, 2003 WL 169767, at *7. Here, in contrast, there is no evidence of a breach of such a duty through CSU's disclosures, and CSU and Sweeney are in fact themselves healthcare providers under the statute who made what this Court holds to be authorized disclosures. The only duties imposed upon them by the plain language of Section 18(6) are to: (1) either provide a copy of the patient's written authorization to the third party or maintain the contact information of the third party in the patient's file and (2) to limit the scope of disclosures to its underlying purpose.[10] As Plaintiffs do not allege that any of the aforementioned duties in Section 18 have been breached by Sweeney, the Court grants Sergeant Sweeney summary judgment on this claim.[11]

---

[10]    These duties are consistent with Section 18's putative purpose, not of confidentiality, but of ensuring patient access to medical records held by their health care providers. *See Davidson v. State*, 3 A.D.3d 623, 625 (3d Dep't 2004) (noting that Section 18 is "designed to ensure that, as a general rule, patients have access to their own medical records").

[11]    To the extent that Plaintiffs' claims are grounded in Sweeney and CSU's alleged breach of the scope of their authorizations, this argument is rejected for the reasons stated in Sections III-D-1 and III-D-

41

### 2.   Governmental Immunity

The Court grants Sergeant Sweeney's summary judgment in his favor on the balance of

the state tort law claims on the grounds of governmental immunity.  Under New York law "when

official action involves the exercise of discretion, [a municipal defendant] is not liable for the

injurious consequence of that action even if resulting from negligence or malice." *Abraham v.*

*City of N.Y.*, 39 A.D.3d 21, 25 (2d Dep't 2007) (quoting *Tango v. Tulevech*, 61 N.Y.2d 34, 40

(1983)).  "If a functional analysis of the actor's position shows that it is sufficiently discretionary

in nature to warrant immunity, it must then be determined whether the conduct giving rise to the

claim is related to an exercise of that discretion." *Mon v. City of N.Y.*, 78 N.Y.2d 309, 313

(1991).  In *Mon*, for example, plaintiffs brought suit against the City of New York in connection

with two officers' negligent hiring of a police officer who fired his revolver and injured Plaintiffs

while attempting to apprehend them. *Id.* at 313-14.  The Court of Appeals held that the

responsibilities of the two officers in "investigating and evaluating the background and

qualifications of police officer candidates and making recommendations and final decisions for

such appointments entailed the exercise of some judgment and discretion," such that the officers'

judgment to hire the offending officer was protected by governmental immunity. *Id.*

Applying these principles here, the Court finds that Sergeant Sweeney is entitled to

governmental immunity.  The record illustrates that, like the officers in *Mon*, Sergeant Sweeney

exercised ample discretion in Plaintiffs' cases, including in performing diagnoses and

recommending treatments, and that Plaintiffs' claims arise from the exercise of this discretion.

*See, e.g.*, *Abraham*, 39 A.D.3d at 24-25 (holding that New York City and Department of Health

and Mental Hygiene officials exercised sufficient discretion in investigation of possible outbreak

---

2, *supra*.

of tuberculosis at school to warrant governmental immunity).  The authorities cited by Plaintiffs

in support of a contrary conclusion are not even remotely apposite.  *See, e.g.*, *Velazquez v. N.Y.C.*

*Health Hosps. Corp.*, 65 A.D.3d 981, 982 (1st Dep't 2009) (holding that health care professional

did not exercise discretion in carrying patient down a stairway); *Bartlett v. State*, 52 A.D.2d 318,

323 (4th Dep't 1976) (holding officials did not exercise discretion in their total ignorance of and

failure to release a patient).  Plaintiffs' argument that Sergeant Sweeney is not protected by

governmental immunity because they have sued him in is individual capacity is also unavailing,

as there is absolutely no evidence in the record of Sweeney engaging in any acts outside the

scope of his employment with respect to Plaintiffs.  *See, e.g.*, *Levenson v. Nussbaum*, 17045/09,

2011 NY. Misc. Lexis 1834, at *6 (Sup. Ct. Apr. 8, 2011).

Finally, Plaintiffs' attempt to avoid governmental immunity by invoking the failure to

abate doctrine must also be unsuccessful.  Under this doctrine, where "the retention of an

employee may involve a *known risk of bodily harm* to others, the field in which [official]

discretion may be exercised . . . is superseded by the duty to abate the risk if in related

circumstances danger to others is reasonably perceived."  *McCrink v. City of N.Y.*, 296 N.Y. 99,

106 (1947) (emphasis added).  *McCrink* involved the failure to abate the risk of bodily harm

arising from the continued employment of a patrolman who was alleged to be a violent alcoholic

with an extensive disciplinary and psychiatric history and to have, without provocation, shot and

killed one and seriously wounded another.  *Id.* at 104-06.[12]  The doctrine is plainly inapplicable

---

[12]     Other failure to abate cases involve a risk of physical injury comparable to that in *McCrink*. *See,*
*e.g.*, *Jones v. City of Buffalo*, 267 A.D.2d 1101, 1102 (4th Dep't 1999) (failure to abate against
foreseeable risk of harm of officer who shot and seriously wounded his estranged wife, and had been
arrested for a violent assault just three weeks earlier); *Wyatt v. State*, 176 A.D.2d 574, 575-76 (1st Dep't
1991) (failure to abate risk of officer who shot and wounded Plaintiffs during traffic dispute after it failed
to investigate allegation that he had previously shot and killed a puppy and threatened its owner).

here because the record is bereft of any evidence supporting a risk, let alone a known one, of bodily harm that was attendant to CSU's operations in general or Sweeney's conduct in particular.

### IV.   CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (ECF No. 32) is **GRANTED IN PART and DENIED IN PART**.  Plaintiffs' claims against the NYPD are dismissed in their entirety, as are Counts VI through XI of the Amended Complaint.  Counts I through III are dismissed with respect to Plaintiff Nardini only.  Plaintiffs' cross-motion for partial summary judgment (ECF No. 33) is **DENIED**.

**SO ORDERED.**

**Dated:**  September 30, 2014

**New York, New York**

ANDREW L. CARTER, JR.
**United States District Judge**

44