**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

KATHLEEN MAKINEN and JAMIE
NARDINI,

       **Plaintiffs,**

   **-against-**

CITY OF NEW YORK, RAYMOND W.
KELLY, as Police Commissioner of the City
of New York, and SERGEANT DANIEL J.
SWEENEY, individually and in his official
capacity,

       **Defendants.**

----------------------------------------------------------- x

USDC SDNY
DOCUMENT ELECTRONICALLY
FILED
DOC#: _____
DATE FILED: 3 - 1 -16

**1:11-cv-07535 (ALC) (AJP)**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

  Plaintiffs Kathleen Makinen and Jamie Nardini sued the City of New York, former Police

Commissioner Raymond Kelly, and Sergeant Daniel Sweeney, claiming that they had been

discriminated against based on a perceived disability in violation of the Americans with

Disabilities Act, the New York State Human Rights Law ("NYSHRL"), and the New York City

Human Rights Law ("NYCHRL").[1] Following an eight-day jury trial in May 2015, the jury

entered verdicts in both Plaintiffs' favor under the NYCHRL only and awarded Makinen

damages in the total amount of $46,100 and Nardini damages in the total amount of $105,000.

  Before the Court are Defendants' post-trial motions pursuant to Fed. R. Civ. P. 50 ("Rule

50") and Fed. R. Civ. P. 59 ("Rule 59"). Defendants seek judgment as a matter of law as to all

NYCHRL claims, pursuant to Rule 50(b), or a new trial pursuant to Rule 59. For the reasons set

forth below, Defendants' Rule 50(b) motion is GRANTED in part and DENIED in part.

Defendants' Rule 59 motion is DENIED.

---

[1] A third plaintiff, Angel Torres, settled his claims. (ECF Nos. 70, 74.)

## BACKGROUND

Familiarity with the facts and procedural history of the case is assumed. For a more complete description of the underlying facts, see Makinen v. City of New York, 53 F. Supp. 3d 676 (S.D.N.Y. 2014).

Plaintiffs were both police officers employed by the New York City Police Department ("NYPD"). Each was separately referred to the NYPD's internal Counseling Services Unit ("CSU"), to be assessed for alcoholism. The CSU is a certified New York State Office of Alcoholism and Substance Abuse Services outpatient treatment center, with a stated objective of assisting police officers who are experiencing difficulty with substance abuse in their rehabilitation and returning them to productive service. At the time at issue, CSU was overseen by Sergeant Daniel Sweeney.

At the time of referral and since, both Plaintiffs denied that they had issues with alcohol abuse. Nevertheless, CSU determined that both did in fact have such issues and prescribed treatment plans. If Plaintiffs did not comply with the treatment plans, they risked suspension and termination. Over the course of several years, Makinen's treatment plan included: outpatient treatment; attendance of Alcoholics Anonymous meetings; alcohol abstinence, inpatient treatment; and private therapy. Plaintiff Nardini's treatment plan included: weekly meetings with a counselor for six weeks and the viewing of six education videos over that same period of time.

After trial, the jury found that the City of New York was liable to both Plaintiffs for discrimination under the New York City Human Rights Law, and that Commissioner Kelly and Sergeant Sweeney were personally liable. It awarded Makinen compensatory damages totaling $16,100, and awarded her $15,000 in punitive damages against Defendant Kelly and an additional $15,000 in punitive damages against Defendant Sweeney. It awarded Nardini

compensatory damages totaling $75,000 and awarded her $15,000 in punitive damages against

Defendant Kelly and an additional $15,000 in punitive damages against Defendant Sweeney.

Defendants filed the instant post-trial motions on July 2, 2015.

## LEGAL STANDARD

### I.   Rule 50(b)

A court may grant a motion for judgment as a matter of law pursuant to Rule 50 only if

"the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to

permit a reasonable jury to find in his favor." Arlio v. Lively, 474 F.3d 46, 51 (2d Cir. 2007).

Rule 50 "imposes a heavy burden on a movant," Cash v. County of Erie, 654 F.3d 324, 333 (2d

Cir. 2011), and "[t]hat burden is particularly heavy where, as here, the jury has deliberated in the

case and actually returned its verdict in favor of the non-movant." Id. (quoting Cross v. N.Y.C.

Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005)). In such a situation, a court may set aside the

jury's verdict "only if there exists such a complete absence of evidence supporting the verdict

that the jury's findings could only have been the result of sheer surmise and conjecture, or the

evidence in favor of the movant is so overwhelming that reasonable and fair minded persons

could not arrive at a verdict against it." Id. (quoting Kinneary v. City of New York, 601 F.3d

151, 155 (2d Cir. 2010)) (internal quotation marks omitted). Put differently, "a Rule 50 motion

may be granted only if the court, viewing the evidence in the light most favorable to the non-

movant, concludes that a reasonable juror would have been *compelled* to accept the view of the

moving party." Id. (emphasis in original) (quoting Zellner v. Summerlin, 494 F.3d 344, 371 (2d

Cir. 2007)) (internal quotation marks omitted).

II.     **Rule 59**

"In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant

to [Rule] 59 may be granted by the district court, although there is evidence to support the jury's

verdict, so long as the district court determines that, in its independent judgment, the jury has

reached a seriously erroneous result or its verdict is a miscarriage of justice." Nimely v. City of

New York, 414 F.3d 381, 392 (2d Cir. 2005) (quoting Munafo v. Metropolitan Transportation

Authority, 381 F.3d 99, 105 (2d Cir. 2004)) (alterations and internal quotation marks omitted).

"[O]n a Rule 59 motion the court may weigh the evidence and the credibility of witnesses and

need not view the evidence in the light most favorable to the verdict winner." ING Glob. v.

United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 99 (2d Cir. 2014) (quoting Raedle v.

Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012)) (internal quotation marks omitted).

However, "a high degree of deference is accorded to the jury's evaluation of witness credibility,

and . . . jury verdicts should be disturbed with great infrequency." Id.

## DISCUSSION

I.     **Rule 50(b)**

Defendants argue that they are entitled to judgment as a matter of law under Rule 50(b)

on six grounds: (1) Plaintiffs are not recovering alcoholics as defined by the NYCHRL;

(2) Nardini did not incur an adverse employment action; (3) Dr. Frances's expert report and

testimony were inadmissible; (4) Plaintiffs cannot demonstrate they were wrongfully perceived

as alcoholics; (5) Plaintiffs failed to demonstrate that Kelly or Sweeney were individually liable;

and (6) the punitive and compensatory damage claims fail as a matter of law.

4

## A.     Definition of Plaintiffs' Disabilities Under NYCHRL

Defendants first argue that Plaintiffs' NYCHRL claims are legally insufficient because neither Plaintiff suffers from the disability of alcoholism as defined by the NYCHRL. The law provides, "In the case of alcoholism, drug addiction or other substance abuse, the term 'disability' shall only apply to a person who (1) is recovering or has recovered and (2) currently is free of such abuse . . ." N.Y.C. Admin. Code § 8-102(16)(c) ("Section 102(16) definition"). Plaintiffs admit that they do not meet that definition; indeed, their contentions that they are not or were not alcoholics are at the heart of their case. Instead, they argue that the relevant provision of the NYCHRL is the section forbidding "an employer or an employee or agent thereof, because of the actual or *perceived* . . . disability . . . of any person . . . to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(a) (emphasis added).

The Court agrees with Plaintiffs. As the Court earlier found, if the Section 102(16) definition applied here, "the NYCHRL's protective reach would be narrower than that of its state and federal counterparts, which would be contrary to the express purpose of the New York City Council in enacting the Local Civil Rights Restoration Act of 2005." (Summ. J. Order, ECF No. 64 ("Summ. J. Order"), 23 n. 5.) That is, if the Court were to require plaintiffs bringing claims of discrimination based on *perceived* alcoholism to meet the NYCHRL definition of "alcoholism," the Court would preclude plaintiffs from bringing claims under the NYCHRL that they could still bring under the ADA and the NYSHRL. The ADA allows a plaintiff to establish a claim of discrimination by establishing that "she has been subjected to an action prohibited . . . because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3). Under the ADA, plaintiffs need

5

only establish that defendants regarded them as having an impairment—including alcoholism—regardless of their actual condition. See, e.g. Rodriguez v. Verizon Telecom, No. 13 Civ. 6969 (PKC) (DCF), 2014 WL 6807834, at *5 (S.D.N.Y. Dec. 3, 2014) (dismissing ADA claim based on actual disability of alcoholism but allowing ADA claim based on perceived disability of alcoholism); Hilton v. Wright, 928 F. Supp. 2d 530, 554-55 (N.D.N.Y. 2013) (concluding that a genuine issue of material fact existed as to whether defendant regarded plaintiff as having a "drug addiction" or "alcoholism," "which would constitute a physical or mental impairment for purposes of being regarded as disabled . . ."); Darcy v. City of N.Y., 06 Civ. 2246, 2011 WL 841375, at *4 (E.D.N.Y. Mar. 8, 2011) (concluding that a rational jury could find that plaintiff was regarded as having an impairment, where defendant made a remark to plaintiff implying that plaintiff suffered from alcoholism).

Because a regarded-as alcoholism claim under the ADA does not require a plaintiff to establish that she is a person who is recovering or has recovered and currently is free of such substance abuse, a perceived-as alcoholism claim under the NYCHRL cannot either. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (describing NYCHRL as a "one-way ratchet," and explaining that federal and state civil rights laws are a "*floor* below which the City's Human Rights law cannot fall" (emphasis in original)). In order to succeed on their claims in this case, Plaintiffs did not need to meet the Section 102(16) definition of alcoholism; they needed only establish that they were discriminated against based on their perceived alcoholism. Therefore, Defendants are not entitled to judgment as a matter of law on the ground that Plaintiffs did not establish they were disabled under the NYCHRL.

6

### B.   Standard for Discrimination Under the NYCHRL

Defendants next contend that to prevail under the NYCHRL, Plaintiffs had to establish that they incurred "adverse employment actions," instead of merely "differential treatment." The Court previously addressed this argument at the summary judgment stage, finding that "to state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment as opposed to the materially adverse employment actions required under the ADA and NYSHRL." (Summ. J. Order, 22).

"[W]hen when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002) (quoting United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991); United States v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000)) (internal quotation marks and citations omitted). "The primary reasons justifying reconsideration of an issue by a trial court are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Razzoli v. Fed. Bureau of Prisons, No. 12 Civ. 3774 (LAP), 2014 WL 2440771, at *6 (S.D.N.Y. May 30, 2014) (quoting Tenzer, 213 F.3d at 39) (internal quotation marks omitted).

The Court finds no cogent or compelling reason to revisit its earlier decision. Defendants do not identify any change of controlling law. Instead, they rely heavily on a state court decision that pre-dates this Court's summary judgment decision. See Bennett v. Health Mgt. Sys., Inc., 92 A.D.3d 29 (1st Dept. 2011). But the Second Circuit, in a published opinion post-dating the case on which Defendants rely, made clear that "the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013) (quoting Williams v. N.Y.C. Hous.

Auth., 61 A.D.3d 62 (1st Dept. 2009)). Instead, to establish liability under the NYCHRL, "the

plaintiff need only show differential treatment—that she is treated 'less well'—because of a

discriminatory intent." Id. The Second Circuit has continued to adhere to this standard, see, e.g.,

Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 82 (2d Cir. 2015); Gorokhovsky v. New

York City Hous. Auth., 552 F. App'x 100, 101 (2d Cir. 2014); Leung v. New York Univ., 580 F.

App'x 38, 40 (2d Cir. 2014), as have district courts. See, e.g., Forte v. Liquidnet Holdings, Inc.,

No. 14 Civ. 2185 (AT), 2015 WL 5820976, at *13 (S.D.N.Y. Sept. 30, 2015); Richards v. New

York City Dep't of Educ., No. 13 Civ. 16 (VEC), 2015 WL 4164746, at *10 (S.D.N.Y. July 10,

2015). Against that backdrop, the Court will not revisit the question of the appropriate standard.

   Defendants also contend that Nardini failed to satisfy even the differential treatment

standard. Nardini presented evidence that she was required to watch a course of alcohol

education videos, given a label of "alcoholic" that will stay in her file for the duration of her

career, and forbidden from drinking in a way that "come[s] to the attention of [her] employer"

for the remainder of the career, at risk of CSU intervening and reassessing her. (Tr. 69-72; 292;

303-04.)[2] While the burdens placed on Nardini do not amount to an adverse employment action,

they do provide sufficient evidence for the jury's determination that Nardini was treated—and

continues to be treated—"less well" than members of the NYPD who had not previously been

perceived as suffering from alcoholism. Based on the testimony of Nardini herself and of CSU

Counselor Schaefer, the Court cannot say that "there exists such a complete absence of evidence

supporting the verdict that the jury's findings could only have been the result of sheer surmise

and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and

fair minded persons could not arrive at a verdict against it." Cash, 654 F.3d at 333.

---

[2] "Tr." refers to the trial transcript.

### C.    Dr. Frances's Expert Testimony

Third, Defendants argue that the testimony of Plaintiffs' expert Dr. Richard Frances was inadmissible. Dr. Frances, a specialist in addiction psychiatry, testified at trial to the accuracy of Plaintiffs' alcoholism diagnoses and the appropriateness of CSU's handling of Plaintiffs' cases. (Tr. 665-74, 698-99, 710, 717-18.) At the summary judgment stage, the Court allowed that it was "a close call" but ultimately found Dr. Frances's testimony to be admissible. (Summ. J. Order, 29.) In their Rule 50(b) motion, Defendants renew their earlier objections, arguing that Dr. France's report was "riddled with errors and methodological flaws that rendered his made-to-order 'diagnoses' patently unreliable under Fed. R. Evid. 702," and further, that his trial testimony itself "reaffirmed that his cherry picking methodology fatally undermined the reliability of his 'opinions.'" (Def.'s Post-Trial Mots., ECF No. 132 ("Def.'s Mot."), 8.)

However, "the admissibility of expert testimony is not the proper subject of a Rule 50 motion, which is a vehicle to challenge the sufficiency of the evidence presented in a case, not evidentiary rulings." Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP, No. 08 Civ. 931 (PKC), 2015 WL 3605143, at *15 (E.D.N.Y. June 5, 2015) (citing Gierlinger v. Gleason, 160 F.3d 858, 869 (2d Cir. 1998); Martinez v. Port Auth. of N.Y. & N.J., No. 01 Civ. 721, 2005 WL 2143333, at *2 (S.D.N.Y. Sept. 2, 2005), aff'd, 445 F.3d 158 (2d Cir. 2006)); see also LNC Investments, Inc. v. First Fid. Bank, 126 F. Supp. 2d 778, 785 (S.D.N.Y. 2001) ("It is inherent in the standards which govern the granting or denial of a Rule 50(b) motion that the motion must be determined on the basis of the evidence the trial judge admitted and the jury considered."). Under Rule 50(b), "[i]t is the record made at trial, consistent with the trial judge's evidentiary rulings, to which one must look in evaluating whether a rational jury could have arrived at the verdict reached." LNC Investments, 126 F. Supp. 2d at 785. While Defendants could properly

9

challenge the Court's evidentiary rulings in a Rule 59 motion for a new trial or on direct appeal, the correctness of the Court's admission of Dr. Frances's testimony is not relevant to the evaluation of their Rule 50(b) motion. The Court declines to revisit the issue for that reason.

### D.    Plaintiffs' Burden to Prove Wrongful Diagnoses

Next, Defendants argue that Plaintiffs bore the burden to prove that the perception that they were alcoholics was incorrect, and that Plaintiffs failed to meet that burden as they presented only their own "subjective belief" that they were not alcoholics. (Def.'s Mot. 9-10; Def.'s Reply. ECF No. 137 ("Def.'s Reply"), 2-3.) Defendants, in short, question whether Plaintiffs adequately proved that they were disabled within the meaning of the NYCHRL.

Turning first to who bore the burden, a plaintiff satisfies the NYCHRL if she "suffers from a statutorily defined disability and the disability caused the behavior for which the employee was terminated [or subjected to differential treatment]." Jacobsen v. New York City Health & Hosps. Corp., 11 N.E.3d 159, 166 (N.Y. 2014). "Unlike the [NYSHRL], the [NYCHRL]'s definition of 'disability' does not include 'reasonable accommodation' or the ability to perform a job in a reasonable manner . . . and employers may raise the inability of disabled employees to with reasonable accommodation, satisfy the essential requisites of their jobs only as an affirmative defense." Id. With this in mind, the Court instructed the jury that Plaintiffs bore the burden of establishing: (1) they suffered from a disability within the meaning of the City statute; (2) they were treated differently from other workers who were not perceived to have their alleged disabilities; and (3) defendants' conduct toward them consisted of more than trivial, insubstantial, or petty behavior.[3] (Tr. 1102.) The Court then instructed the jury that

---

[3] The parties contest only whether Plaintiffs were cognizably disabled and whether they were subjected to cognizably differential treatment; they do not contest the element of causation, i.e. that the alleged alcoholism prompted Defendants' actions. (See Summ. J. Order, 18 n. 2.)

Defendants could still prevail by proving, by a preponderance of the evidence, that plaintiffs

could not satisfy the essential requisites of their jobs. (Tr. 1104.)

Plaintiffs did bear the burden to prove that they were disabled within the meaning of the

NYCHRL. The NYCHRL defines a disability as:

> "any physical, medical, mental or psychological impairment, or a history or record of
> such impairment. . . . an impairment of any system of the body; including, but not limited
> to: the neurological system; the musculoskeletal system; the special sense organs and
> respiratory organs, including, but not limited to, speech organs; the cardiovascular
> system; the reproductive system; the digestive and genito-urinary systems; the hemic and
> lymphatic systems; the immunological systems; the skin; and the endocrine system; or a
> mental or psychological impairment."

N.Y.C. Admin. Code § 8-102(16). It also provides that it is "an unlawful discriminatory practice

[f]or an employer or an employee . . . because of an actual or perceived . . . disability" to

discriminate against an employee. N.Y.C. Admin. Code § 8-107(a) (emphasis added). Putting

these provisions together, Plaintiffs were required to show that Defendants *perceived them* as

having a "physical, medical, mental or psychological impairment, or a history or record of such

impairment."

There is no requirement, however, the Plaintiffs prove they were *wrongfully* perceived as

having a disability. Defendants argue that Plaintiffs could only prevail if they proved that they

were not in fact active alcoholics and were wrongfully perceived as such. This argument builds

on the undisputed fact that "police officers who are suffering from alcohol dependence or abuse

are, as a matter of law, not qualified to perform the essential functions of the job . . ." (Summ. J.

Order, 25 (citing Brennan v. N.Y.C. Police Dep't, No. 93 Civ. 8461 (BSJ), 1997 WL 811543, at

*4-7 (S.D.N.Y. May 27, 1997)). Therefore, Defendants argue, if Plaintiffs were shown to be

active alcoholics, they would in fact be unable to perform the essential functions of their jobs and

Defendants could not be held liable for discrimination on the basis of the disability. This is all

true—but Defendants misunderstand the burden. Under the NYCHRL, Defendants bear the burden of demonstrating that disabled employees could not satisfy the essential requisites of their jobs. See Jacobsen, 11 N.E.3d at 166. Plaintiffs needed only establish that they were disabled or perceived as disabled. Defendants bore the burden to establish "the inability of disabled employees" to perform their jobs, with or without reasonable accommodation.

Plaintiffs presented ample evidence to support a finding that they were perceived as disabled. In addition to Plaintiffs' own testimony, they presented that of Dr. Frances and of Counselor Schaefer. Through this testimony, Plaintiffs established that Defendants perceived them and treated them as if they were alcoholics. Indeed, Defendants essentially concede that they perceived Plaintiffs as alcoholics. This is all that Plaintiffs needed to show: that they were disabled or perceived as disabled under the NYCHRL. They did not need to show that Defendants *wrongfully* perceived them as disabled. The correctness of the perception is only relevant to Defendants' affirmative defense, where the burden was on Defendants to show that Plaintiffs were unable to carry out the essential requisites of the job because they were, in fact, alcoholics. The jury was instructed on this.[4] But the jury found that Plaintiffs had met their burden and Defendants had not met theirs. Viewing the evidence in the light most favorable to Plaintiffs, there was not a complete absence of evidence supporting the verdict such that the findings could only have been the result of sheer conjecture, nor was the evidence in favor of Defendants so overwhelming that a reasonable and fair-minded person could not arrive at a verdict against it.

---

[4] The jury was told, "Defendants may still prevail on the New York City Human Rights Law claims if they prove, by a preponderance of the evidence, that plaintiffs could not satisfy the essential requisites of their jobs. If an officer is an alcoholic and actively consuming alcohol, she is not able to perform the essential requisites of the job. Defendants must prove that plaintiffs' alleged alcoholism prevented them from satisfying the essential requisites of their jobs. . . . If defendants prove that plaintiffs could not, even with a reasonable accommodation, perform the essential requisites of their job, then you must find in favor of the defendants." (Tr. 1104.)

**E.      Individual Liability of Sergeant Sweeney and Commissioner Kelly**

Defendants next argue that there is no legal basis on which to hold Commissioner Kelly or Sergeant Sweeney individually liable. The NYCHRL provides for individual liability for persons who "aid, abet, incite, compel, or coerce the doing of any of the acts forbidden thereunder, or attempt to do so." N.Y.C. Admin. Code § 8-107(6). "An individual defendant may be held liable under the aiding and abetting provision of the NYSHRL [and NYCHRL] if he 'actually participates in the conduct giving rise to a discrimination claim.'" Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 n. 10 (2d Cir. 2011) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir.1995) abrogated on other grounds by Burlington Ind. v. Ellerth, 524 U.S. 742 (1998)); see also Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004) (applying the same standards to evaluate aiding and abetting claims under the NYSHRL and the NYCHRL). "To actually participate in the discrimination . . . an individual need not himself take part in the primary violation." Lewis v. Triborough Bridge & Tunnel Auth., 77 F. Supp. 2d 376, 381-82 (S.D.N.Y. 1999). An individual in a supervisory role may also be held liable for a failure to take appropriate investigative or remedial measures upon being informed of offensive conduct. Id.

District courts have been inconsistent in their application of aiding-and-abetting liability in one key regard: there is "disagreement over whether an individual can be held liable for aiding and abetting his own conduct . . ." Gorman v. Covidien, LLC, --- F. Supp. 3d ---, No. 13 Civ. 6486 (KPF), 2015 WL 7308659, at *6 (S.D.N.Y. Nov. 19, 2015). While some courts have found that "the primary actor cannot be an aider and abettor of his own actions," Hicks v. IBM, 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999), others have allowed that a defendant "may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions

13

serve as the predicate for the employer's vicarious liability." Tully-Boone v. North Shore-Long Island Jewish Hosp. Sys., 588 F.Supp.2d 419, 427 (E.D.N.Y. 2008). See also Gorman, 2015 WL 7308659, at *6 (collecting cases). Mindful of the Second Circuit's approach in Tomka, this Court will allow aiding-and-abetting liability to flow from an individual's own conduct.[5]

The NYCHRL also provides for direct liability for "an employer or an employee or agent thereof" who engages in discrimination. N.Y.C. Admin. Code § 8-107(1)(a). As with all provisions of the NYCHRL, this provision must be interpreted liberally and state and federal antidiscrimination laws must be regarded as floors below which the NYCHRL's protections cannot fall. Mihalik, 715 F.3d at 109. If a plaintiff establishes that a defendant is directly liable under the NYSHRL, then that defendant may also be held directly liable under the NYCHRL. See Burhans v. Lopez, 24 F. Supp. 3d 375, 386 (S.D.N.Y. 2014). Under the NYSHRL, "an individual is properly subject to liability for discrimination when that individual qualifies as an 'employer.'" Townsend v. Benjamin Enterprises, Inc., 679 F.3d 41, 57 (2d Cir. 2012) (quoting N.Y. Exec. Law § 296(1)). "An individual qualifies as an 'employer' when that individual has an ownership interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'" Id. (quoting Patrowich v. Chem. Bank, 63 N.Y.2d 541 (N.Y. 1984) (per curiam)).

### 1.    Sergeant Sweeney

Defendants argue that Sergeant Sweeney may not be found individually liable for aiding and abetting because he himself was alleged to have engaged in discriminatory actions. (Def.'s

---

[5] In Tomka, the Second Circuit allowed the plaintiff to plead claims of sexual harassment against defendants in their personal capacities where the plaintiff alleged that "each of the individual defendants assaulted her and thereby created a hostile working environment." 66 F.3d at 1317.

Mot. 12.) However, as noted above, individuals may be held personally liable for aiding and abetting even for conduct they themselves engaged in. See Tully-Boone, 588 F. Supp. 2d at 427.

Plaintiffs presented evidence at trial that Sergeant Sweeney was the commanding officer of the CSU, with direct supervisory responsibility for all other counselors. (Tr. 373-74.) The evidence showed that he both participated directly in the discriminatory conduct and failed to take appropriate remedial measures upon being informed of the discriminatory conduct of others in the unit. Sergeant Sweeney personally threatened Plaintiffs with suspension if they refused his treatment plan, and decided Nardini's treatment plan; that is to say, he personally threatened to treat them less well than other employees because of their perceived disability. (Tr. 157.) As a supervisor, he discussed every diagnosis and treatment plan with the counselors and did nothing to alter those plans even after he was aware that Plaintiffs objected to them and that other entities did not believe them to be alcoholics. (See, e.g., Tr. 383, 393, 438, 839-40.) This evidence formed a more than sufficient basis for the jury to conclude that Sergeant Sweeney had "actually participated" in the conduct giving rise to Plaintiffs' claims here.

### 2.    Commissioner Kelly

Defendants argue that Commissioner Kelly cannot be held personally liable to either Plaintiff. The Court disagrees. With regard to Commissioner Kelly's personal liability under the New York City Human Rights Law, the jury was instructed:

> "Similar to the New York State Human Rights Law, the New York City Human Rights Law also allows for liability against individual defendants like Sergeant Sweeney and Commissioner Kelly. With respect to defendant Commissioner Kelly, it is a matter of law that, as commissioner of the New York Police Department, defendant Kelly possesses sufficient power, authority, and control over the governance, administration, policies, and practices of the NYPD that he may be found personally liable for damages . . ."

(Tr. 1106.) As opposed to the instruction given with regard to Sergeant Sweeney, the jury was *not* instructed on aider-and-abettor liability with regard to Commissioner Kelly. The instruction

reflects instead only the form of direct liability provided for by N.Y. Exec. Law § 296(1) and

N.Y.C. Admin. Code § 8-107(a).

Defendants argue that Commissioner Kelly may not be held liable solely because of his

position as commissioner and that he may not be held individually liable only because he was

"aware of and approved [the Department's] discriminatory promotion and training decisions."

(Def.'s Mot. 11-12 (quoting Kellman v. Metro. Transp. Auth., 8 F. Supp. 3d 351, 393 (S.D.N.Y.

2014)). However, the authority Defendants cite deals with aider-and-abettor liability, not with an

employer's direct liability. See Kellman, 8 F. Supp. 3d at 393 ("Plaintiff asserts that Culhane and

McConville should be held individually liable under the NYSHRL and NYCHRL as aiders and

abettors."). Because Commissioner Kelly was not held liable under that theory, this authority is

irrelevant. The same is true for Defendants' point that "there is not a scintilla of evidence

demonstrating that Kelly participated—or was even aware of—any allegedly discriminatory

conduct." (Def.'s Mot. 12.) If an individual is an employer, Plaintiffs need not show that he

participated in the conduct giving rise to the claim. See Stevens v. New York, 691 F. Supp. 2d

392, 400-01 (S.D.N.Y. 2009) ("Under this provision, an individual can be liable if he has an

'ownership interest or . . . power to do more than carry out personnel decisions made by others,'

or if he 'actually participates in the conduct giving rise to a discrimination claim" (emphasis

added)); Jackson v. Battaglia, 63 F. Supp. 3d 214, 222 (N.D.N.Y. 2014) (quoting Tomka, 66

F.3d at 1317) (The statutes "provide for individual liability where the individual possessed

'power to do more than carry out personnel decisions made by others,' or is shown to have

'actually participate[d] in the conduct giving rise to a discrimination claim'" (emphasis added));

see also Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 53 (2d Cir. 2014) (quoting Townsend,

679 F.3d at 57 (2d Cir. 2012)) ("As a general rule, individuals may be subject to liability as

employers 'if they have ownership interests in the employer or do more than carry out personnel decisions of others'" (alterations omitted)); E.E.O.C. v. Suffolk Laundry Servs., Inc., 48 F. Supp. 3d 497, 524 (E.D.N.Y. 2014) (collecting cases adopting the standard described in Matusick.)

It is immaterial, then, that there was no evidence of Commissioner Kelly participating directly in the discrimination. He could be held liable solely on the basis that he had the power to "do more than carry out personnel decisions of others." Matusick, 75 F.3d at 53. The jury instruction directed that Commissioner Kelly possessed such power as a matter of law, and the New York City Charter supports that instruction. The Charter vests the Police Commissioner with the cognizance and control of the government, administration, disposition and discipline of the department, and installs him as the chief executive chargeable with and responsible for the execution of all laws and the rules and regulations of the department. [6] N.Y.C. Charter § 434. At the charge conference, regarding the instruction to the jury that Commissioner Kelly had sufficient control to be held liable as a matter of law, the Court noted, "I know counsel are both in agreement with this and have indicated that this should be told to the jury as a matter of law," and confirmed that the source of law was in fact the City Charter. (Tr. 962.) This level of control was sufficient to hold Commissioner Kelly personally liable, regardless of his own participation.

F.     **Compensatory and Punitive Damages**

Finally, Defendants contend that Plaintiffs' claims for damages fail as a matter of law. Plaintiff Makinen was awarded compensatory damages for emotional distress and mental

---

[6] Courts have understood the Charter to mean that the Commissioner is vested with official policymaking authority concerning terminations, Walton v. Safir, 122 F.Supp.3d 466, 477-78 (S.D.N.Y. 2000), that the Commissioner is "grant[ed] general control of the NYPD," Mullins v. City of New York, 634 F. Supp. 2d 373, 388 n. 5 (S.D.N.Y. 2009) aff'd, 626 F.3d 47 (2d Cir. 2010), and that the "Commissioner exercises broad discretion to manage the Police Department, necessarily including deployment of personnel and their assignment to appropriate duties. That discretion extends to personnel evaluation, investigation and discipline. It includes imposition of penalties, and specific assignment restrictions, on administratively disciplined officers." Boss v. Kelly, 776 N.Y.S.2d 772, 774 (N.Y. Sup. Ct. 2004) aff'd, 17 A.D.3d 269, 793 N.Y.S.2d 423 (1st Dept. 2005).

anguish, lost wages, and out-of-pocket costs and expenses, and was awarded punitive damages against Defendants Kelly and Sweeney. Plaintiff Nardini was awarded compensatory damages for emotional distress and mental anguish, and was awarded punitive damages against Defendants Kelly and Sweeney. In their Rule 50 motion, Defendants challenge the emotional distress awards and the punitive damage awards.

### 1.    Compensatory Damages

"Under Title VII, NYSHRL and NYCHRL, a plaintiff's recovery of damages for mental anguish is limited to compensation for actual and proven injury." Mendez v. Starwood Hotels & Resorts Worldwide, Inc., 746 F. Supp. 2d 575, 600 (S.D.N.Y. 2010). "Damages for emotional distress . . . cannot be assumed simply because discrimination has occurred." MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012) (citing Lopes v. Caffe Centrale LLC, 548 F.Supp.2d 47, 55 (S.D.N.Y. 2008); Fowler v. New York Transit Auth., No. 96 Civ. 6796 (JGK), 2001 WL 83228, at *10 (S.D.N.Y. Jan. 31, 2001)). However, "[a] compensatory award for emotional distress in a discrimination action may be based on testimonial evidence alone and is not preconditioned on whether [the plaintiff] underwent treatment, psychiatric or otherwise." Id. Here, Defendants argue that the compensatory damages awarded for emotional distress cannot be sustained as a matter of law. Defendants claim that Plaintiffs did not establish a "causal link" between Defendants' conduct and plaintiffs' emotional distress and that Plaintiffs failed to show that "other stressors in their lives" were not the true causes of their emotional distress. The Court disagrees.

Plaintiffs' testimony adequately established both their emotional distress and that their distress "flowed" from Defendants' conduct and not outside aspects of their lives. See Hiller v. Cty. of Suffolk, 199 F.R.D. 101, 104 (E.D.N.Y. 2001). In response to the question, "[H]ow has

18

this experience with the Counseling Services Unit affected you?", Makinen testified that she suffered from severe headaches, anxiety attacks, and vision loss. (Tr. 213-15.) Nardini likewise described physical and emotional symptoms, including anxiety, depression, panic attacks, hypervigilance, and sleeplessness, as a result of "this whole experience at CSU and being diagnosed." (Tr. 87-89.) She specifically testified that her symptoms began after she learned of her CSU diagnosis. (Tr. 87.) Both Plaintiffs clearly attributed a host of physical and mental symptoms to their interactions with the CSU, and both rejected invitations to attribute those symptoms to outside stressors, like their romantic relationships. (See, e.g., Tr. 214-15.) The jury credited Plaintiffs' testimony regarding both their emotional distress and the link between Defendants' conduct and that distress, and the Court will not disturb its findings.

## 2. Punitive Damages

"In analyzing punitive damages, the same federal standard applies under the NYCHRL as well as under federal law." Johnson v. Strive E. Harlem Employment Grp., 990 F. Supp. 2d 435, 449 (S.D.N.Y. 2014) (quoting MacMillan, 873 F. Supp. 2d at 563) (alterations and internal quotation marks omitted). This standard allows the recovery of punitive damages where "an employer discriminates or retaliates against an employee with 'malice' or 'reckless indifference' to the employee's federally protected rights." Carrion v. Agfa Constr., 720 F.3d 382, 386 (2d Cir. 2013) (citing Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 572 (2d Cir. 2011)). "A plaintiff can satisfy this burden by presenting evidence that (1) the employer discriminated (or retaliated) against him with conscious knowledge it was violating the law, *or* (2) that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn." Roberts v. United Parcel Serv., Inc., 115 F. Supp. 3d 344

.

(E.D.N.Y. 2015) (emphasis in original) (quoting <u>Caravantes v. 53rd St. Partners, LLC</u>, No. 09

Civ. 7821, 2012 WL 3631276, at *25 (S.D.N.Y. Aug. 23, 2012)).

"Direct evidence that an employer acted with knowledge that the discrimination . . .

violated federal law is not required; rather, the requisite state of mind may be inferred from the

circumstances." <u>MacMillan</u>, 873 F. Supp. 2d at 563 (quoting <u>Manzo v. Sovereign Motor Cars,</u>

<u>Ltd.</u>, No. 08 Civ. 1229 (JG) (SMG), 2010 WL 1930237, at *2 (E.D.N.Y. May 11, 2010)). "As an

alternative to proving that the defendant knew it was acting in violation of federal law, egregious

or outrageous acts may serve as evidence supporting an inference of the requisite evil motive."

<u>Hill v. Airborne Freight Corp.</u>, 212 F.Supp.2d 59, 76 (E.D.N.Y. 2002) <u>aff'd</u>, 93 F. App'x 260 (2d

Cir. 2004)

       *a)*     *Sergeant Sweeney*

There is sufficient evidence to support the jury's finding that Sergeant Sweeney acted

with malice or reckless indifference to Plaintiffs' right to work free from different treatment on

the basis of a perceived disability. The jury heard from Sergeant Sweeney's deposition testimony

that he oversaw the CSU; that there was no physician or psychologist on staff at the unit and that

there was "nothing clinical" about initial assessments and diagnoses; that across his 25 years in

the unit, he could not remember a diagnosis being adjusted down; that 98 percent of individuals

referred received a diagnosis of an alcohol-related problem; that such a diagnosis remained with

employees for the length of their careers; and that if employees refused treatment from the unit,

there would be repercussions on their employment. (Tr. 373-84.)

From this evidence alone, the jury could have reasonably concluded that Plaintiffs were

entitled to punitive damages from Sergeant Sweeney. While Plaintiffs did not present direct

evidence that Sergeant Sweeney acted with knowledge that the discrimination in question

violated federal law, the requisite state of mind may be inferred from the circumstances. <u>See</u>

<u>MacMillan</u>, 873 F. Supp. 2d at 563. "Arguably, it was reasonable for the jury to infer that . . .

managers knew that their actions were in violation of federal law simply by virtue of the well-

established Supreme Court case law on discrimination and retaliation, the long-standing statutory

schemes proscribing such conduct, the size of [the company], and the common knowledge in

today's society that employment discrimination is impermissible." <u>Hill</u>, 212 F. Supp. at 76.

      Based on the evidence presented of how the CSU operated under Sergeant Sweeney, his

position in the Department and the structure of the Department, and common knowledge of

statutory schemes proscribing discriminatory conduct—taken together with evidence of Sergeant

Sweeney's persistence in his course of action even when faced with evidence that Plaintiffs were

not alcoholics—the jury could infer that he "not only intentionally discriminate[d] but d[id] so in

the face of a perceived risk that these actions are prohibited by law." <u>Greenbaum v.

Handelsbanken</u>, 67 F. Supp. 2d 228, 262 (S.D.N.Y. 1999) (Sotomayor, J.); <u>see also</u> <u>Roberts</u>, 115

F. Supp. 3d at 374 (upholding punitive damages in part because defendant was "anything but

prompt" in responding to her complaints of discrimination); <u>MacMillan</u>, 873 F. Supp. at 563

(upholding punitive damages in part because employer failed to impose disciplinary sanctions in

connection with discriminatory incident). Therefore, the Court will not disturb the punitive

damages verdict against Sergeant Sweeney.

      *b)*    *Commissioner Kelly*

      The Court cannot, however, uphold the punitive damages awarded against Commissioner

Kelly, as the evidence even when viewed in the light most favorable to Plaintiffs is insufficient

to permit a reasonable jury to find that Commissioner Kelly acted with malice or reckless

indifference to Plaintiffs' rights. <u>See</u> <u>Arlio</u>, 474 F.3d at 51. As discussed above, Plaintiffs did not

21

need to establish Commissioner Kelly's personal participation in the discriminatory acts in order to hold him personally liable. But in order to recover punitive damages from him, they needed to present at least some evidence showing his "state of mind," as the "the terms 'malice' and 'reckless' ultimately focus on the actor's state of mind." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999). While it is "unnecessary to show actual malice to qualify for a punitive award, [the] intent standard, at a minimum, require[s] recklessness in its subjective form." Id. at 536 (internal citations omitted) (citing Smith v. Wade, 461 U.S. 30 (1983)). It is true, of course, that "direct evidence that an employer acted with knowledge that the discrimination . . . violated federal law is not required; rather, the requisite state of mind may be inferred from the circumstances." MacMillan, 873 F. Supp. 2d at 563 (alterations in original) (citing Manzo, 2010 WL 1930237, at *2). But Plaintiffs must present *some* evidence to establish a "positive element of conscious wrongdoing." Kolstad, 527 U.S. at 529-30.

Here, Plaintiffs presented no direct evidence of Commissioner Kelly's state of mind, nor did they present any evidence from which his state of mind could be inferred. While the jury may have inferred—based on his position and common knowledge—that Commissioner Kelly was generally familiar with antidiscrimination law, see Hill, 212 F. Supp. at 76, there was no evidence to support an inference that Commissioner Kelly "not only intentionally discriminate[d] but d[id] so in the face of a perceived risk that these actions are prohibited by law." Greenbaum, 67 F. Supp. at 262. This is because Plaintiffs presented no evidence whatsoever of Commissioner Kelly's actions or actions. Though Commissioner Kelly's position in the department is sufficient to render him individually liable under the NYCHRL, his position alone cannot substitute for the state of mind required to impose punitive damages upon him. The Court therefore must set aside the punitive damages awarded against Commissioner Kelly, as there exists "such a complete

22

absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." <u>Cash</u>, 654 F.3d at 333.

## II.      Rule 59 Motion for a New Trial

In addition to their Rule 50(b) motion for judgment as a matter of law, Defendants also bring a Rule 59 motion for a new trial, arguing that they are entitled to a new trial because of: (1) errors in the jury instructions; (2) the admission of a letter written by Counselor Joseph Stassi into evidence; and (3) the damages awarded.

### A.      Errors in Jury Instructions

Defendants first claim that the jury instructions were erroneous, in line with three arguments advanced in their Rule 50 motion: (1) the jury was not instructed that plaintiffs were required to prove they were recovering alcoholics, as defined by Section 102(16) of the NYCHRL; (2) the jury was instructed that Plaintiffs needed to establish that they were "treated differently," rather than that Plaintiffs needed to establish that they suffered an adverse employment action; and (3) the instructions did not require plaintiffs to prove that they were wrongfully perceived as an alcoholic.

"Where the court's instruction misleads the jury as to the correct legal standard or where it fails to adequately inform the jury on the law, it will be deemed erroneous." <u>Cobb v. Pozzi</u>, 363 F.3d 89, 112 (2d Cir. 2004) (citing <u>Gordon v. New York City Bd. of Educ.</u>, 232 F.3d 111, 116 (2d Cir. 2000)). "An erroneous jury instruction mandates a new trial unless the error is harmless." <u>Id</u>. As described at length above, none of the three instructions given misled the jury as to the correct legal standard. "The Court declines [Defendants'] invitation to wade through and apply each of its Rule 50(b) arguments in the Rule 59 context." <u>Stevens v. Rite Aid Corp.</u>,

23

No. 6:13-CV-783, 2015 WL 5602949, at *20 (N.D.N.Y. Sept. 23, 2015). Defendants' motion for a new trial on this ground is denied.

**B.    Admission of Stassi Letter**

Defendants next argue that the Court's admission into evidence of a letter written by a counselor who evaluated Makinen was in error. A district court has broad discretion over the admission of evidence at trial. See Kogut v. Cty. of Nassau, 789 F.3d 36, 47 (2d Cir. 2015). However, "[a] new trial is necessary if 'the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that the jury reached a seriously erroneous result or the verdict a miscarriage of justice." Barrella v. Vill. of Freeport, 43 F. Supp. 3d 136, 184 (E.D.N.Y.) (alterations omitted) (quoting Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005)). An erroneous evidentiary ruling cannot serve as grounds for a new trial if the admission of the evidence was "harmless—i.e. . . . the evidence was unimportant in relation to everything else the jury considered on the issue in question," Cameron v. City of New York, 598 F.3d 50, 61 (2d Cir. 2010) (alterations omitted) (quoting United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998)), or if the court "can conclude with fair assurance that the evidence did not substantially influence the jury." Id. (quoting United States v. Rea, 958 F.2d 1206, 1220 (2d Cir. 1992)).

The evidence at issue here is a letter, dated April 2, 2007, from Joseph Stassi. Stassi is a licensed social worker and the executive director of Counseling Mediation and Forensic Services, an office to which Makinen was referred prior to her CHU referral. (Tr. 829-33.) In the one-page letter, Stassi stated that Makinen had moderate depression and anxiety, attributable to her unstable marriage; expressed concern over the evaluation of Makinen by the Suffolk County Police Department; and stated that Makinen had been cooperative in treatment and had made

progress. At trial, Plaintiffs moved to admit the letter during the cross-examination of Sergeant

Sweeney. (Tr. 833.) Defendants objected to its admission on the grounds that the letter was

hearsay and additionally, pursuant to Fed. R. Evid. ("FRE") 403, that its probative value was

substantially outweighed by a danger of unfair prejudice and needlessly presenting cumulative

evidence. (Tr. 834-36.) Defendants specifically took issue with the letter's final paragraph, which

asserted that Makinen was not an alcoholic. (Tr. 836-37.) The Court did not exclude the letter on

hearsay grounds but did express concern that the final paragraph represented "a person's opinion

and conclusion . . . without this person testifying to the basis of this." (Tr. 837.) As a result, the

letter was admitted with the final paragraph redacted. (Tr. 837-39.)

Defendants now renew their contentions that the letter was inadmissible hearsay and that

the probative value of the letter was substantially outweighed by unfair prejudice. The Court

rejects both of these contentions. First, at trial, Defendants themselves stated that letter was "in

and of itself hearsay, but of course, it's a business record." (Tr. 835.) By this, Defendants

referred to FRE 803, which provides that "a record of an act, event, condition, opinion, or

diagnosis" that meets certain other requirements is not excluded by the rule against hearsay,

regardless of whether the declarant is available as a witness. Fed. R. Evid. 803. In addition to the

business records exception, FRE 801 defines hearsay as a statement offered to prove the truth of

the matter asserted. See Fed. R. Evid. 801(c) (" 'Hearsay' means a statement that . . . a party

offers in evidence to prove the truth of the matter asserted in the statement"). The letter here was

not admitted to prove the truth of the matter; it was instead admitted to show that Sergeant

Sweeney was aware that Makinen had been referred to Stassi prior to her referral to CHU and

that Stassi had conducted an investigation. (Tr. 829-33; 839-40.) Therefore, the letter itself was

not hearsay. See Tuccio v. Papstein, 307 F. App'x 545, 546 (2d Cir. 2009) ("[T]he challenged

paragraphs are not hearsay because defendant is not offering them for the truth of the matters asserted. The statements are instead offered to show the information [the police officer-witness] had when he applied for the arrest warrant"). The result is the same for Defendants' hearsay objection to the portions of the letter referring to "all those interviewed."[7] "Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. Again, these statements were not offered for the truth of the matter, i.e. whether Makinen was in fact histrionic or in fact intoxicated. Instead, these embedded statements were offered to show that the statements were made to Stassi in the course of his investigation. (Tr. 839.) See United States v. Ferguson, 676 F.3d 260, 286 (2d Cir. 2011) ("[T]he statement was not offered for its truth; it was offered solely for the purpose of showing that the statement was made to [the defendant].") Because neither the letter nor the statements in it were hearsay, the Court was correct in its decision to not exclude the letter on that ground.

Defendants' second argument, that the letter should have been excluded pursuant to FRE 403, is similarly unavailing. "Rule 403 favors admissibility: evidence is only excluded when its probative value is substantially outweighed by . . ." "the danger of unfair prejudice." United States v. White, 692 F.3d 235, 247 (2d Cir. 2012); see also Fed. R. Evid. 403. "Evidence is considered prejudicial if it 'involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" Hart v. RCI Hospitality Holdings, Inc., 90 F. Supp. 3d 250, 257 (S.D.N.Y. 2015) (quoting, inter alia, United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995)).

---

[7] The letter states, "Reconstructing the events of that night and discussing the events with people who were present, Officer [Makinen] was in fact histrionic. However, all those interviewed indicate they had been with her for several hours and did not see her consume any alcohol during that time period. I would ask you to keep this in mind during your evaluation for her fitness for duty . . ."

Defendants contend that "whatever miniscule probative value the letter contains is substantially outweighed by the unfair prejudice to the defendants." (Def.'s Mot. 19.) The Court disagrees. Defendants argued at trial and argue again now that the letter is of "miniscule probative value" because of the limited information in it as to Stassi's sources. (Tr. 835-36; Def.'s Mot. 19.) But regardless of the sources of Stassi's information, the letter has probative value insofar as it shows the information available to Sergeant Sweeney and the CSU at the time in question. On the other side of the equation, Defendants do not identify the prejudice that flowed from the letter's admission. At trial, Defendants identified the later-redacted paragraph as prejudicial. (Tr. 836-37.) Absent that paragraph, it is unclear what adverse effect—beyond tending to prove the fact that justified its admission into evidence—the letter has on Defendants. Defendants argue:

> "[W]hatever miniscule probative value the letter contains is substantially outweighed by the unfair prejudice to defendants. Stassi did not even identify the individuals he purportedly interviewed. Furthermore, Stassi expressed his supposed 'concern' about the evaluations made by arresting officer Andrew Derose and Duty Captain Theo Papadopoulos, but did not interview them. In fact, Stassi's dubious 'reconstruction' of events is strikingly similar to Dr. Frances's cherry picking methodology."

(Def.'s Mot. 19.) This seems to reflect a concern that the jury would attach undue significance to unreliable evidence. But the jury was apprised of the reliability of the statements of the individuals in the letter through the testimony of Sergeant Sweeney, who stated:

> "Well, actually, I don't know because he doesn't specifically say who he spoke to . . . He doesn't say he spoke to them and reconstructing the events of that night and discussed with them as to people who were present. He doesn't say who they are, who was present. I don't know who was present at that time or he doesn't even say who he spoke to. So I don't know if he did all that."

(Tr. 840.) This testimony—along with the fact that the letter was not introduced for the proof of the matter asserted—counteracted any prejudice identified by Defendants here. As at trial, the Court cannot say that the probative value of the redacted version of the letter was substantially

27

outweighed by unfair prejudice. The decision to admit it was well within the broad discretion the Court enjoys over the admission of evidence at trial. See Kogut, 789 F.3d at 47.

Both sides focused much of their briefing on whether the evidence in question was "critical to the jury's decision," and other factors going to whether the admission of the letter was harmless. Because the letter was properly admitted, the Court need not engage in this harmless error analysis. However, the Court briefly notes that even before the letter was introduced, Sergeant Sweeney testified that Makinen had been referred to Stassi in 2007. (Tr. 831-32.) And aside from the letter, the jury heard other evidence that Sergeant Sweeney had information that might call into doubt a diagnosis that Makinen was an alcoholic. (See, e.g., Tr. 827-28; 843-44.) Given the other evidence presented, the letter itself was "unimportant in relation to everything else the jury considered on the issue in question," Cameron, 598 F.3d at 61, and the Court "can conclude with fair assurance that the evidence did not substantially influence the jury." Id.

### C.   Damages

Finally, Defendants move for a new trial on the ground that the jury's award of damages was against the weight of the evidence and should be vacated. Defendants specifically contest: (1) the punitive damages awarded to both Plaintiffs against both individual Defendants; (2) the $75,000 emotional distress compensatory damages awarded to Nardini; and (3) the $6,000 lost-wages and $5,100 out-of-pocket-expenses compensatory damages awarded to Makinen.

#### 1.   Punitive Damages

When reviewing an award of punitive damages, the Court "must keep in mind the purpose of punitive damages: to punish the defendant and to deter him and others from similar conduct in the future." Patterson v. Balsamico, 440 F.3d 104, 121-22 (2d Cir. 2006) (quoting

Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992)). The Court's "task is to make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." Id. The Supreme Court has articulated three "guideposts" for reviewing punitive damages awards: "(1) the degree of reprehensibility associated with the defendants' actions; (2) the disparity between the harm or potential harm suffered and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases." Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 165 (2d Cir. 2014) (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)) (internal quotation marks omitted); see also Zakre v. Norddeutsche Landesbank Girozentrale, 344 F. App'x 628, 631 (2d Cir. 2009) (applying these guideposts to NYCHRL claims).

"The Supreme Court has noted that perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 564 (S.D.N.Y. 2012) (quoting Gore, 517 U.S. at 575) (alterations and internal quotation marks omitted). To determine the reprehensibility of a defendant's conduct, courts look to whether:

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) (citation omitted).

Defendants contend that the punitive damages awarded to each Plaintiff should be vacated based on the first Gore factor: the degree of reprehensibility.[8] As discussed above,

---

[8] Defendants also contend that the jury's award of punitive damages to Makinen should be set aside "because it does not make sense." (Def.'s Mot. 21 n. 5.) Defendants argue that the jury's verdict is inconsistent in that it found in Makinen's favor on the NYCHRL claims but not the NYSHRL claims. (Id.) However, the two statutes use different standards, as discussed above: while the NYSHRL requires a showing of an adverse employment action, the

Defendants are entitled to judgment as a matter of law on the matter of punitive damages against Commissioner Kelly, and the only punitive damages at issue are the $15,000 each Plaintiff received against Sergeant Sweeney. Sergeant Sweeney's conduct was sufficiently reprehensible to support these relatively small punitive damages awards. Through multiple interactions, spread across several years, Sergeant Sweeney repeatedly treated Plaintiffs differently because of their perceived disabilities. He oversaw the CHU and approved treatment plans based on apparently deficient diagnostic methodology. And he made and approved treatment plans despite having conflicting information regarding whether Plaintiffs were actually alcoholics. These decisions directly affected Plaintiffs' financial wellbeing, as their failure to comply could result in their losing their jobs.

"Although it is true that [Defendant's] conduct is far from the type of egregious behavior that may be found to support a significant award of punitive damages, it is equally true that the award of punitive damages in this case is relatively modest—thus reflecting what the jury may have concluded was a modest degree of reprehensibility." <u>Vasquez v. New York City Dep't of Educ.</u>, No. 11 Civ. 3674 (AJN), 2015 WL 3619432, at *15 (S.D.N.Y. June 10, 2015) (upholding punitive damages award of $20,000 where school principal told teacher he could not run an afterschool program because "she wanted a female teacher to run the program"); <u>see also</u> <u>Miranda-Ortiz v. Deming</u>, No. 94 CIV. 0476 (CSH), 2001 WL 604017, at *16 (S.D.N.Y. June 1, 2001) ("Though recognizing that the plaintiff's injuries in our case are not the most severe and differ from those in other cases, even a cursory review of the many punitive damage awards in our Circuit involving § 1983 claims shows that the $15,000 awarded in the case at bar is

---

NYCHRL requires only a showing of differential treatment. For that reason, the jury's verdict is not inconsistent and so the jury's decision to find that Defendants "not only violated the CHRL based upon the same nucleus of facts but did so with malice and reckless indifference" is not, as Defendants contend, "wholly illogical." (<u>Id.</u>)

considerably below the average . . . The Court could find no § 1983 case (nor any other case involving punitive damages for that matter) where a punitive damage award of anything approaching $15,000 was reduced as excessive.") Given the evidence presented, the modest punitive damages awarded against Sergeant Sweeney are appropriate.

### 2.    Nardini's Emotional Distress Damages

"Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." Campbell, 538 U.S. at 416 (quoting Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 432 (2001)). "Under federal law, an award will not be disturbed unless it is 'so high as to shock the judicial conscience and constitute a denial of justice.'" Rainone v. Potter, 388 F.Supp.2d 120, 122 (E.D.N.Y. 2005) (quoting Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990)).

"Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'" Graham v. City of New York, No. 08 Civ. 3518 (MKB), 2015 WL 5258741, at *25 (E.D.N.Y. Sept. 10, 2015) (quoting Olsen v. Cty. of Nassau, 615 F.Supp.2d 35, 46 (E.D.N.Y. 2009)). "Awards for 'garden-variety' emotional distress, where the evidence of the harms comes from plaintiff's testimony alone, vary widely in amount but are typically lower than those in other cases." Id. "In the Second Circuit, 'garden variety' emotional distress claims generally merit $30,000 to $125,000 awards." MacMillan, 873 F. Supp. 2d 546, 561 (S.D.N.Y. 2012) (quoting Olsen, 615 F. Supp. at 46) (internal quotation marks omitted); see also Lore v. City of Syracuse, 670 F.3d 127, 177 (2d Cir. 2012) ("This Court has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of 'testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective

distress.' . . . [W]e [previously] rejected [a] defendant's contention that those damage awards, for 'garden variety emotional distress claims,' 'should have been reduced to between $5,000 and $30,000'"); Patterson v. Balsamico, 440 F.3d 104, 120 (2d Cir. 2006) (upholding the jury's $100,000 compensatory damages award where "the plaintiff offered testimony of his humiliation, embarrassment, and loss of self-confidence, as well as testimony relating to his sleeplessness, headaches, [and] stomach pains"); Meacham v. Knolls Atomic Power Laboratory, 381 F.3d 56 (2d Cir. 2004) (upholding award of $125,000 for "subjective distress"), vacated on other grounds sub nom. KAPL, Inc. v. Meacham, 544 U.S. 957 (2005); Johnson v. Strive E. Harlem Employment Grp., 990 F. Supp. 2d 435, 456 (S.D.N.Y. 2014) ("[A]ssuming Plaintiff has proved at best 'garden variety emotional distress,' such proof generally merits only '$30,000 to $125,000' in compensation."); Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010) (noting a consensus in recent cases that "the range of acceptable damages for emotional distress in adverse employment action cases lacking extraordinary circumstances seems to be from around $30,000 to $125,000.").

The $75,000 awarded to Nardini is in line with the garden variety emotional distress damages upheld in other cases. Nardini testified that she suffers from continuing anxiety, depression, restless legs, sleeplessness, and panic attacks as a result of Defendants' conduct. (Tr. 87-79.) She described the physical symptoms of her panic attacks: her legs and armed cramp up, her tongue swells, her heart races, and she experiences tunnel vision and shortness of breath. (Tr. 89-90.) She testified that she had been prescribed anti-anxiety medication to treat her symptoms and that she continues to take the medication. (Id.) She testified that she is generally "absolutely terrified of being around alcohol, drinking alcohol, consuming alcohol, being around people that are drinking alcohol." (Tr. 85.) And she testified about a specific incident at her brother's

wedding, where she was asked to pose for a photograph holding a glass of champagne, but refused to do so out of fear that the "picture could end up at CSU, [and] [t]hey could misinterpret that picture." (Tr. 86-87). She ultimately was not in the photo at her brother's wedding because, she testified, "[O]ne picture could mean my job." (Id.)

Taken as a whole, Nardini's testimony supports the award of $75,000 for emotional distress damages. For "garden-variety" claims like hers, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." MacMillan, 873 F. Supp. at 560 (quoting Olsen, 615 F. Supp. 2d at 46) (internal quotation marks omitted). "Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration." Id. (alterations and internal quotation marks omitted). Crediting Nardini's testimony of that nature, the jury awarded her damages of $75,000, an amount within the acceptable range for garden variety damages. The Court finds that award to be appropriate.

### 3.   Makinen's Economic Damages

"Under New York law, compensatory damages for all economic injury 'must be established with reasonable certainty' and 'may not be based on pure speculation and conjecture.'" Mugavero, 680 F. Supp. 2d at 581 (quoting Kramer v. Showa Denko K.K., 929 F.Supp. 733, 743 (S.D.N.Y. 1996)). "A claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages. He need not prove the amount of loss with mathematical precision; but the jury is not allowed to base its award on speculation or guesswork." Id. (quoting Sir Speedy, Inc. v. L & P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992)).

Defendants argue that Makinen is not entitled to either lost-wages damages or out-of-pocket-expense damages because she received unlimited sick leave while in treatment and was paid her full wages for that time. Makinen did testify that she was on sick leave during her in-patient treatment, that she had unlimited sick leave, and that she was paid her full-time wage while on sick leave. (Tr. 248.) However, she also testified that when not in in-patient treatment, she had to attend Alcoholics Anonymous meetings, outpatient treatment, and individual therapy sessions on "personal" time, and she was not paid for that time.[9] (T.T. 210-11.) During those sessions, she left her children with babysitters. (Tr. 211.) Makinen testified that her total lost wages came to $25,000 for the time she was "confined" and "for those hours that I had to be in those meetings all day long." (Tr. 215.) She also testified that she spent $1,500 for babysitters for "all those nights" she was in treatment and that she spent an additional $3,600 on out-of-pocket treatment costs, including paying for treatment not covered by her insurance. (Tr. 190, 216.)

The award of economic damages is supported by the evidence, and the Court cannot say that the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice. See Nimely, 414 F.3d at 392. While Makinen was in fact paid for the time she spent in in-patient treatment, she testified that she was not paid for the time she spent in various other ordered forms of treatment. The jury seems to have taken both of those facts into account, as it did not award her the full $25,000 that she claimed in lost wages and instead awarded her only $6,000. In addition, in her testimony, Makinen calculated that she spent a total of $5,100 on out-of-pocket treatment costs. Defendants did not present any evidence to the contrary at trial, nor do they

---

[9] Defendants argue that the Court previously determined that "Makinen's treatment that took place outside work was not compensable." (Def.'s Reply 10.) Makinen testified that she participated in treatment on "personal" time. (T.T. 210.) As an initial matter, is not clear from Makinen's testimony whether by "personal" time, she meant that she attended treatment outside work hours or she meant the time was "personal" because she was not compensated for it. In addition, the portion of the Court's prior Decision to which Defendants cite deals with Makinen's Fair Labor Standards Act and New York Labor Law claims, and does not bear on her NYCHRL claim. (S.J. Order 31-33.)

explain in their Rule 59 motion why the out-of-pocket expenses damages cannot be sustained. Through her testimony, Makinen presented enough evidence for the jury to calculate economic damages with reasonable certainty. Under Rule 59, "a high degree of deference is accorded to the jury's evaluation of witness credibility, and . . . jury verdicts should be disturbed with great infrequency." <u>ING Glob.</u>, 757 F.3d at 99. The Court will not disturb this portion of the verdict.

**CONCLUSION**

Defendants' Rule 50 Motion is GRANTED as to the punitive damages awarded against Commissioner Kelly and DENIED as to all other claims. Defendants' Rule 59 motion is DENIED as to all claims.

**SO ORDERED.**

**Dated:** February 29, 2016

New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**